

EXHIBIT 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on )
her behalf and as Next )
Friend of minor JS, )
minor HS and minor AS, )
          Plaintiffs, ) Case No. 08-1171-MLB
                        )
vs.                     )
                        )
CITY OF LIBERAL,        )
KANSAS,                 )
                        )
          Defendant.    )

D E P O S I T I O N

The deposition of JON ANTRIM was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
8:05 A.M.

## Page 2

### APPEARANCES

The **plaintiffs** appeared in person by TONYA
BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas   67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas   67530

## Page 3

### I N D E X

                                          Page

JON ANTRIM
  Direct Examination by Mr. Rathbun         4

### Exhibits

                                          ID'd

Deposition Exhibit 1 (1618)                 15
Deposition Exhibit 2 (1583)                 20
Deposition Exhibit 3 (1593)                 22
Deposition Exhibit 4 (155-159)              33
Deposition Exhibit 5 (213-219)              33

## Page 4

**JON ANTRIM,**
called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:

### DIRECT EXAMINATION

BY MR. RATHBUN:

Q State your name.

A John Antrim.

Q What do you do for a living?

A I am a police officer with the City of Liberal.

Q At one point corporal, but now sergeant, as I
understand?

A That's correct.

Q All right.  Sergeant, have you ever given a
deposition before?

A First time, sir.

Q All right.  Let me kind of run through what I call
the rules of the road and we'll get this thing under
way.  When we started, you put your right hand up in
the air and took an oath, which you've probably done
many times before.

A Yes, sir.

Q Since you're under oath, it's very important that
you understand my questions before you attempt to
answer them.  So if at any point I ask a question
which sounds in any way confused or garbled, will

29

1  you know that are alcohol intoxicated?

2      MR. GLENDENNING:  Object to form.

3  A  None that I'm aware.

4  Q  (BY MR. RATHBUN)  And the one way you would know

5  that is obviously if you'd received training for

6  that; correct?

7  A  Yes, sir.

8  Q  Use of force just because of the liability potential

9  that it offers you, that it maybe subjects you to as

10  a police officer, is that something that you have

11  tried to study over the years?

12  A  Yes, sir.

13  Q  And you have gone through training sessions in terms

14  of use of force?

15  A  Yes, sir.

16  Q  If I ask you to tell me the difference between -- if

17  I talk about somebody being hog tied, you know what

18  that means?

19  A  Yes, sir.

20  Q  What does that mean?

21  A  Basically they're handcuffed and then their feet are

22  tied with a hobbled restraint or whatever is

23  available and then that is attached to their

24  handcuffs.

25  Q  And what's the difference, if there is, between a

30

1  hobble restraint and hog tying?

2  A  The hobble restraint is not actually attached to the

3  handcuffs.

4  Q  It's just your legs --

5  A  Legs are tied together.

6  Q  Well, your legs are tied together -- okay.

7      Are there times -- what is the -- what's

8  the policy of the Liberal police department in terms

9  of when you use hobble and when you use hog tie, if

10  there is one?  I'm not suggesting that there is.

11  A  I don't believe there is one.

12  Q  So it's left up -- when to hog tie and when to

13  hobble is left up to the officer's discretion?

14  A  Yes, sir.

15  Q  And you've never had training to teach you maybe

16  when you should use one and when you should use the

17  other?

18  A  They've talked about it as to the point of they

19  caution us using the hog tie.  Haven't prohibited

20  it.  Just based upon circumstances, we are allowed

21  to still use that.

22  Q  And what would be the -- when did they talk to you

23  about that?

24  A  It's -- it's always been cautioned not to -- to use

25  the hog tie, dependent upon circumstances.

31

1  Q  What does that mean?  What circumstances would it be

2  dependent upon?

3  A  The behavior of the -- of the person.

4  Q  What does that mean?

5  A  They're combative, if they're kicking, if they're

6  kicking out the windows, obviously, the -- the hog

7  tie, as you refer to it, would be a viable option.

8  Q  Or if they're combative on the ground, struggling

9  with you, is it Liberal police department policy

10  that hog tying is okay in that case?

11  A  If they're kicking and they won't stop, yes.

12  Q  All right.  So, basically, as you understand the

13  policy and as you've been taught, the hog tie should

14  only be used where you're getting resistance to

15  taking someone down?  Would that be a fair

16  statement?

17      MR. GLENDENNING:  Object to form.

18  A  It's used to stop the resistance of that person.

19  Just because they resist doesn't mean that we're

20  going to do it, but if they're kicking and won't

21  comply then -- then, yes.

22  Q  If they're kicking and struggling, that's the signal

23  that hog tie is okay?

24      MR. GLENDENNING:  Object to form.

25  A  Yes.

32

1  Q  (BY MR. RATHBUN)  All right.  How many times have

2  you used a Taser on a member of the public?

3  A  An exact number, I can't quote you.  I can give you

4  a range.

5  Q  Just a range would be all right.

6  A  Between 10 and 20.

7  Q  All right.  And did this start shortly after you

8  were given your first M26?

9  A  Several months.

10  Q  All right.  And would you characterize your usage of

11  the Taser as being average -- let me ask -- I mean,

12  maybe you don't even know how other officers on the

13  force do this.  When I say officers, I don't mean

14  that specific rank.  I mean other -- other --

15      MR. GLENDENNING:  Is there a question?

16      MR. RATHBUN:  I didn't get there yet.

17      MR. GLENDENNING:  Okay.

18  Q  (BY MR. RATHBUN)  Let me just start all over.  Do

19  you think you use the Taser less, average or more

20  than anyone else on the force?

21      MR. GLENDENNING:  Object to form and

22  foundation.

23  A  I -- I don't know.  There's officers I don't work

24  with.  There's shifts I don't even see so I don't

25  know.

61

1    pictures of Mr. Soto other than Keating? Did you
2    see?
3  A  Not that I know of.
2    All right. What happened next?
5  A  We -- Sergeant Odle arrived on the scene. Was
6    briefed of the situation. He asked if we felt that
7    we needed EMS to respond. I told him no, 'cause we
8    were going to the hospital, anyway, for a mental
9    evaluation and then we were going to transport him.
10 Q  Okay. What happened next?
11 A  I went to the bed of -- of the truck where I looked
12   through the clothing and I found Mr. Soto's I.D.
13 Q  Okay. What did you do then?
14 A  I then took my clothes -- or I took his clothes to
15   the trunk of my car, got in my car, put my mike
16   pouch back into the -- the mike and turned the
17   camera off.
18 Q  Why did you do that?
19 A  'Cause we were fixing to load him up and the
20   incident, in my eyes, was over. He was handcuffed
21   and secured and we were just going to load him up
22   and take him to the hospital.
23 Q  From the time you turned off the camera -- what
24   happened -- what happened after you turned off the
2?   camera?

62

1  A  After we turned off the camera, we went up -- we
2    went up and made sure everybody was taken care of.
3    We picked him up and carried him back to my car. It
4    was a matter of minutes after we turned off the
5    camera.
6  Q  Okay. Then what happened?
7  A  At the time we picked him up, Mr. Soto was still
8    moaning, making the noises he'd been making the
9    whole entire time, mumbling. We picked him up,
10   began to carry him. As we got towards the back door
11   of my police car, that's when Mr. Soto went limp.
12 Q  What did you do?
13 A  At that time I had them place him on the ground.
14   Laid him on his side, on his right side. I noticed
15   that it appeared that he was having some difficulty
16   breathing. At that time I requested an ambulance to
17   respond.
18 Q  What time would that have been? You were indicating
19   on --
20 A  Approximately 1817.
21   Q  6:17?
2z A  Yes, 6:17 p.m.
23 Q  How do you know that?
24 A  Again, by the communication radio logs.
25 Q  And this would have been about, you say 6:09 was the

63

1    time he was secured?
2  A  Yes, sir.
3  Q  6 -- let's see here. I need to make sure. It may
4    have been 6:07. Look back at your report and tell
5    me, would you?
6  A  6:09 p.m. is when I advised communications that he
7    was handcuffed.
8  Q  All right. How long after that did you turn off
9    your camera?
10 A  I turned off the camera approximately 1815, by the
11   communications logs.
12 Q  And how would the communication log know that?
13 A  I don't know. That was just -- it's an approximate
14   from the time we picked him up to the time that we
15   requested an ambulance.
16 Q  You didn't look on the logs to see that you turned
17   off your camera at 8:15 (sic); that's just your
18   estimate from looking at the logs?
19 A  Right.
20 Q  I had misunderstood you. I thought you said
21   according to radio logs --
22 A  I --
23 Q  -- at 8:15 -- or 1815 which implied to me that you
24   had looked at the radio logs to see an entry for
25   turning off the camera.

