IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA A. BOWEN-SOTO, as Administrator )
of the Estate of Juan Soto, Jr.,                           )
                                        Plaintiff,            )
                                                               )
          v.                                                  )          Case No. 08-1171-MLB-DWB
                                                               )
CITY OF LIBERAL, KANSAS,                      )
                                        Defendant.         )
_____)

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### DEFENDANT'S STATEMENT OF FACTS[1]

1.      At about 6:00 p.m. on August 30, 2006, Liberal police officers responded to a 911 dispatch advising that a naked man was outside of a McDonald's yelling obscenities at people. (Antrim Depo. 36:8 thru 37:17; Ratzlaff Depo. 20:13-17; Head Depo. 16:25 thru 17:2.)

2.      Exhibit A is a true and correct copy of the dispatch CAD card. (Odle Depo. 23:9 thru 25:4.)

3.      Officer Antrim responded and found Soto naked, holding his hands over his face and talking.  (Antrim Depo. 41:25 thru 42:15.)

4.      Antrim arrived on the scene at approximately 6:05 p.m. and was out of his car to contact Soto at 6:05:56 p.m.  (Odle Depo. 26:20 thru 27:4; 23:9 thru 25:4; Exhibit A.)

5.      An officer cannot be faulted for taking a minute or two to determine whether he is dealing with a case of excited delirium (ED).  (Scott depo. 60:6-13.)

_____

[1]Where there is a material question of fact, defendant has adopted the version most favorable to plaintiff for purposes of summary judgement.  Defendant reserves the right to contest these facts if the case survives to trial.

1

6.     Officer Antrim attempted to establish verbal rapport, telling Soto numerous times that he wanted to help him.  (Antrim Depo. 46:1-16; 46:21 thru 47:7.)

7.     Officer Antrim intended to transport Soto to the hospital for medical and/or psychiatric evaluation upon taking him into custody.  (Antrim Depo.61:4-22; Odle Depo. 43:7-22.)

8.     While Officer Antrim was attempting to establish verbal rapport with Soto, another citizen approached causing Soto to run.  (Antrim Depo. 46:21 thru 47:9.)

9.     When Soto ran from Antrim, he was running in the direction of the McDonald's restaurant and one of Liberal's busiest intersections.  (Ratzlaff Affd., para. 2.)

10.    Antrim chased Soto and discharged his taser.  (Antrim Depo. 47:10-25.)[2]

11.    Officer Ratzlaff got on Soto's back to handcuff him.  (Antrim Depo. 50:3-17.)

12.    Ratzlaff is 6 ft., 5 inches tall  and weighed 270-280 lbs at the time.  (Ratzlaff Affd., para. 1.)

13.    As Ratzlaff was attempting to handcuff Soto, Soto did an "amazing push up to a standing position with Ratzlaff on his back. (Antrim Depo. 50:11-17; Ratzlaff Depo. 26:11-14.)

14.    Antrim again Tased Soto with no effect.  (Antrim Depo. 50:18-23.)

15.    Three other officers arrived and attempted to handcuff Soto.  (Antrim Depo. 51:7-24.)

16.    Antrim drive stunned Soto with no effect. (Antrim Depo. 51:22 thru 52:21.)

17.    Soto would not relinquish his hands to be handcuffed.  (Antrim Depo. 53:12-18; Ratzlaff Depo. 27:14 thru 29:15; Head Depo. 23:16 thru 25:2; McCord Depo. 25:1 thru 27:12.)

---

[2]The deployment  of the taser in this situation was proper.  (Scott Depo. 36:4-9, Ex. 1 p. 8.)  Plaintiff has abandoned all  claims of inappropriate taser use. (Rathbun Letter, Doc. 76, p.2.)

18.     Despite the number of officers, the struggle with Soto was one of the hardest struggles one of the officers had ever experienced.  (Head Depo. 23:16 thru 25:2.)

19.     The officers were not able to get Soto's hands all the way behind his back; Soto was handcuffed with two sets of handcuffs attached to each other, allowing him more movement than a single set of handcuffs would have.  (Antrim Depo.57:1-6; Head Depo. 28:9-17. )

20.     Soto was handcuffed at approximately 6:09 pm.  (Antrim Depo. 62:25 thru 63:7.)

21.     After Soto was handcuffed, two of the officers had blood on them from the struggle and proceeded to clean and sanitize themselves. (Antrim Depo. 59:25 thru 60:4.)