64

1  A  No, no, no. I'm sorry.
2  Q  That's all right. It's not your fault.
3         So you think you turned off the camera
4    about 6:15. 6:17 you called for EMS?
5  A  Uh-huh.
6         MR. GLENDENNING: Yes?
7  A  Yes. Sorry.
8  Q  (BY MR. RATHBUN) What happened when you saw that he
9    wasn't breathing?
10 A  When he was having the difficulty breathing, I had
11   Officer Dixon remove the -- the hog tie or the dog
12   leash that he was secured with.
13 Q  Why is that? Why was that?
14 A  Why was that? Just to relieve him from his
15   restraints. We also removed the handcuffs.
16 Q  Okay.
17 A  Had Officer McCord check to see if there was a
18   pulse. Officer McCord checked his pulse and stated
19   that there was one. I continued to monitor him
20   until it appeared that he was no longer breathing.
21   Immediately after he stopped breathing, I had --
22 Q  Let me ask you there. So McCord felt for a pulse
23   and found one?
24 A  Yes.
25 Q  You later felt for a pulse and didn't find one?

77

1          MR. GLENDENNING: Okay. At what point?

2  **Q** (BY MR. RATHBUN) When he turned off the camera.

3  **A** I had made the comment to Odle on the video -- you
4    could hear it -- that I was going to be taking him
5    to the hospital. We don't normally call and let
6    them know we're coming. We just take 'em to the
7    hospital and then they take 'em into triage and go
8    from there.

9  **Q** Do you have to get in your car and turn the camera
10    off?

11  **A** Yes.

12  **Q** That's the only camera that would have had a --
13    that's the only video camera that would have had a
14    view of the last couple minutes of his life;
15    correct?

16          MR. GLENDENNING: Object to form.

17  **A** To my knowledge, yes.

18  **Q** (BY MR. RATHBUN) Position wise, of where he was?
19          Could you get us on the next one, please.
20          (A second video was started.)

21  **Q** (BY MR. RATHBUN) All right. Car Number 5.
22          (An off-the-record discussion was
23    had.)

24  **Q** (BY MR. RATHBUN) Okay. This starts going at -- let
25    me ask you here. What does the B stand for?

78

1  **A** Brake. Means he's touching his brakes.

2          (Video running.)

3  **Q** (BY MR. RATHBUN) Okay. So at this point, 6:06:09
4    on this camera, he's -- Dixon is pulling up behind
5    the pickup?

6  **A** That's correct.

7  **Q** And we see in the foreground, in the background of
8    the left-hand side, who do we see there, or can you
9    make any of those out?

10  **A** Can I turn it this way?

11  **Q** Sure.

12  **A** Head and McCord are down here and if we play a
13    little bit more, maybe I can tell better.

14  **Q** The problem is, he pulls up and you just can't see
15    much.

16          (Video running.)

17  **Q** (BY MR. RATHBUN) So when he's parked there at
18    6:06:12, you can just see one individual there?

19  **A** That's McCord.

20  **Q** Okay. What's -- explain to me there -- I'm going to
21    stop it at 6:07, basically. The officer's picked
22    him up. What was going on there? Could you tell?

23  **A** That's where he started squirming and kicking. If
24    you'll rewind it just a little bit. Little bit
25    more.

79

1          (Video running.)

2  **Q** (BY MR. RATHBUN) Okay. They stand up at 6:06:45.
3    It looked like they moved him over.

4  **A** No. He started squirming and rolling and trying to
5    kick.

6  **Q** Who's got his legs there?

7  **A** Dixon.

8  **Q** All right. Dixon's holding his legs crossed and
9    then holding his legs down?

10  **A** Uh-huh.

11  **Q** Who's on the front of him?

12          MR. GLENDENNING: Object to form.

13  **Q** (BY MR. RATHBUN) Probably can't -- we can't see in
14    this, can we?

15  **A** I don't know.

16  **Q** I'm going to jump ahead a couple minutes.

17          (Video running.)

18  **Q** (BY MR. RATHBUN) Now, who is this at -- whoops.
19    Oh, I messed that up. I'm sorry.
20          (Video running.)

21  **Q** At 6:10:25 who is that that's staying in front of
22    the -- is that Sergeant Odle?

23  **A** That's me.

24  **Q** Oh, that was you. What were you doing there?

25  **A** I don't recall.

80

1  **Q** Okay.

2          (Video running.)

3  **Q** (BY MR. RATHBUN) Is that you again?

4  **A** Yes.

5  **Q** At 6:10:59 you were looking for something in the
6    back of the pickup. What were you looking for;
7    clothes?

8  **A** That's when I picked up his clothes to take them to
9    my car.

10  **Q** Okay. And that's when we see you before, walk
11    around and you turn your camera off?

12  **A** Yeah, eventually.

13          (Video running.)

14  **Q** (BY MR. RATHBUN) All righty. Who just -- at
15    6:12:17, who just walked in front of us there?

16  **A** That's Ratzlaff.

17  **Q** And Ratzlaff, is that when they're doing the hog
18    tie?

19  **A** It appears, yes.

20  **Q** Okay.

21          (Video running.)

22  **Q** (BY MR. RATHBUN) All right. So it looks like it's
23    6:13:09 and he's being hog tied and he's being
24    carried now somewhere and that's the last in this
25    videotape you see him. Right?

**Page 1**

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on )
her behalf and as Next )
Friend of minor JS, )
minor HS and minor AS, )
)  Case No. 08-1171-MLB
Plaintiffs, )
)
vs. )
)
CITY OF LIBERAL, )
KANSAS, )
)
Defendant. )

D E P O S I T I O N

The deposition of CHRISTOPHER HEAD was
taken on behalf of the plaintiff before
CINDY L. FENTON, a Certified Shorthand Reporter of
Kansas, at Jury Room, Seward County Courthouse, 415
North Washington, Liberal, Kansas, on December 9,
2008, commencing at 9:18 A.M.

**Page 2**

## APPEARANCES

The **plaintiffs** appeared by:

**RANDALL K. RATHBUN**

Depew, Gillen, Rathbun & McInteer

8301 East 21 Street, Suite 450

Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**

Watkins Calcara, Chtd.

P. O. Drawer 1110

Great Bend, Kansas  67530

**Page 3**

### I N D E X

Page

CHRISTOPHER HEAD
Direct Examination by Mr. Rathbun          4

### Exhibits

ID'd

Deposition Exhibit 1          10
Deposition Exhibit 2          50
Deposition Exhibit 3          46
Deposition Exhibit 4          22
Deposition Exhibit 5          55

**Page 4**

(Marked Deposition Exhibit 1, 2, 3 and
4.)

**CHRISTOPHER HEAD,**

called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. RATHBUN:

Q What's your name?

A **Christopher Nelson Head.**

Q Where you live, Officer?

A **Liberal, Kansas.**

Q All right.  Have you ever given a deposition before?

A **No, sir.**

Q All right.  You understand when we started you put
your right hand up in the air and took an oath?

A **Yes.**

Q Since you did that, it's very important that you
understand my questions before you attempt to answer
them.  So if at any point I ask a question which
sounds confused or garbled, will you ask me to
straighten it up?

A **Yes, I will.**

Q If you go ahead and answer the questions today,
then, will it be fair for the jury and I to assume
that you understood the question?

33

1 A Yes.

2 Q Anything else? You have it there handy? You want

3 to --

4 A I do, if you don't mind.

5 Q Sure. Go ahead.

6 A Our Taser is designed to control an aggressive and

7 violent subject when a threat and/or resistance has

8 been or being perceived.

9 Q Did you consider John to be violent and aggressive?

10 A When I was there, very much so.

11 Q Do you know what he was like before you got there?

12 A Only from the radio.

13 Q Did you consider him to be violent and aggressive

14 before you got there?

15 A Yes, I did. When he took off running, then that's a

16 sign of aggression. We didn't know where he was

17 going to go. McDonald's was right there. The

18 highway was right there. He could have caused an

19 accident, someone gotten hurt. He could have gotten

20 hit by a car. So yes, I do.

21 Q So in your nomenclature, fleeing is a violent act,

22 an aggressive act?

23 A In a situation like this, we didn't know what he was

24 going to do. He was naked. He wasn't thinking

25 clearly. Of course, I wasn't there at the time, but

34

1 from what I seen on the video, I believe that he

2 should have been tased.