22.     After Soto was handcuffed, he calmed a bit and called Keating by name. (Keating Depo. 31:16 thru 32:25.)

23.     Officer Keating knew Soto to be a drug addict from past dealings with him.  (Keating Depo. 31:16 thru 32:25.)

24.     After talking to Keating, Soto began to resist again and kick at the officers.  (Keating Depo. 34:12-19.)

25.     Ratzlaff obtained a dog leash from his car to restrain Soto's legs.  (Ratzlaff Depo. 30:6-22.)

26.     The restraint used on Soto allowed approximately two feet between his hands and feet.  (Head Depo. 37:12 thru 38:3; Ratzlaff Depo. 34:1 thru 35:10.)

27.     Some literature defines a "hog-tie" as a restraint in which there is less than one foot between the ankles and the handcuffs and a restraint with a greater distance as a "hobble" restraint. (Scott Dep. 65:9-16.) See also *Cruz v. Laramie, infra.*

28.     Within one minute after Soto legs were secured with the leash, officers picked him up and began carrying him to a patrol car for transport to the hospital. (Ratzlaff Affd., para 3.)

29.     At the time the officers picked Soto up to carry him to the car, Soto was still moaning and mumbling, making noises and speaking. (Antrim Depo. 62:7-11; Odle Depo. 44:8-14.)

30.     As the officers carried Soto to the car, he went limp. (Antrim Depo. 62:7-11.)

31.     Soto was set down and rolled onto his side. (McCord Depo. 31:2-17.)

32.     When it was discovered that Soto was having difficulty breathing, the restraints, including the handcuffs, were removed. (Antrim Depo. 64:8-16; McCord Depo. 31:2-17.)

33.     An ambulance was called at 6:17 p.m. (Antrim Depo. 64:2-7; Odle Depo. 45:1-22.)

34.     When Antrim called for the ambulance, Soto was still breathing through pursed lips. (Antrim Depo. 65:12-19.)

35.     Antrim monitored Soto and began CPR when it appeared that Soto had stopped breathing. (Antrim Depo. 65:21-23.)

36.     A fire rescue squad arrived on the scene at 6:18 p.m., approximately one minute after the call for an ambulance was made. (Antrim Depo. 66:3-8; Ex A "TK20 ON SCENE AT 1818".)

37.     When fire rescue arrived a defibulator was applied but advised "no shock" because there was not a shockable cardiac rhythm. (Antrim Depo. 66:11-24.)

38.     The ambulance arrived at approximately 6:22 p.m. (Navarrette Depo. 26:10-13.)

39.     Plaintiff's medical expert called the officers failure to summon medical assistance immediately "negligent." (Sperry Depo. 68:25 thru 69:4.)

40.     Even if EMTs are summoned immediately upon officers arriving on a scene, they can do nothing for ED until the subject is subdued and under control.  (Scott Depo.81:25 thru 82:3; Sperry Depo. 81:11 thru 82:2; Navarrette Depo. 34:25 thru 35:20.)

41.     If the paramedics had arrived on the scene while the officers were struggling with Soto, they would not have done anything during the struggle.  (Navarrette Depo. 34:15-19.)

42.     Even with the struggle over, but Soto still talking, and not appearing to be in distress, the paramedics would not have done anything.  (Navarrette Depo. 34:20-24.)

43.     There is nothing the paramedics in this case would have done if called sooner that they did not do upon arrival.  (Navarrette Depo. 33:18-20, 36:11-14.)

44.     If the paramedics had been on the scene when Soto coded, the paramedics would have started CPR, bagged him, intubated and then administered IV drugs.  (Navarrette Depo. 35:21 thru 36:14.)

45.     Antrim had received no training to the effect that he should immediately summon medical help in such a situation.  (Antrim Depo. 27:14 thru 28:11; 46:17-20.)

46.     This was not a normal police situation that Liberal police officers encounter everyday.  (Odle Depo. 38:17 thru 39:4.)

47.     This is the only case of  ED the Seward County paramedic/shift supervisor had ever seen.  (Navarrette Depo. 6:14 thru 7:4, 9:8-16; Rinehart Depo. 6:15-25.)