3 Q So the answer is, yes, fleeing is an aggressive act?

4 MR. GLENDENNING: Object to the form.

5 A With the totality of the circumstances in this

6 situation, yes.

7 Q (BY MR. RATHBUN) All right. Were you able to find

8 out if he had a history of drug or mental problems?

9 A Not myself. I was told that he used cocaine.

10 Q But that was later on?

11 A Yeah.

12 Q Okay.

13 A I didn't know who Mr. Soto was at the time.

14 Q All right. I think at this point, someone went to

15 get a raincoat or something to cover John; is that

16 right?

17 A Yes, I did.

18 Q You did?

19 A Yes.

20 Q And where did you find that?

21 A I didn't find one. After I -- after he was

22 handcuffed and I got off of him. When we found out

23 who he was, I tried to contact dispatch to see if

24 they could -- had any family information on him. We

25 have a system called Sleuth. If someone's been

35

1 dealt with in the past then their information is

2 in the computer. They can check that. Check different

3 records and see if he has any family members or any

4 known cases where we dealt with them for mental

5 issues.

6 After I contacted dispatch, I then went

7 and started looking in patrol cars for something to

8 cover him up with. My initial thought was a

9 raincoat, because normally officers carry raincoats

10 in their bags, but I wasn't able to find anything to

11 cover him up with.

12 Q I think at the same time you were looking for that,

13 someone else found a dog leash?

14 A Yes.

15 Q What happened to that?

16 A It was used as a hobble restraint -- makeshift

17 hobble restraint to avoid Mr. Soto from kicking and

18 becoming aggressive again.

19 Q What's a hobble restraint?

20 A It's used to secure the hands and the feet with a --

21 a length of cord or something to stop them from

22 kicking.

23 Q Is that sometimes referred to as hogtied?

24 A No.

25 MR. GLENDENNING: Object to form.

36

1 Q (BY MR. RATHBUN) It's not. You've never heard it

2 called a hogtie?

3 MR. GLENDENNING: Object to form.

4 A No.

5 Q (BY MR. RATHBUN) No?

6 A A hogtie is when you tie someone where their feet

7 and hands are touching and it's extremely tight

8 where their feet and hands are against their rear.

9 In my training, a hobble restraint is when

10 you -- you don't -- you don't get that aggressive.

11 You just use the instrument to stop them from

12 kicking.

13 A hogtie is much more aggressive. A

14 hobble restraint is less -- less aggressive and it's

15 not as tight, to give the person some freedom of

16 movement.

17 Q In your understanding, hogtie is where their feet

18 are actually touching their hands?

19 A In my training and experience, yes.

20 Q What about if there's, like -- what about if you

21 give them nine inches or whatever between their feet

22 and their hands, is that --

23 A I would still say --

24 MR. GLENDENNING: Just a minute. I didn't

25 hear the last word of the question. Let him finish

1    his question.

2 **Q** Is that a hogtie or a hobble?

3        MR. GLENDENNING:  Object to the form and

    foundation.

5 **Q** (BY MR. RATHBUN)  Go ahead.

6 **A** I would say that that's too close to be a hobble

    **restraint.  I think you need more.**

8 **Q** How far?

9 **A** Two feet.  Just enough to keep them from kicking.

10 **Q** Have you seen the videotape in this?

11 **A** Yes.

12 **Q** What's the distance between the feet and the hands

    when he was restrained?

14 **A** I would say probably about two feet, maybe.  I don't

    **know.  There's nothing to really show us to scale,**

    **but I know that his feet were -- when his legs were**

    **bent, they were barely on his thighs.  They weren't**

    **close to being tightly against his buttocks nor his**

    **hands.**

20        MR. GLENDENNING:  You said parallel to his

    thighs.

22 **A** I'm sorry.  Like a 90-degree angle to his thighs.

23 **Q** (BY MR. RATHBUN)  You said they were --

24 **A** They appeared to be approximately a 90-degree angle

    **with his thighs.  He had room to move his feet back**

1    **and forth until the hobble restraint restrained him.**

2 **Q** So if his -- his legs are straight up at the knees?

3 **A** When they picked him up, they were.

4 **Q** And you've looked at the video?

5 **A** Yes.

6 **Q** Does it look like he could -- does it look like they

    were pulled back further than that or straight up at

    the knees or --

9        MR. GLENDENNING:  Object to form.

10 **Q** (BY MR. RATHBUN)  Go ahead.

11 **A** I don't understand the question.

12 **Q** Sure.

13        You've looked at the video?

14 **A** Yes.

15 **Q** You saw that his legs were crossed?

16 **A** Yes.  I saw they were crossed whenever they -- I

    **don't know if he uncrossed them when they picked him**

    **up, though.**

19 **Q** I'm talking about when he's laying on the ground.

    His legs were crossed; correct?

    **A** Yes.

22 **Q** Feet were tied together?

23 **A** Yes.

24 **Q** Now, were his feet, if -- bent at the knees, feet

    straight up in the air, that would be the 90 degrees

1    you were talking about?

2 **A** Yes.

3 **Q** All right.  Were they -- were they -- if I decrease

    the degrees and go feet closer to the rear, did you

    notice how -- were they ever held down closer than

    that in the restraint?

7        MR. GLENDENNING:  Object to the form.

8 **A** After they got them tied, I don't believe so.  I

    **know that Dixon was holding him that close to keep**

    **him from kicking them.  After -- after his feet and**

    **hands were hobbled together, you could clearly see**

    **that he had a distance between his hands and his**

    **feet.**

14 **Q** (BY MR. RATHBUN)  Who tied him?

15 **A** I don't know.  I noticed Dixon had his feet and I

    **don't know who did the hands.**

17 **Q** That wasn't you?

18 **A** No.

19 **Q** I assume their description of how they tied them

    would be more accurate than yours?

21        MR. GLENDENNING:  Object to form and

    foundation.

23 **A** You can see on the video that he had -- his knees

    **were bent at an approximate 90-degree angle.**

25 **Q** (BY MR. RATHBUN)  Okay.  That wasn't my question.

1    My question is, the person that tied them

    would know better than you how they tied him?

3        MR. GLENDENNING:  Object to form and

    foundation.

5 **Q** (BY MR. RATHBUN)  Go ahead.

6 **A** I guess so, yes.

7 **Q** Are you familiar with positional asphyxia?

8 **A** Yes.  That's when someone is placed in a position

    **long enough where they can't breathe, they end up**

    **passing out?**

11 **Q** Does it also involve how they're restrained?

12        MR. GLENDENNING:  Object to form.

13 **A** I would say that somebody can be upside down or just

    **be laying in the wrong angle and have positional**

    **asphyxia.  I don't know if it has anything to do**

    **with being restrained.**

17 **Q** (BY MR. RATHBUN)  All right.  In your way of

    thinking, positional asphyxia is not related to the

    type of restraint?

20        MR. GLENDENNING:  Object to form.

21 **A** I think if someone were in a position even if they

    **weren't restrained then they could be asphyxiated.**

23 **Q** (BY MR. RATHBUN)  Okay.  But that wasn't my

    question.

25 **A** I don't understand your question.  I'm sorry.

**Page 1**

```
          1
 1
 2
 3
 4        IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF KANSAS
 5
 6    TONYA BOWEN-SOTO, on      )
      her behalf and as Next   )
 7    Friend of minor JS,      )
      minor HS and minor AS,   )
 8                             )  Case No. 08-1171-MLB
            Plaintiffs,        )
 9                             )
      vs.                      )
10                             )
      CITY OF LIBERAL,         )
11    KANSAS,                  )
                               )
12          Defendant.         )
13
              D E P O S I T I O N
14
15
16
17
18         The deposition of JEFF KEATING was taken
19    on behalf of the plaintiff before CINDY L. FENTON, a
20    Certified Shorthand Reporter of Kansas, at
21    Conference Room, Liberal Inn, 603 East Pancake,
22    Liberal, Kansas, on October 22, 2008, commencing at
23    12:25 P.M.
24
25
```

**Page 2**

### APPEARANCES

The **plaintiffs** appeared in person by TONYA BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas 67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas 67530

**Page 3**

### INDEX

Page

JEFF KEATING
Direct Examination by Mr. Rathbun          4

### Exhibits

ID'd

Deposition Exhibit 7 (00007-00009)          6
Deposition Exhibit 8 (206-209)              7

**Page 4**

**JEFF KEATING,**
called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:
(Marked Deposition Exhibits 7 and 8.)
### DIRECT EXAMINATION
BY MR. RATHBUN:

Q What's your name?