48.     Before this call, the Seward County EMS paramedic shift supervisor had received no training in how to deal with subjects in ED.  (Navarrette Depo. 9:19 thru 10:2.)

49.     During the time he served as an emergency room physician, plaintiff's medical expert never encountered a case of ED.  (Sperry Depo. 27:23 thru 28:17.)

50.     Plaintiff's medical expert has never provided medical treatment to a person in ED. (Sperry Depo.34:2-4.)

51.     Plaintiff's police expert never received any training in how to deal with persons in ED.  (Scott Depo. 30:25 thru 31:2.)

52.     In retrospect, plaintiff's police expert now believes he dealt with some cases of ED as a police officer in the 1980s.  However, he did not recognize it as ED at the time.  (Scott Depo. 28:18 thru 29:5.)

53.     Plaintiff's police expert has not dealt with any cases of ED since the early 1980s. (Scott Depo. 29:16-18.)

54.     Plaintiff's police expert served as Assistant Chief of Police in North Miami Fl., a department with approximately 95 officers. (Scott Depo. 22:1-8.)

55.     North Miami Beach is part of the Miami metropolitan area.  (Scott Depo. 22:9-12.)

56.     Boca Raton had approximately 300 police department employees.  (Scott Depo. 20:22 thru 21:6.)

57.     Officers of the Boca Raton Police Department did not encounter ED on a regular basis while plaintiff's police expert  was Chief of Police there.  (Scott Depo.64:15-21.)

58.     Plaintiff contends that Soto died of ED secondary to acute cocaine intoxication and asphyxiation secondary to aspiration of stomach contents. (PTO Doc. 83, p. 3 sec. 5. a., 3rd para.)

59.     The paramedics were not aware that Soto had vomited and aspirated until after his death.  (Navarrette Depo. 23:13-20.)

60.     The paramedics did not suction Soto's airway because they were unaware that he had vomited and aspirated.  (Navarrette Depo. 36:15 thru 37:14.)

61.     With no knowledge that Soto had vomited and aspirated, the paramedics would not have laid Soto on his side.  (Navarrette Depo. 35:16-20.)

62.     Even though placed on his side, Soto could still have aspirated while vomiting and died.  (Sperry Depo. 88:6-17.)

63.     To the extent moving Soto on his side decreased the risk of vomiting and aspiration, such could have been achieved even if he was "hog-tied" while turned on his side.  (Sperry Depo. 87:11-25.)

64.     A person who had aspirated as much vomit as Soto would probably be unable to talk. (Sperry Depo. 73:13 thru 74:2.)

65.     During the times that Soto was talking, the vomiting and aspiration would not yet have occurred.  (Sperry Depo. 76:10-13.)

66.     If the EMTs had been immediately present but did not know that Soto had vomited and aspirated, there would have been no intervention for that problem and Soto would have died. (Sperry Depo. 77:20 thru 78:21.)

67.     Even if the EMTs had arrived sooner, Soto would have probably died anyway. (Sperry Depo. 79:23 thru 80:4, 86:5 thru 87:10; DiMaio Affd. para. 6.)

68.     Cocaine use is a common cause of ED.  (Scott Depo. 29:6-15.)

69.     Defendant's expert opines that the cause of death was a fatal cardiac arrhythmia caused by cocaine intoxication.  (DiMaio Affd. para. 3.)

70.     Cardiac arrhythmia is one of the most common severe complications encountered in cases of ED.  (Sperry Depo. 27:16-22.)

71.     The proper treatment to prevent cardiac arrest from ED is the administration of a sedative medication such as Valium.  (DiMaio Affd. para 4.)

72.     When Valium is administered, takes 15-30 minutes at a minimum to have an effect. (Dimaio Affd. para 2; Ex DB, p. 5, 4th para.)

73.     Even if  EMS had been summoned immediately, there was insufficient time for the administration of Valium by the usual route to have acted.  (DiMaio Affd. para 5.)

74.     Plaintiff's expert agrees that if Soto went into cardiac arrest at the scene, statistically, he would probably have died even if the EMT s had been summoned immediately.  (Sperry Depo. 93:23 thru 94:6.)