A **Jeffrey Dale Keating.**

Q What do you do for a living?

A **I'm a police officer for the City of Liberal.**

Q Mr. Keating, have you ever had your deposition taken before?

A **In other trials -- or other matters, yes.**

Q A deposition or trial testimony?

A **Deposition.**

Q What would that be about?

A **One of them was a case I was involved in when I was chief of police for Tyrone, Oklahoma.**

Q What would that have involved? Just --

A **That was involved with a suit that the City and I were named in for violation of constitutional rights I believe is what it was.**

Q An allegation of excessive force or --

A **Yes, I believe so.**

Q Was that case settled or tried?

33

1 Q And when would this have been, do you know?

2 A In the '90s.

3 Q Sometime between '88 and '94?

A Yes.

5 Q Had you seen him since then?

6 A No.

7 Q So what was going on that evening before when you

8 said you had called to go to -- I forgot what street

9 you said. Washington Street?

10 A Uh-huh.

11 Q What was going on that evening?

12 A Just that Officer Almes had reported a subject

13 wearing a yellow shirt, I believe, that was seen

14 running from a known drug house. Basically, when

15 Deputy Finn had located him in the garage, we just

16 did a field interrogation of him and released him.

17 Told me -- in fact, we talked. I asked John if he

18 was still on probation or parole. He said no; that

19 he'd done his time in prison and was out. Told me

20 he was living with his mother and I forget the

21 address he stated he was living at. But it was in

22 Liberal.

23 Q Uh-huh. And you let him go at that point?

24 A Yes.

25 Q All right. That was the first time you'd seen him

34

1 since back in Tyrone?

2 A (Non-verbal response.)

3 Q Yes?

4 A Yes.

5 Q All right. And at that point, again, he started

6 actively resisting the officers, according to your

7 notes? You can look if you want.

8 A Uh, yes.

9 Q I'm sorry. We're back to --

10 A Back to --

11 MR. GLENDENNING: Object to form.

12 Q (BY MR. RATHBUN) We're back to the scene now. He

13 stated Jeff something, and he acted as if he had

14 recognized you; right?

15 A Yes.

16 Q And at that point, again, he started actively

17 resisting the officers and trying to roll over and

18 kick at the officers?

19 A Yes.

20 Q So what happened then?

21 A At that point that's when I left and went to a

22 patrol car to get a camera because it's --

23 Q What was the purpose for the camera?

24 A It's department policy that, if possible, you

25 photograph whenever a Taser is deployed where the

35

1 probes hit on the person.

2 Q Why is that?

3 A For evidence.

4 Q So you did that?

5 A I went and got the camera. I came back. Had

6 photographed the location where the probe had struck

7 Soto in the back and I photographed where the probe

8 was found that hit the pavement. And I believe I

9 photographed where he had -- where he had gotten

10 entangled in the wire from the probe that was in

11 him.

12 Q Okay. What happened then?

13 A At that point --

14 Q Is still kicking -- I mean, is he still kicking

15 at this point?

16 A Yes.

17 MR. GLENDENNING: Object to form.

18 A Yes.

19 Q (BY MR. RATHBUN) Okay. What happened then?

20 A At that point I went to take the camera back to the

21 car, being I wasn't -- wasn't in the area.

22 Q What did they do with the legs, do you know?

23 A I know I observed that they used a nylon restraint

24 to control his kicking.

25 Q How did they do that?

36

1 A They tied his legs up and basically brought 'em back

2 up to his back to try to -- and that's for officer

3 safety and his safety as well.

4 Q So you cross the legs and then tie the legs together

5 and then pull the legs back so that they can't kick?

6 A That's how it's normally done, but I didn't get

7 close enough to see how they'd done it.

8 Q You ever heard that referred to as hog tie?

9 A Sure.

10 Q Is that what that would be? Is that what that would

11 have been?

12 A Yes.

13 Q What happened then?

14 A Like I said, I was putting the camera up. I saw

15 Corporal Antrim and Officer McCord, and I don't

16 recall who the third officer was, carry him to

17 Antrim's patrol car.

18 Q How long would that have taken from the time they

19 got the hog tie on to them carrying him to the car?

20 A I don't recall how long that took.

21 Q Just time enough for you to put your camera away?

22 A Yes.

23 Q Were you doing anything else?

24 A No.

25 Q Okay. What did you see as they were taking him to

## Page 1

```
                                                    1

 1
 2
 3            IN THE UNITED STATES DISTRICT COURT
 4                    DISTRICT OF KANSAS
 5
 6    TONYA BOWEN-SOTO, on      )
      her behalf and as Next   )
 7    Friend of minor JS,      )
      minor HS and minor AS,   )
 8                             ) Case No. 08-1171-MLB
                  Plaintiffs,  )
 9                             )
      vs.                      )
10                             )
      CITY OF LIBERAL,         )
11    KANSAS,                  )
                               )
12                Defendant.   )
13
                D E P O S I T I O N
14
15
16
17
18        The deposition of JOHN McCORD was taken on
19    behalf of the plaintiff before CINDY L. FENTON, a
20    Certified Shorthand Reporter of Kansas, at
21    Conference Room, Liberal Inn, 603 East Pancake,
22    Liberal, Kansas, on October 22, 2008, commencing at
23    1:26 P.M.
24
25
```

## Page 2

```
                                                    2
 1
 2
 3              APPEARANCES
 4
 5   The plaintiffs appeared in person by TONYA
 6   BOWEN-SOTO, and by:
 7   RANDALL K. RATHBUN
 8   Depew, Gillen, Rathbun & McInteer
 9   8301 East 21 Street, Suite 450
10   Wichita, Kansas  67206-2936
11
12   The defendant appeared by:
13   ALLEN G. GLENDENNING
14   Watkins Calcara, Chtd.
15   P. O. Drawer 1110
16   Great Bend, Kansas  67530
17
18
19
20
21
22
23
24
25
```

## Page 3

```
                                                    3
 1
 2
 3                   I N D E X
 4
 5                                            Page
 6
 7   JOHN McCORD
 8   Direct Examination by Mr. Rathbun          4
 9
10
11
12
13                   Exhibits
14
15                     ID'd
16
17   Deposition Exhibit 9 (0010-0012)          18
18
19
20
21
22
23
24
25
```

## Page 4

```
                                                    4
 1             (Marked Deposition Exhibit 9.)
 2                  JOHN McCORD,
 3   called as a witness on behalf of the plaintiff,
 4   having been first duly sworn, testified as follows:
 5             DIRECT EXAMINATION
 6   BY MR. RATHBUN:
 7   Q  What's your name?
 8   A  John McCord.
 9   Q  What do you do for a living?
10   A  I'm a police officer.
11   Q  You ever had your deposition taken before?
12   A  Never.
13   Q  All right.  Let's go over what I call the rules of
14      the road here so you can kind of know what's going
15      to be going on today.  When you came in here, you
16      put your right hand up in the air and took an oath,
17      which means it's very, very important that you
18      understand my questions before you attempt to answer
19      them.  So if I ask a question which sounds confused
20      or garbled in any way, will you ask me to straighten
21      it out?
22   A  Sure.
23   Q  Can we just have an understanding today if you don't
24      understand it, then you're not going to answer it?
25      Okay?
```

25

1  A  When I pulled in, I seen Antrim had his Taser
2     pointed at him. Ratzlaff was -- was on the ground
3     struggling with Soto. As I stopped my truck and got
4     out, Soto had grabbed Ratzlaff by the back of the
5     leg, causing him to fall backwards and I went over
6     and grabbed ahold of his right arm.
7  Q  Was he on the ground at the time on his knees or --
8  A  For certain, I'm not sure which position. He was
9     low 'cause I remember having to scoop down to grab
10    his -- his arm.
11 Q  You grabbed his right arm?
12 A  Yes.
13 Q  Ratzlaff and was Head there at the time?
14 A  Yes. We got there, same time, we arrived together.
15 Q  And Head was helping Ratzlaff on the left arm?
16 A  I remember Head -- no, I think Head was on the same
17    arm that I had.
18 Q  Okay. So both you guys were working on the right
19    arm. Is anybody helping Ratzlaff on the left arm?
20 A  I think Keating. I think Keating was on his left
21    arm.
22 Q  Okay. And was he -- was anyone -- did anyone have
23    any of their weight on him to hold him down,
24    Mr. Soto?
25 A  I know I didn't at that time.