75.     The city has no written policy concerning the use the hobble or hog-tie restraint. (Ratzlaff Depo. 35:19-21.)

76.     Mullanax has been with the Liberal Police Department since 1989.  (Mulanax Depo. 9:17-18.)

77.     Mulanax is the Lieutenant Of Operations and oversees training of officers.  (Mulanax Depo. 10:24 thru 11:11.)

78.     The city's training officer was unaware that any city officer used a hog-tie restraint. They were not trained to do so.  (Mulanax Affd. Para. 1-2.)

79.     Dog leashes were furnished to restrain dogs.  (Mulanax Affd. para. 3.)

80.     There are only two known instances in which a hobble or hog-tie restraint has been used by a Liberal police officer.  (Scott Depo. 74:7-13.)

81.     A proper policy is not required to include a specific prohibition on every way an officer might use excessive force.  (Scott Depo. 69:2-25.)

82.     Police departments are entitled to expect an officer to have been provided basic training at the academy and build on that.  (Scott Depo. 39:2-9.)

83.     Officers are typically not trained at academies to use hog-tie restraints and it has been known since the 1980s that hogtying is inconsistent with standard law enforcement practices. (Scott Depo. 76:4-23.)

84.     At the time of his death Soto was unemployed, having quit his last job the previous July.  (Bowen Depo. 83:7-22.)

## ARGUMENT AND AUTHORITY

**I.     Plaintiff cannot establish the essential elements of its claims.**

The only claims plaintiff asserts in the Pretrial Order are claims made against the city for failure to train.  No claims have been made against the officers individually. Nor have any claims been made that any affirmative policy of the city caused any constitutional violations.

In order to prevail on failure to train claims, the plaintiff must prove more than merely that training was in fact inadequate.  It  must also prove each of the following: (1) the individual officer's actions violated Soto's constitutional rights; (2) the violation arose under circumstances that were usual and recurring situations for the City's officers; (3) the inadequate training demonstrates deliberate indifference to the rights of persons with whom the officers would come in contact; and (4) there is a direct causal link between the constitutional deprivations and the inadequate training. *Carr v. Castle,* 337 F. 3d. 1221, 1228 (10th Cir. 2003); *Bryson v. Macy*, 611 F. Supp. 2d 1234,1264 (W. D. Okl. 2009)(modifying factors for non excessive force cases).

### A.  Failure to train concerning summoning medical assistance. (First claim)

#### 1.  No violation by officers

It has long been the rule that a city may not be held liable under 1983 unless plaintiff can establish a constitutional violation by the individual officers. *Ellis v. Ogden City,* 2009 U.S. App. Lexis 27769 (10th Cir, December 17, 2009)(copy attached); *Martinez v. Beggs,* 563 F.3d. 1082 (10th Cir 2009)(and cases cited therein).  The Tenth Circuit has expounded on that rule by instructing that "even if it could be said that [a city's] policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation." *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155-56 (10th Cir. 2001).

Two very recent cases from the Tenth Circuit make it clear that, unless plaintiff can establish the requisite culpable state of mind on the part of the officers – here deliberate indifference – it cannot establish a claim against the city.

*Martinez* applied the above rules specifically to a claim that police officers had failed to provide needed medical care to an intoxicated detainee because their employing agency had failed to adequately train them regarding the handling of intoxicated inmates.  563 F.3d. at 1091.  The court held that the plaintiff could not establish the subjective component of deliberate indifference against the officers because they were not actually aware of the risk of heart attack and death.  And since the officers were not deliberately indifferent, the Sheriff and County could not be liable on a constitutional claim that they had failed to adequately train the officers regarding the handling of intoxicated detainees.  563 F.3d. at 1091.  The fact that officers are ignorant due to a failure to train may give rise to a negligence claim but, unless there has been deliberate indifference or the wanton

infliction of pain or death by the officers, there can be no *constitutional* claim against a municipal entity.

In *Ellis,* the Court concluded that the plaintiff had failed to allege or show the requisite "intent to harm" on the part of the officers. Without the requisite culpable state of mind on the part of the officers, there could be no claim against the city:

> Since the officers were not alleged sufficiently to have committed a constitutional violation, they could not provide the nexus required for municipal liability under § 1983. *See Graves*, 450 F.3d at 1218. Therefore, once the claims against the officers were properly dismissed, the claims against the municipality were also properly dismissed since liability for the municipality could not attach.

Slip Op. p. 11.

The same result is required here. Plaintiff does not even allege that the officers were deliberately indifferent. For that reason alone, plaintiff fails to state a claim.