26

1  Q  Did anybody else?
2  A  I'm trying to look in the narrative --
3  Q  Sure.
4  A  -- if it was in there or not. According to my
5     narrative it said that Head was on his back.
6  Q  Okay. At this -- at this time, was Antrim trying to
7     drive stun him or was it later?
8  A  It was around that.
9  Q  They keep saying "dry" in here. Drive stun?
10 A  Drive stun, yes.
11 Q  Drive stunning him?
12 A  It was sometime around that -- that time frame.
13 Q  So you got your handcuffs then on his right, right
14    hand?
15 A  Yes.
16 Q  Right wrist. And then it looks like Ratzlaff put
17    handcuffs on his left wrist?
18 A  Yes.
19 Q  Okay. Then it looks like to secure his feet they
20    got some leash from a dog, tied his feet; is that
21    correct?
22 A  Eventually.
23 Q  Okay. I'm reading here. "A pair of handcuffs came
24    from Officer Ratzlaff and we secured his left hand."
25 A  Uh-huh.

27

1  Q  Then the next paragraph, it said secured his feet so
2     he would not start to kick. How much time ran
3     between those two?
4  A  I honestly don't know.
5  Q  When you said "eventually," it made it seem like
6     maybe you were suggesting more time had gone by?
7  A  After he was handcuffed, I remember Dixon was
8     holding his feet down and he eventually let up off
9     his -- off his feet and then Soto started kicking.
10 Q  So then you tied his -- not you, but his feet were
11    tied at that point?
12 A  Yes.
13 Q  And how did that work? Were they crossed?
14 A  I don't know.
15 Q  You watched the video last evening?
16 A  Yes.
17 Q  Did you happen to notice?
18 A  I -- I didn't see his feet.
19 Q  Okay. Would it be correct that his -- according to
20    your report here --
21 A  They wrapped the rope around his feet, bent his
22    knees and then tied the rope to the handcuffs.
23 Q  Is that called hog tying?
24 A  Used to be.
25 Q  What's it called now?

28

1  A  I don't know what the technical term is for it, but
2     it's the same concept.
3  Q  You don't call it hog tying now?
4  A  We don't call it hog tying, but that's how we secure
5     people's feet.
6  Q  Well, are you not supposed to hog tie now?
7        MR. GLENDENNING: Object to form.
8  A  Oh, we don't call it hog tying anymore, but it's the
9     same principle.
10 Q  It's the same thing; you just don't call it that?
11 A  Sure.
12 Q  All right. After you got him secured, you noticed
13    then you had blood on your hands --
14 A  Yes.
15 Q  -- from a wound on Mr. Soto's head?
16 A  Yes.
17 Q  What do you -- you're saying they are, the next
18    paragraph, "As we waited for Officer Keating to get
19    the camera from the car, I kept my right knee on
20    Soto's back on the right side." Now, what was the
21    purpose for the camera?
22 A  To photograph where the Taser dart had hit Soto.
23       MR. RATHBUN: Allen, would you pull up
24    picture MVC 968 S.
25       MR. GLENDENNING: You mean 698?

29

1      MR. RATHBUN:  Yeah.  The dyslexic lawyer
2  here.
3      MR. GLENDENNING:  Yes.  I've got it.
4  Q  (BY MR. RATHBUN)  Does that appear to be pictures
5  taken of him laying on the ground there?
6      MR. GLENDENNING:  Just one picture.
7      MR. RATHBUN:  Yeah.  Well, you're going to
8  show him the next one in a minute.
9  A  It does.
10  Q  (BY MR. RATHBUN)  The -- the white object to the
11  right of his tattoo, is that the cord from the
12  probe, from the Taser probe?
13  A  The probe itself or the wire?
14  Q  The wire.
15  A  Yes.
16  Q  And I take it the other -- the other probe missed?
17  A  Yes.
18  Q  Is that your understanding of why it wasn't working?
19  A  Yes.
20  Q  All right.  And we go to the next one.  Same thing?
21      MR. GLENDENNING:  Which is MVC 699 S.  He
22  asked you if that's the same.
23  A  Oh, I'm sorry.  Yes.
24  Q  (BY MR. RATHBUN)  At this point you have removed
25  your knee from his back so you could take these

30

1  pictures?
2  A  It looks like my knee is on his shoulder.
3  Q  I was just going by your report here.  It says you
4  pulled it out of his back?
5  A  That was the Taser dart that I pulled out of his
6  back.
7  Q  Oh, I'm sorry.  You're right.  All right.
8      And while he was on the ground, at this
9  time -- at this point he was still talking; correct?
10  A  Correct.
11  Q  The last thing you heard him say was "sorry, Jesus"?
12  A  Yes.
13  Q  Do you -- not you, but are you -- when you do a
14  drive stun, are you supposed to also indicate the
15  Taser's been deployed to 91- -- to dispatch?
16  A  Again, it depends on the circumstances.  We're not
17  required to notify dispatch.  If the situation
18  allows us to notify them, then we will.
19  Q  But if you're in the middle of a struggle, you don't
20  do it, obviously?
21  A  Right.
22  Q  All right.  Next paragraph, Antrim grabbed Soto's
23  left arm.  You grabbed his right arm, and then you
24  guys started to carry him to the patrol car;
25  correct?

31

1  A  Correct.
2  Q  And what happened then?
3  A  We carried him towards Antrim's car.  Officer Head
4  told us to -- to be careful 'cause it -- it looked
5  like Soto was ejaculating.  At that point, according
6  to my narrative, that we had put him down on the
7  ground.
8  Q  Rolled him onto his side?
9  A  Yes.
10  Q  At this point then set him back down.  Felt for a
11  pulse and at first -- the first time you felt for a
12  pulse, you could feel it; correct?
13  A  Correct.
14  Q  And then you guys took off the cuffs and cut the
15  rope.  And you felt again and then the second time
16  you couldn't find the pulse; right?
17  A  Right.
18  Q  And Odle at that time then told Antrim to start CPR?
19  A  Yes.
20  Q  Now, when was fire rescue called?  Before then or
21  after then or --
22  A  I don't know.
23  Q  When did they get there?
24  A  Couldn't tell you.  I don't know what time it was.
25  Q  Were they -- were they still doing CPR when fire

32

1  rescue got there?
2  A  Me and Antrim were doing CPR.
3  Q  And did you guys continue to do that until EMS got
4  there or did the --
5  A  I don't know if --
6  Q  -- fire rescue got there.
7  A  -- if we continued when the fire department arrived
8  or if they continued.  I don't remember, but I know
9  we -- we did CPR until -- until I remember that the
10  fire department arrived there and started getting
11  their stuff ready.
12  Q  What happened next?
13  A  I remember that the ambulance eventually got there.
14  Everybody there was -- was working on -- on
15  Mr. Soto.  I drove the ambulance to -- to the
16  hospital while they worked on him in the back.
17  Q  How was it that you happened to drive it to the
18  hospital?
19  A  They needed somebody to drive the ambulance.  So I
20  jumped in the driver's seat and went.
21  Q  All right.  Give me one minute.
22      (Recess taken.)
23  Q  (BY MR. RATHBUN)  Did your badge get broken in this
24  deal?
25  A  My name tag.

**Page 1**

```
                                              1

 1

 2

 3        IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF KANSAS
 4

 5
     TONYA BOWEN-SOTO, on      )
 6   her behalf and as Next    )
     Friend of minor JS,       )
 7   minor HS and minor AS,    )
                               ) Case No. 08-1171-MLB
 8          Plaintiffs,        )
                               )
 9      vs.                    )
                               )
10   CITY OF LIBERAL,          )
     KANSAS,                   )
11                             )
            Defendant.         )
12

13        D E P O S I T I O N

14

15

16

17

18       The deposition of DENNIS MULANAX was taken

19   on behalf of the plaintiff before CINDY L. FENTON, a

20   Certified Shorthand Reporter of Kansas, at

21   Conference Room, Liberal Inn, 603 East Pancake,

22   Liberal, Kansas, on December 9, 2008, commencing at

23   11:03 A.M.

24

25
```

*COPY* (watermark)

---

**Page 2**

```
                                              2

 1

 2

 3              APPEARANCES

 4

 5   The plaintiffs appeared by:

 6   RANDALL K. RATHBUN

 7   Depew, Gillen, Rathbun & McInteer

 8   8301 East 21 Street, Suite 450

 9   Wichita, Kansas  67206-2936

10

11   The defendant appeared by:

12   ALLEN G. GLENDENNING

13   Watkins Calcara, Chtd.

14   P. O. Drawer 1110

15   Great Bend, Kansas  67530

16

17

18

19

20

21

22

23

24

25
```