Perhaps the reason plaintiff failed to allege deliberate indifference on the part of the officers is because the evidence would not support such a claim. The basis of a claim for failure to provide medical care is the unnecessary and wanton infliction of pain in violation of the 8th Amendment's prohibition on cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[I]n the medical context, the inadvertent failure to provide medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id*. At 104-105.

The Constitution does not guarantee error free or the best and fastest medical care. It only requires that public officials not be deliberately indifferent to a recognized need for medical treatment. Something more than negligence must be shown in order for conduct to create a claim of constitutional magnitude rather than a mere tort. *Sevier v. City of Lawrence*, 60 F.3d 695, FN 7

(1995); *Beckett-Crabtree v. Hair*, 07-5181, 298 Fed. Appx. 718 (2008)(unpublished), (applying the rule in an excessive force case. ) (Copy attached.). For a violation of this standard to occur, the officer must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). This standard is not violated "unless the [officer] knows and disregards an excessive risk to inmate health or safety; the [officer] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

This is not a case where no medical assistance was provided at all. This is a case of a delay of a few minutes in calling for medical help. And that was because the officers did not realize upon arrival that Soto was in need of anything other than psychiatric care, which they intended to take him to the hospital to receive. When officers arrived on the scene, Soto was alive and well enough to run, resist and talk to the officers. He was not yet in cardiac arrest or suffering from asphyxiation. That he needed psychiatric or drug intervention was obvious. But there was no reason to expect vomit, aspiration and asphyxiation within the time needed to subdue and transport him to the hospital. The officers were carrying him to a car to transport him to the hospital when he either asphyxiated or went into arrest – depending on which expert you believe. It was then, for the first time, that Soto was in need of immediate resuscitation. At that point, the officers commenced CPR and called for an ambulance.

Not every person in ED will require the assistance of medically trained persons at the scene before being transported to a hospital. Thus, the complaint is not that the officers failed to summon medical help when it became actually necessary but that they did not *prophylactically* summon medical help a few minutes sooner so that it would be standing by if and when it was needed. As soon as the officers did realize that Soto was having trouble breathing, they immediately summoned medical help.

In order to make its case, plaintiff must show that the officers actually realized a need for immediate medical care earlier – before it was discovered that Soto was not breathing. This it cannot do. There is no evidence in the record to indicate that the officers were aware of a risk of asphyixiation or cardiac arrest requiring the immediate summoning of medical help to the scene rather than transporting Soto to a medical facility as they had planned to do.

None of the officers had ever encountered a case of ED before. Even the EMTs who responded to the scene had never encountered or even heard of ED before. The EMTs had no special training on the subject of how to deal with ED. None of the officers were aware that the symptoms Soto was exhibiting put him at risk of death by cardiac arrest or aspiration. None of the officers were aware of any standard or suggestion that they should summon help to the scene rather than transporting Soto to the hospital themselves. It is not obvious to the average person that a person in Soto's condition is at risk of death in a short amount of time. There is no evidence to support a claim that the officers were being deliberately indifferent to a recognized need for medical assistance a few minutes earlier than it was summoned.

The uncontroverted facts clearly show that the officers did not recognize a need to immediately summon medical assistance when they arrived on the scene. When plaintiff did exhibit

signs of needing immediate medical care, it was immediately provided. Such conduct was, at most, negligence. Plaintiff does not even *allege* that the officers were deliberately indifferent. The standard plaintiff claims the officers violated is not a constitutional one but a negligence standard. Plaintiff's expert refers to the officer's conduct as negligence. (DSOF 39.)

Without deliberate indifference by the individual officers, there was no violation of Soto's constitutional right to be free from deliberate indifference at the scene. And without such a violation by the officers on the scene, there can be no claim against the city for causing a violation of Soto's rights.

###           2.           The circumstances were not "usual and recurring."

Every bit of evidence in the record on this issue points clearly to the conclusion that ED is rare and anything but "usual and recurring" in general. More importantly it is particularly rare in the City of Liberal. None of the officers had ever encountered ED. Even the EMTs, whose job it is to be prepared to deal with medical emergencies within the county, had never heard of ED or received any training in how to deal with it until after Soto's death. Plaintiff's police expert worked as an officer and police administrator in the Miami metropolitan area and Boca Raton. Only in hindsight, can he identify any incident involving ED. During the time he served as a chief of police in a similar environment, he cannot say whether any of his officers encountered ED. The city of Liberal, by contrast, is not part of a large metropolitan area like Miami.