---

**Page 3**

```
                                              3

 1

 2

 3                I N D E X

 4

 5                                        Page

 6

 7   DENNIS MULANAX

 8     Direct Examination by Mr. Rathbun       4

 9

10

11

12

13                Exhibits

14

15                                        ID'd

16

17   Deposition Exhibit 1                    61

     Deposition Exhibit 2                    33
18   Deposition Exhibit 3                     6

19

20

21

22

23

24

25
```

---

**Page 4**

```
                                              4

 1        (Deposition Exhibit 1, 2 and 3.)

 2              DENNIS MULANAX,

 3   called as a witness on behalf of the plaintiff,

 4   having been first duly sworn, testified as follows:

 5              DIRECT EXAMINATION

 6   BY MR. RATHBUN:

 7   Q  What's your name?

 8   A  Dennis Mulanax.

 9   Q  Where do you live?

10   A  Liberal, Kansas.

11   Q  Have you had your deposition taken before?

12   A  Yes, I have.

13   Q  How many times?

14   A  Once.

15   Q  What would that have involved?

16   A  It was with a civil suit in which an officer was

17      suing a supervisor.

18   Q  For some sort of harassment?

19   A  Racial discrimination.

20   Q  All right.  How long ago was that deposition?

21   A  Fifteen --

22   Q  It doesn't matter.

23   A  Fifteen years ago.

24   Q  In terms of process, I'm going to ask you questions

25      today.  You put your hand up in the air and took an
```

**45**

1    MR. GLENDENNING: This one?

2 Q (BY MR. RATHBUN) This is a different one. This is

3    the one prior to this one here. Okay.

A Yes.

5 Q And you review these disks carefully when you get

6    them; right?

7 A I try to, yes.

8    MR. RATHBUN: All right. Could you go

9    back out and go to support materials. Medical info.

10    Excited delirium, Power Point. Would you just open

11    that up first? Would you just run the show?

12 Q (BY MR. RATHBUN) Would you have gone through

13    this -- do you have Power Point capability? Would

14    you have gone through this Power Point?

15 A Yes.

16 Q So we know as of November of '04 you had this?

17 A Yes.

18 Q Can we move on with this? Let's go onto a couple --

19    you talk about cocaine. It kind of -- hit it some

20    more. Go ahead. Keep going. All right. I'm

21    sorry. Okay. Here we go.

22    This talks about symptoms and behavioral

23    patterns, again, bizarre and aggressive behavior;

24    correct?

25 A Yes.

**46**

1 Q Dilated pupils, fear, high temperature, hiding

2    behind things, irrational, incoherent speech,

3    jumping into water. There's more of them. Panic,

4    paranoia, profuse sweating, public disrobing,

5    self-inflicted injuries, shivering, shouting,

6    seizures, unexpected physical strength, violent

7    behavior.

8    This is something that, again, a number of

9    these are the things that we were seeing with

10    Mr. Soto; right?

11    MR. GLENDENNING: Object to form.

12 Q (BY MR. RATHBUN) Go ahead.

13 A Not all of those, from what I saw, or from the brief

14    video that I watched, but, yes.

15 Q Certainly a number of them?

16 A Yes.

17 Q All right. Do you remember reading about Cruz vs.

18    The City of Laramie, Wyoming, on hogtying?

19 A Briefly, yes.

20 Q Have you taught your officers about hogtying?

A No.

22 Q What's hogtying?

23    MR. GLENDENNING: Object to form and

24    foundation.

25 A Hogtying is an unpolitical term -- or unpolitically

**47**

1    correct term that departments use for which I refer

2    to as a total restraint in which the subject's arms

3    are more or less -- where the subject's arms are

4    restrained with a connection device to the legs.

5 Q (BY MR. RATHBUN) On their stomach, arms behind

6    their back, then legs tied to their hands?

7 A Could be referred to that, or it could be referred

8    to the hands to the feet up front.

9 Q All right.

10 A I've heard a few general descriptions of what you

11    were referring to as hogtying. Again, I don't refer

12    to it as hogtying.

13 Q Would you allow one of your subjects to be placed on

14    their stomach with their hands behind their back and

15    then their legs pulled up and have their hands tied

16    to their legs?

17    MR. GLENDENNING: Object to form.

18 Q (BY MR. RATHBUN) Do you teach that that's

19    appropriate?

20    MR. GLENDENNING: They don't teach that.

21 Q (BY MR. RATHBUN) If that happens, that would be

22    contrary to your training?

23    MR. GLENDENNING: Object to form.

24 A The training then or the training now?

25 Q (BY MR. RATHBUN) In '06?

**48**

1 A Again, I didn't -- we don't teach what you refer to

2    as hogtying. We just now teach that we're not going

3    to do it.

4 Q When did you start doing that?

5 A The last time I did it was this morning and --

6 Q When did you start?

7 A This morning, as far as officially teaching it. As

8    far as putting the word out?

9 Q Yeah.

10 A Since this situation.

11 Q Since this lawsuit was filed?

12 A No. It's been -- it hasn't been told to the

13    officers that they can't do it. It's been told

14    unofficially, not in a training atmosphere or a

15    policy or a written directive atmosphere, that we

16    won't be doing it.

17 Q When did you start doing it?

18 A This morning.

19 Q I'm sorry. One other thing. Do you agree with what

20    Taser was telling you that excited delirium is

21    regarded as a medical emergency with a psychological

22    presentation?

23    MR. GLENDENNING: Object to form and

24    foundation.

25 A I would -- I would agree with that generally, yes.

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on        )
her behalf and as Next      )
Friend of minor JS,         )
minor HS and minor AS,      )
                            )  Case No. 08-1171-MLB
            Plaintiffs,      )
                            )
vs.                         )
                            )
CITY OF LIBERAL,            )
KANSAS,                     )
                            )
            Defendant.      )