Plaintiff's medical expert never encountered ED while serving as an ER physician and has never been called upon to provide treatment for ED. Clearly, ED is not a "usual and recurring" situation for Liberal officers and the failure to provide training on ED before the encounter with Soto

is, at most, negligence. Since ED it is not a "usual and recurring" situation in Liberal, this essential element of a failure to train case cannot be established.

### 3. No deliberate indifference by the city's policy makers.

Even if the plaintiff could get past the issue of the officers' deliberate indifference, it must also show that the city's trainers failed to provide training out of deliberate indifference on their part as well. The deliberate indifference standard as applied to the city requires a showing of more than failure to train. It requires even more than negligent failure to train.[3] The "touchstone of this inquiry . . . is the risk inadequate training poses and the City's awareness of that risk." *Carr*, at 1229 (quoting *City of Canton*, 489 U.S. 378, 390 (1989). It must be shown that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* It must be "substantially certain" that failure to train would result in a constitutional violation. *Carr,* at 1229 (quoting from *Barney v. Pulshipher*, 143 F. 3d. 1299, 1307-08 (10th Cir, 1998)).

The record in this case will not support a finding that the city's policy makers knew that a failure to train on ED was "substantially certain" to result in a violation of constitutional rights.

ED was not a common occurrence and likelihood of encountering an ED case in Liberal was very low. ED is uncommon even in large metropolitan areas as shown by the plaintiff's experts' lack

---

[3]It is a general proposition of 1983 jurisprudence that something more than negligence must be shown in order for conduct to create a claim of constitutional magnitude rather than a mere tort. *Sevier v. City of Lawrence*, 60 F.3d 695, FN 7 (1995); *Beckett-Crabtree v. Hair*, 07-5181, 298 Fed. Appx. 718 (2008)(unpublished), applying the rule in an excessive force case. (attached)

of experience with ED despite careers that would have placed them in emergency rooms and supervising large numbers of police officers in several different cities. ED is particularly uncommon in Liberal. This may well be the only such case that has ever arisen in Liberal. Even the paramedics were unaware of the condition and had never encountered it before. The fact that training on the subject was not made a higher priority and provided before Soto's death cannot reasonably be said to constitute deliberate indifference to a substantial certainty of a constitutional violation. At most, it was negligence, not deliberate indifference.

### 4. No causation

There is a question of fact (complete with dueling experts) as to the specific mechanism of Soto's death. However, this question of fact is immaterial and does not prevent summary judgment because the summoning of medical assistance a few minutes earlier would not have changed the result under either expert's version. Thus, the failure to summon medical assistance immediately is not a cause of Soto's death.

### a. Plaintiff's version.

Plaintiff alleges that the cause of death was the regurgitation and aspiration of stomach contents. Plaintiff's expert agrees that this could not have occurred during or before the times that Soto was talking or making noises. Soto was still talking or making noises as the officers carried him back to the car. Immediately upon seeing that Soto was having difficulty breathing, the restraints were removed, the ambulance was called and CPR was started. One minute later, a fire rescue squad arrived and continued CPR. Approximately four minutes later, the ambulance arrived and took over resuscitation efforts. (DSOF 32-38.)

16

Had the ambulance been on scene when Soto was being subdued, they would have done nothing until he was subdued. After he was subdued, if he was talking and moaning and not appearing to be in distress, the paramedics would have done nothing. (DSOF 40-42.)

If Soto was asphyxiating on aspirated stomach contents, as plaintiff alleges, what he needed was to have the blockage suctioned. This was not done by the paramedics even after they arrived as they were not aware that Soto had vomited and regurgitated. Thus, the very thing that plaintiff's expert believes killed Soto was the one thing he received no treatment for. Not because the ambulance was not called sooner but because the paramedics could not tell that aspiration had occurred and suction was needed. There is no indication that this would have changed in anyway if they had been there sooner. In fact, the supervising EMT testified they would not have done anything differently had they been there sooner. They would have started CPR just as the officers did. They would have intubated, just as they did. They would have started IV meds, just as they did. They would not have suctioned him – the one thing he needed, because they did not know he needed it. (DSOF 60, 61, 66.)