            D E P O S I T I O N


        The deposition of DAVID ODLE was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
2:18 P.M.
```

**Page 2**

### APPEARANCES

The **plaintiffs** appeared in person by TONYA BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas  67530

**Page 3**

### INDEX

Page

DAVID ODLE
Direct Examination by Mr. Rathbun          4

### Exhibits

ID'd

Deposition Exhibit 10 (177-178)          6
Deposition Exhibit 11 (361-363)         13
Deposition Exhibit 12 (212-328)         22
Deposition Exhibit 13 (189-192)         22
Deposition Exhibit 14 (308-321)         15

**Page 4**

### DAVID ODLE,

called as a witness on behalf of the plaintiff, having been first duly sworn, testified as follows:

(Marked Deposition Exhibits 10, 11, 12, 13 and 14.)

### DIRECT EXAMINATION

BY MR. RATHBUN:

**Q** What's your name?

**A** David Odle.

**Q** Lieutenant now; right?

**A** Lieutenant now.

**Q** All right. Lieutenant, have you ever given a deposition before?

**A** One other.

**Q** Tell me about that. How long ago was it?

**A** It was in the mid '90s, Virginia, before I became a police officer. It was a civil action on a motor vehicle accident.

**Q** Okay. Plaintiff or defendant?

**A** Kind of in the middle. They were -- I was one guy that got hit of several so it was just --

**Q** Okay. You were in the chain reaction?

**A** Yeah.

**Q** All right. You probably don't remember too well the rules of that. So I'll kind of go over the rules of

37

1  getting the one telling me what they are supposed to
2  be doing and we'll go from there.  I know that gets
3  you in trouble sometimes, but -- okay.
4  Q  (BY MR. RATHBUN)  Let's look at your narrative.
5  What's the little --
6  A  This is mine.
7  Q  Yeah.  This, what is it?  What's the little D number
8  on there at the bottom?
9  A  155.
10  Q  Okay.
11        MR. GLENDENNING:  Wait a minute.
12  Exhibit 4 is Antrim's.  Where's yours?
13  A  Oh, there's mine.
14        MR. GLENDENNING:  Exhibit 10 is his.
15  Q  (BY MR. RATHBUN)  And what number down --
16  A  177.
17  Q  Okay.  Any of these guys, while you were there
18  watching them do anything wrong in your viewpoint?
19  A  Are you asking me do I believe any of the officers
20  on scene at this time did anything wrong?
21  Q  Right.
22  A  No, I don't believe they did.
23  Q  They followed the policy as the City outlined it to
24  them?
25  A  I believe they're -- the officers' on scene's

38

1  actions were correct.
2  Q  And to the extent they did anything wrong, it was
3  because they'd been trained the wrong way?
4        MR. GLENDENNING:  Object to form and
5  foundation.
6  A  I -- I don't believe their actions were incorrect.
7  Q  (BY MR. RATHBUN)  I understand that, but I asked a
8  different question.
9        MR. GLENDENNING:  No.
10  Q  (BY MR. RATHBUN)  They performed as how they'd been
11  trained; right?
12        MR. GLENDENNING:  Object to form and
13  foundation; and it's been asked and answered.
14  Q  (BY MR. RATHBUN)  Go ahead.
15  A  I believe they acted as they have been trained and
16  correctly.
17  Q  All right.  When you pull up to a scene and you've
18  got a naked guy standing there yelling that one of
19  your officers has a nuclear device, does that say to
20  you that this person has some problems?
21        MR. GLENDENNING:  Object to form and
22  foundation.
23  A  I have never responded directly to a scene initially
24  that had a guy naked making those statements.  It's
25  certainly not normal police work that we deal with,

39

1  those type of --
2  Q  It's not the normal thing you run into every day in
3  Liberal, Kansas?
4  A  Exactly.
5  Q  All right.  As you pulled up there, it was obvious
6  there was something wrong with this guy?
7        MR. GLENDENNING:  Object to form.
8  A  When -- when I arrived, he was handcuffed and lying
9  on the ground.
10  Q  (BY MR. RATHBUN)  Oh.  All right.  All right.
11  What's a -- I'm looking at your -- what's a hobble
12  restraint.
13  A  It is a length of nylon cord used to bind an
14  individual's feet together.
15  Q  All right.  Is there a difference between a hobble
16  restraint and a hog tie?
17        MR. GLENDENNING:  Object to form.
18  A  I'm -- I'm not really familiar with a hog tie, per
19  se, beyond what would be used to tie cattle or
20  something like that.  Hobble restraint is merely to
21  bind someone's feet together, physically together.
22  Q  (BY MR. RATHBUN)  And does it -- like, can I be
23  sitting in a chair and my feet -- sitting in a chair
24  with my feet out in front of me with my feet tied
25  together?  Is that hobble restraint?

40

1  A  Yes, it is.
2  Q  What if I'm lying on my stomach and my arms are
3  handcuffed behind me and my legs are pulled up and
4  my feet -- that hobble restraint on my feet is tied
5  to my hands behind me, is there a term for that?
6  A  Not that I'm aware of.
7  Q  Is that something that you would train your officers
8  to do?
9  A  To tie the subject's feet to their handcuffs?
10  Q  Yes.
11  A  Is that what you're saying?
12  Q  Yes.
13  A  The idea behind a hobble restraint is to keep
14  someone from kicking.  If it continues beyond that,
15  they'll have to be essentially held or something,
16  but I have never tied somebody's feet to their
17  hands.
18  Q  Did you see that in this case?
19  A  No.
20  Q  Did you know that had happened?
21  A  I saw the hobble restraint on his feet, but it --
22  when I observed him, it did not appear that they
23  were connected.
24  Q  If they were connected, would that be all right with
25  you?  You see any problem with that?

41

1  A  I don't know that it would change the position or
2     his actions greatly if they were to be connected
3     somehow.
4  Q  So connected somehow, as in legs pulled up behind
5     and tied to the hands, is that a problem or not?
6        MR. GLENDENNING: Object to form.
7  A  The -- the feet could be given enough -- given
8     enough restraint.
9  Q  (BY MR. RATHBUN) The feet could be given enough
10    restraint? What does that mean?
11 A  The feet could be tied if there was a long enough
12    restraint, yes.
13 Q  What kind of long enough restraint would you need?
14 A  Depends on the height of the person.
15 Q  Is there anything wrong with just laying someone
16    down on their stomach, crossing their legs, tying
17    them and then bringing them up so that they tie them
18    to the hands?
19        MR. GLENDENNING: Object to form.
20 Q  (BY MR. RATHBUN) Is there a problem with that?
21        MR. GLENDENNING: Object to form. Go
22    ahead.
23 A  Okay. I -- I don't see any problem with that, no.
24 Q  (BY MR. RATHBUN) All right. But you didn't know
       that's what had happened in this case; right?

42

1  A  As I stated before, when I arrived it appeared that
2     his feet were hobbled together, but I --
3  Q  But not hog tied?
4        MR. GLENDENNING: Object to form.
5  A  His feet were hobbled together, but didn't appear to
6     be attached to anything else.
7  Q  (BY MR. RATHBUN) Are you having problems with the
8     word "hog tied"? Have you never heard that before?
9  A  I've heard the term "hog tied," but --
10 Q  And you know what that means, don't you?
11 A  I know what I believe it to mean.
12 Q  What do you believe it to mean?
13 A  That your hands and feet are tied together in some
14    fashion.
15 Q  So if he's on his stomach and his arms are
16    handcuffed behind him, hog tied would mean his legs
17    were brought up and tied with his arms behind him;
18    right?
19        MR. GLENDENNING: Object to form.
20 A  If -- if the items were tied together, the feet,
21    hands.
22 Q  (BY MR. RATHBUN) And you didn't see that in this
23    case?
24 A  No, I don't -- I don't recall ever seeing his feet
25    tied to his hands or the handcuffs.

43

1  Q  Okay. How long did you get there before they
2     started carrying him back to Antrim's vehicle to
3     take him to -- let me back up.
4        Do you know what they were going to do
5     with him?
6  A  At what point?
7  Q  When they started carrying him back towards Antrim's
8     vehicle.
9  A  Prior -- prior to him being transported back to the
10    car, I asked Antrim if we needed medical assistance,
11    an ambulance. He stated he didn't believe so, but
12    we were going to need to take him to be evaluated at
13    Southwest Med, the hospital. It was my belief when
14    he was being transported to the car that he was
15    going to be transported directly to Southwest
16    Medical Center.
17 Q  And, in fact, you have here in your report the
18    officers then picked up Mr. Soto and began
19    transporting him back to Car 11 where he was going
20    to be transported to Southwest Medical Center; is
21    that correct?
22 A  That's correct.
23 Q  Okay. Were you there when this was going on,
24    standing right there by the vehicle?
25 A  When we were transporting, yes, I was walking beside

44

1     the officers.
2  Q  When the officers sat him on the ground to open the
3     car door, it appeared that he became unconscious and
4     passed out. Was that your observation?
5  A  That was my observation, yes.
6  Q  Was he sitting up and just fell over or how did --
7     what did you see?
8  A  When they were carrying the gentleman to the car, he
9     had -- was speaking to the officers or saying
10    something apparently to the officers. We got back
11    to where the patrol unit was at. He quit talking at
12    that point. The officers sat him on the ground next
13    to the patrol car. He became limp and slumped to
14    one side.
15 Q  Like sat him on the ground as in seated?
16 A  He was -- he was seated next to the -- towards the
17    rear of the patrol car.
18 Q  And then just kind of fell over to the side?
19 A  Just kind of slumped over, yes.
20 Q  Look at Deposition Exhibit 12, which is the time
21    frame and see if you can look at that to give me an
22    idea of the approximate time that happened.
23        MR. GLENDENNING: Object to form and
24    foundation.