### b. Defendant's expert's version.

Defendant's expert opines that Soto died of cardiac arrest resulting from his cocaine intoxication. The treatment to prevent cardiac arrest for a person in ED is sedation by a medication such as Valium. However, that needs to be administered before the cardiac arrest occurs and takes 15-30 minutes from administration by the usual route to have the desired effect. (DSOF 71-73.) And if the arrest is not prevented, once it occurs, the chances of survival are nil. Plaintiff's expert agrees that once Soto went into cardiac arrest, it was unlikely that he would survive. (DSOF 74.)

The paramedics had no training in dealing with ED. They would not have taken any action until after Soto was subdued. The cardiac arrest occurred in less than 10 minutes after he was subdued. Thus, even if EMS had been summoned earlier, they would not have taken any action that would have prevented the cardiac arrest and once the arrest occurred there was essentially nothing else to be done other than the resuscitation attempts that were tried without success.

Even if the paramedics had been aware of the need for sedation, had been called upon Antrim's arrival at 6:06 and arrived on the scene five minutes after being called and immediately administered Valium, it would not have had the necessary 15-30 minutes to take effect before the cardiac arrest, which occurred at approximately 6:17. (DSOF 4, 5, 36, 38.)

Even if the ambulance had been called sooner, the result would not have changed under either expert's opinion. The failure to call for an ambulance sooner, therefore, cannot be a cause of the death as a matter of law.

## B. Hog-tie claim (Second claim)

### 1. Training not inadequate[4]

Plaintiff's expert concedes that no policy or training program needs to include a specified prohibition on every possible thing an officer could do wrong. He concedes that it is proper for a city to assume that an officer has been given basic training at the academy and build on that. He further concedes that hogtying is not a restraint officers are typically trained to use and that it has long been widely known that hogtying should not be used. (DSOF 81-83.) It was not a restraint the

---

[4]If plaintiff could prove that Soto was "hogtied" as that term is defined in *Cruz,* there might be a valid claim for nominal damages against the individual officers under a 4th Amendment excessive force analysis. However, plaintiff has not brought a 4th Amendment claim against the individual officers. Plaintiff has asserted only an 8th Amendment failure to train claim against the city.

city's training officer knew or expected to be used by the officers. (DSOF 75-80.) The mere fact that an officer on an isolated occasion does something he is not expected to do does not mean his training has been inadequate. The failure to expressly forbid hogtying simply does not constitute inadequate training as a matter of law. Thus, plaintiff cannot establish the threshold element of this claim.

### 2. No violation by officers.

Plaintiff is attempting to capitalize on and confuse the various definitions of "hog-tie." In analyzing this claim it is important to determine exactly what it is that the Tenth Circuit has prohibited as "Hog-tieing" and then determine if the officers transgressed *that* definition of hog-tieing. It is improper to simply lift the word "hog-tie" out of the case and then contend that anything someone else refers to as "hog-tieing" falls within the Tenth Circuit's proscription.

In *Cruz v. City of Laramie,* 239 F. 3d. 1183 (10ᵗʰ Cir. 2001), the Tenth Circuit held that "hog-tieing" as it understood and applied the term "involve[s] the binding of the ankles to the wrists, behind the back, *with 12 inches or less of separation*." 239 F. 3d. at 1188. (Emphasis added.) Moreover, the *Cruz* court specifically noted that the case involved a question of fact as to whether the restraint used in that case was in fact a "hog-tie" by this definition as there was conflicting evidence as to the distance between the ankles and the wrists; specifically there was evidence in that case that the restraint left less than 12 inches between them and was, therefore, a "hog-tie."

Soto was not "hog-tied" as that term was understood and declared unconstitutional by the Tenth Circuit. The distance between his ankles and wrists was approximately two feet. There is no evidence in this case to support a contention that it was less than one foot. Moreover, Soto's wrists were not as far behind his back as normal because he was not cuffed with a single set of cuffs.

Some control of Soto's legs was required as he was resisting by attempting to kick the officers. This method of restraint – by whatever name it is called – is less restrictive than the "hog-tie" declared to be unconstitutional in *Cruz*. The officers' use of the less restrictive restraint on a person who is kicking is not addressed by *Cruz*.