25 A  At what time he slumped over?

**Page 1**

10:17AM

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on            )
her behalf and as Next         )
Friend of minor JS,            )
minor HS and minor AS,         )
                               )  Case No. 08-1171-MLB
            Plaintiffs,        )
                               )
vs.                            )
                               )
CITY OF LIBERAL,               )
KANSAS,                        )
                               )
            Defendant.         )

D E P O S I T I O N

        The deposition of JARED RATZLAFF was taken
on behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
10:29 A.M.

**Page 2**

APPEARANCES

The **plaintiffs** appeared in person by TONYA
BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas   67206-2936

The **defendant** appeared by:
**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas   67530

**Page 3**

I N D E X

                                          Page

JARED RATZLAFF
    Direct Examination by Mr. Rathbun        4


Exhibits


                                          ID'd

Deposition Exhibit 6 (128-129)               6

**Page 4**

**JARED RATZLAFF,**
called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. RATHBUN:

Q   What's your name?

A   **Jared Ratzlaff.**

Q   Officer, what do you do for a living?

A   **I work for the City of Liberal police department.**

Q   How long you done that?

A   **Since January of 2004, so almost five years.**

Q   Have you ever given a deposition before?

A   **No, I haven't.**

Q   All right.  Let me run through what I call the rules
    of the road here, just so you know kind of what
    we're going to be doing today.  Since you took an
    oath when we started, it's very, very important that
    you understand my questions before you attempt to
    answer them.  So if at any point I ask a question
    which sounds confused or garbled in any way, will
    you ask me it straighten it out?

A   **Yes, sir.**

Q   And can we have an agreement that if you don't
    understand it, you're just not going to answer it?

A   **Yes, sir.**

---

**29**

1  of his right arm?

2  **A Yes, sir.**

3  Q Keating was trying to get control of his head?

4  **A Yes.**

5  Q And was Dixon there at the time on the legs or not?

6  **A I'm not real sure when he showed up.**

7  Q Okay. Were the four of you -- let's say not

8  counting Dixon at this point. Were the four of you

9  able to get him under control?

10  **A No.**

11  Q What happened?

12  **A He was fairly strong and just, there was -- we**

13  **couldn't get his arms out from underneath him. It**

14  **took everything we had and eventually we were able**

15  **to, but it took a long time.**

16  Q And you heard the Taser going off at times during

17  this struggle?

18  **A Yes.**

19  Q How many times did he discharge the Taser? Do you

20  know?

21  **A I'm not sure.**

22  Q How long did the struggle take for you to get him

23  under control?

24  **A I really don't know for sure.**

25  Q All right. And at some point Dixon arrived, then,

---

**30**

1  and got control of the legs?

2  **A Yes, sir.**

3  Q While this was going on, Antrim was drive stunning

4  him, trying to get control?

5  **A Yes, sir.**

6  Q And then you went back to Patrol Car 26 and grabbed

7  a dog leash; right?

8  **A After getting him in handcuffs; yes, sir.**

9  Q And what was the purpose of the dog leash?

10  **A We use the dog leash when people are trying to kick**

11  **officers or to control the legs.**

12  Q Is that -- do you call that a hog tie or what do you

13  call that?

14  **A A hobble restraint.**

15  Q A hobble restraint?

16  **A Yes, sir.**

17  Q Do you know what a hog tie is?

18  **A Yes.**

19  Q Is that different than a hobble restraint?

20  **A Not really.**

   Q They're the same in thing your viewpoint?

22  **A Yes, sir.**

23      MR. RATHBUN: When you -- I told you I

24  wouldn't need that video tape again, but I may need

25  the second one, the --

---

**31**

1      MR. GLENDENNING: Car 5?

2      MR. RATHBUN: Car 5 towards the end there.

3  I wanted to get --

4      MR. GLENDENNING: When he's putting up the

5  tape?

6      MR. RATHBUN: Yeah. I also want to get it

7  there where he is -- at 6 -- at 6:12, if you can get

8  it to 6:12.

9      MR. GLENDENNING: 1812? These are police

10  tapes. You're going to have to get that language

11  down.

12      MR. RATHBUN: I've done this more than I

13  care over the years. I'm back to civilian stuff

14  now, man.

15      MR. GLENDENNING: What are you looking

16  for?

17      MR. RATHBUN: When he goes to the car and

18  gets the leash. It's right about 6:12. Then see if

19  you can enlarge it. Okay. Here we go.

20      (Video running.)

21      MR. RATHBUN: Can we stop that?

22      MR. GLENDENNING: Yeah.

23  Q (BY MR. RATHBUN) Who was that that just walked over

24  there?

25  **A That is me.**

---

**32**

1  Q And you have -- that's when you have the dog leash

2  in your hand?

3  **A I don't know if I had it at that point or not.**

4      MR. RATHBUN: Let's back up.

5      MR. GLENDENNING: Back up and look at it

6  closer.

7  Q (BY MR. RATHBUN) Maybe you can conclude that as you

8  see what you do with it.

9      (Video Running.)

10      MR. RATHBUN: He may have to just watch

11  what he does there before he can say for sure what

12  he's doing.

13      MR. GLENDENNING: I'll just go by real

14  slow frame by frame so you can see what you have in

15  your hand, maybe.

16  **A Okay.**

17  Q (BY MR. RATHBUN) You recognize what -- what you're

18  doing there?

19  **A Yes, I do.**

20  Q Are you -- this is on Car 5 at 18:12:20. It looks

21  like you're wrapping his legs?

22  **A Yes, sir.**

23  Q All right. Keep going. It looks like at some point

24  you turn this over to Dixon to do?

25  **A Yes, sir.**

---

33

1 Q All right. Let me ask you, in terms of restraining
2   individuals with the hog tie or hobble, whatever you
3   want to call it, do you have training -- have you
4   had training on that with the P.D.?
5 A **Just training while I was in field training with a**
6   **field training officer.**
7 Q At KLETC or --
8 A **No, on-the-street training here.**
9 Q Okay. And what training would that have been?
10 A **On the -- when we're arresting somebody that's**
11  **kicking us while they're on the ground we'll take**
12  **the restraint, tie it around their legs and tie it**
13  **to their handcuffs in the back, and then carry them**
14  **to the car in that fashion. Untie it from their**
15  **hands and shut it in the door at that point.**
16 Q Shut what in the door?
17 A **Shut the dog leash in the door so they can sit**
18  **upright.**
19 Q So -- but it keeps their legs still tied together --
20 A **Yes.**
21 Q -- but you untie them from the cuffs?
22 A **Right.**
23 Q And I take it, the closer you get the legs tied to
24  the cuffs, the less they move?
25 A **Yes.**

34

1 Q So you try and get it as close to the cuffs as you
2   can?
3       MR. GLENDENNING: Object to the form.
4 A **We just try to get it where they can't kick the knot**
5   **loose.**
6 Q So there's no slack in it, in other words?
7 A **Right.**
8 Q So you try and push the legs back as far as you can
9   get it so that -- so that they can't kick their legs
10  around?
11      MR. GLENDENNING: Object to form.
12 Q (BY MR. RATHBUN) Go ahead.
13 A **Not necessarily, no.**
14 Q Well, if you don't push the legs all the way back,
15  then how do you keep them from kicking?
16 A **I'm not real sure what you're asking or how to**
17  **answer what you're saying.**
18 Q You're doing a good job then. You're supposed to
19  ask me to clarify.
20      Obviously, the closer you get the legs to
21  the cuffed hands, the less the legs can move;
22  correct?
23 A **Yes.**
24 Q So is it your goal to try and stop the kicking,
25  then, to get the legs as close to the cuffs as you

35

1   can?
2       MR. GLENDENNING: Object to form.
3 A **No.**
4 Q (BY MR. RATHBUN) Okay. What's your goal?
5 A **The goal is just to get the legs and the hands**
6   **secured to a point where they can't continue to**
7   **kick.**
8 Q Where there's no slack between the two?
9 A **There may be some slack, but not enough to where**
10  **they can kick.**
11 Q And you learned how to do that from field training
12  from somebody that you were riding around with --
13 A **Yes, sir.**
14 Q -- showed you how to do that?
15 A **Yes, sir.**
16 Q And who was that?
17 A **It would have been Sergeant Antrim, Sergeant Wade,**
18  **and I believe that's it.**
19 Q Is there any written procedure you know of about
20  when you use the hog tie?
21 A **Not that I can recall right now.**
22 Q And you've never had any -- and you've never had any
23  training from Mulanex or any of the other highers up
24  on how to use a hog tie and when to use it?
25 A **Not that I can recall, anyway.**

36

1 Q All right. What happened then after the legs were
2   secured?
3 A **After the legs were secured, I went back to my**
4   **patrol car to get hand sanitizer for myself.**
5 Q Is that in the videotape where Antrim yells, "Jeff,
6   get my hand sanitizer"? Is that --
7 A **No, that's at a different point.**
8 Q Okay. What happened next?
9 A **I came back up to where we were at and started**
10  **collecting the Taser cartridge and the probes for**
11  **evidence purposes.**
12 Q Okay. At this point is he still laying in the same
13  place with the arms behind his back and the legs or
14  has he been moved?
15 A **I'm not --**
16      MR. GLENDENNING: Object to form.
17 A **I'm not sure.**
18 Q (BY MR. RATHBUN) Okay. What happens next?
19 A **I heard somebody ask Soto if he was okay. Turned**
20  **back around and saw Officer McCord pulling the**
21  **handcuffs off of him and checking for a pulse.**
22 Q Okay. What did you do at that point?
23 A **I went back up to see if I could assist, but we had**
24  **officers that were already performing CPR. So,**
25  **again, I just started scene security to make sure**