### 3. Not usual and recurring

"Hog-tieing" was not a usual and recurring situation in the City of Liberal. (DSOF 45-57.) The city did not teach its officers to use it. Unlike Laramie in *Cruz,* Liberal did not provide restraints specifically to be used for hogtying. This incident and one other is all that the evidence indicates occurred involving a similar restraint. And even then, there was no "hog-tie," as that term was defined in *Cruz* as more than one foot of clearance existed between the feet and hands.

### 4. No deliberate indifference to obvious need for training

The city's policy makers had no knowledge that officers were using a hog-tie restraint or in need of further training on the subject. A failure to issue a specific prohibition on hog-tieing was not "substantially certain" to result in a constitutional violation. Even in the absence of such training, the use of any similar restraint was very rare. On no occasion was a "hog-tie," as defined in *Cruz,* ever shown to be used by Liberal officers.

Given the lack of knowledge that its officers were using a hog-tie restraint and the rarity of the use of even a similar "hobble" restraint, it simply cannot be said that the city was deliberately indifferent to an obvious need for training on the subject.

This case is readily distinguishable from *Cruz*. In *Cruz*, Laramie supplied specific restraints in its police vehicles and expected officers to use the hog-tie but failed to train on when it would be appropriate and when it would not. The Tenth Circuit noted that hog-tieing is not always

inappropriate.  The problem was that a restraint supplied by Laramie and expected to be used, was used on a person with diminished capacity – a circumstance in which it should not have been used. Thus *Cruz* teaches that, if a city expects and equips its officers to use hog-tie restraints, it should provide training on when their use is appropriate and  when it is not.

By contrast, Liberal provided no hog-tie restraints to its officers and did not expect them to use such a restraint.

### 5.　　No Causation

Under either expert's opinion, the restraint did not cause death.  According to plaintiff, aspirated vomit did.  However, vomiting and aspiration can occur in any position, including sitting up or laying on one's side.  To the extent that the chances of vomiting and aspiration could have been reduced by lying him on his side, that could have been done even while he was restrained.  The restraint did not cause the aspiration nor did it prevent placing Soto in a position to reduce the chances of aspiration.  (DSOF 62-63.)  Thus, the restraint, was not a causative factor even if plaintiff's expert is right about the cause of death.

The alternative suggestion for cause of death was cardiac arrest.  That also was not caused by the restraint.  The likely cause of the cardiac arrest was Soto's acute cocaine intoxication, not the manner in which he was restrained.

### III.　　Plaintiff cannot establish its claim of lost earnings.

Plaintiff is claiming only those "damages recoverable under Kansas law in a survival action . . . ." (Pretrial Order, Doc 82, p.9.)  This claim is further itemized and includes a claim for lost earnings suffered by Soto, which would be "recoverable under Kansas law in a survival action." [5]

"A survival action [under Kansas law] allows the personal representative to recover damages accrued by the injured party *between the date of injury and death* for the benefit of the decedent's estate." *Jeanes v. Bank of Am., N.A.,* 40 Kan.App.2d. 281, Syl. 4 (2008.) (Emphasis added.); *Farm and City Ins. Co. v. American Standard Ins. Co.,* 220 Kan. 325, 337 (1976.)  "Recovery may not be had for loss of earnings or earning capacity beyond the time of death." *Flowers v. Marshall,* 208 Kan. 900, syl. 3 (1972.)

Since Soto was unemployed at the time of his death, he suffered no loss of earnings between the arrival of the officers and his death, recoverable under Kansas law.

## CONCLUSION

For the reasons set forth above, defendant is entitled to summary judgment on all of plaintiff's claims as the essential elements of plaintiff's constitutional claims have not been alleged or cannot be established.  At a minimum, defendant is entitled to summary judgment on plaintiff's lost wage claim as the facts clearly show that no wages were lost between the time the officers arrived and Soto's death and, therefore, no lost wages are recoverable under Kansas law in a survival action.

---

[5]In addition to lost earnings, plaintiff also seeks to recover medical and funeral expenses. Defendant concedes that a question of fact exists as to those two items of damage.

WATKINS CALCARA, CHTD.

s/ Allen G. Glendenning
      Allen G. Glendenning, #12187
      1321 Main - Suite 300
      P.O. Drawer 1110
      Great Bend, Kansas  67530
      (620) 792-8231
      Fax: (620) 792-2775
      aglenden@wcrf.com
      Attorneys for Defendant