IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on          )
her behalf and as Next        )
Friend of minor JS,           )
minor HS and minor AS,        )
                              ) Case No. 08-1171-MLB
             Plaintiffs,      )
                              )
vs.                           )
                              )
CITY OF LIBERAL,              )
KANSAS,                       )
                              )
             Defendant.       )


D E P O S I T I O N




        The deposition of JON ANTRIM was taken on

behalf of the plaintiff before CINDY L. FENTON, a

Certified Shorthand Reporter of Kansas, at

Conference Room, Liberal Inn, 603 East Pancake,

Liberal, Kansas, on October 22, 2008, commencing at

8:05 A.M.

**EXHIBIT E**

1    delirium?

2              MR. GLENDENNING:  Object to form and

3    foundation.

4  A  I don't know why they taught it.

5  Q  (BY MR. RATHBUN)  So you went through this

6    three-hour course and took a test, and when it was

7    over with you didn't have any idea why they taught

8    the -- why they taught you about excited delirium?

9              MR. GLENDENNING:  Object to form and

10   foundation.

11 A  Again, I don't know why we had the class.  I can't

12   tell you why the administration decided to have the

13   class.

14 Q  (BY MR. RATHBUN)  Did you learn anything in it that

15   you thought would be helpful in your day-to-day work

16   as a police officer?

17 A  We learned different ways of handling situations

18   like what we had ran into in the past.

19 Q  What ways did you learn to handle it that were

20   differently?

21 A  Just, basically, immediate medical care.

22 Q  Was this something that you were unaware of prior to

23   February of '07?

24             MR. GLENDENNING:  Object to form.

25 A  Can you reask that as far as --

Cindy L. Fenton, CSR

**EXHIBIT E**

1   Q   (BY MR. RATHBUN)   Yeah.

2   A   -- aware of what?

3   Q   You said one thing I learned is to have immediate

4       medical care.   Is this something that you were

5       unaware of before February of '07?

6   A   In regards to excited delirium?

7   Q   Yes.

8   A   Yes.

9   Q   No one had trained you that prior to that time?

10  A   When they trained me prior to that time, I had not

11      heard of this.

12  Q   When did they first start talking to you about using

13      caution with the Taser with people that were drug

14      intoxicated?   When did you first hear that?

15          MR. GLENDENNING:   Object to form.

16  A   They never have.

17  Q   (BY MR. RATHBUN)   So you've never received any sort

18      of warning in terms of using the Taser with drug

19      intoxicated individuals?

20  A   No.

21  Q   Or individuals that are emotionally or mentally

22      imbalanced, acting weird, like you and I might say

23      it?

24  A   No.

25  Q   No restrictions on Taser use for people as far as

Cindy L. Fenton, CSR


**EXHIBIT E**

1    213.

2                    MR. RATHBUN:  I'm just trying to pull it

3    up.

4                    (Marked Deposition Exhibit 4 and 5.)

5                    MR. GLENDENNING:  213 through what?

6                    MR. RATHBUN:  213 through 219, which is a

7    drawing.

8    Q   (BY MR. RATHBUN)  You can look at those if you want,

9        but I think they're the same things you have there.

10   A   Yeah, they're the same.

11   Q   All right.  Tell me about that day.  And that was,

12       what, August the 30th of '06?

13   A   (Non-verbal response.)

14   Q   What was your shift that day?

15   A   6:00 p.m. to 6:00 a.m.

16   Q   So you came on to work.  What had you done that day?

17       Do you recall?  What day of the week was this?

18   A   I don't know what day of the week it was.  Arrived

19       at -- at the police department and went to roll

20       call.

21   Q   For a 6:00 shift, what time do you get there?

22   A   I typically get there 15 minutes early.

23   Q   You dress out or are you already dressed?

24   A   We're already dressed.

25   Q   And roll call is at what time?

Cindy L. Fenton, CSR

**EXHIBIT E**

1  A  1800, 6:00 p.m.

2  Q  Tell me what happened that day.

3         MR. GLENDENNING:  Object to form.  It's

4     overbroad.

5  Q  (BY MR. RATHBUN)  Okay.

6  A  In relation to this incident?

7  Q  Yes.

8  A  At approximately 6:01, I responded to the area of

9     McDonald's south.

10 Q  I'm going to interrupt as we go along.  I apologize

11    in advance for that.

12        So you were sitting in roll call and you

13    got a call?

14 A  Yes.

15 Q  How did that come about?

16 A  Came out as a male outside of McDonald's south that

17    was naked, screaming obscenities at customers.

18 Q  Okay.  What did you do?

19 A  As I was responding, we received additional

20    information that he was by Furniture Mart.

21 Q  Let me ask you, in terms of timing, you were Car 11;

22    right?

23 A  Yes, sir.

24 Q  I notice the time stamp on your car was about

25    three -- three minutes different than the time stamp

**EXHIBIT E**

1    if you can, but, yes, basically up to the officer.

2  Q  And is it mostly when you have interaction with the

3     public?

4  A  Yes.

5  Q  They strongly advise that you use it?

6  A  If possible.

7  Q  All right.  If I understand what you said, I notice

8     in watching the video on 11, it actually starts

9     before you turn into Sherwin-Williams?

10  A  Yes.

11  Q  Was that because of the 30 second delay you talked

12     about?

13  A  Yes.

14  Q  Not delay, but it goes back and picks up the

15     30 seconds before you turn it on?

16  A  Yes.

17  Q  So as you got out, you -- did you have to activate

18     your mike pack or was it already --

19  A  Once you hit the record button and you pull it out

20     of the charger, it automatically kicks on.

21  Q  And was it in the car charger at that point?

22  A  When I turned the camera on, yes.

23  Q  So you picked it out, put it in your pocket?

24  A  Yes.

25  Q  What happened next?

**EXHIBIT E**

1  A  As I got out of my car, I drew my X26 and held it

2     behind my back.

3  Q  And why did you do that?

4  A  At that point in time I was by myself.  We have seen

5     videos of disrobed people that potentially are under

6     the influence of PCP, exhibit super human strength

7     and things of that nature.  So, basically, as a

8     protection for myself at that time in case something

9     went bad.

10  Q  What did you -- when you pulled up, Mr. Soto was

11     speaking in gibberish?

12  A  He was looking at the roof of the building.  Had his

13     hands over his face and, yeah, he was just -- he was

14     talking.  At first I didn't understand what he was

15     saying.

16  Q  Was it plain to you right off the bath that this guy

17     had problems?

18  A  I knew it was unusual.

19  Q  I mean -- and you don't come upon naked people very

20     often, I am assuming.

21  A  First time.

22  Q  So you knew that -- you knew that something was

23     obviously not right with this guy?

24  A  Correct.

25  Q  Could you tell what it was?  I mean, did it seem to

Cindy L. Fenton, CSR

**EXHIBIT E**

1    Q   All right.  So what did you do then?

2    A   Um --

3    Q   I'm sorry.  I need to stop you.

4              So we have a guy standing out there naked

5        saying things that are abnormal.  What did your

6        training tell you to do at that point?

7    A   To try and establish verbal rapport with him.

8    Q   All right.  And so what did you do to try and

9        establish that verbal rapport?

10   A   I identified myself.  I tried to communicate with

11       him.  He kept referring to the sheriff's office had

12       sprayed something in his eyes that were burning his

13       eyes.  Tried to get him to verbally comply to allow

14       me to take him into custody.  Numerous times I told

15       him I wanted to help him, as well as I told him I

16       wanted to help get the stuff out of his eyes.

17   Q   Had you been trained prior to this to call for

18       medical assistance with a situation like this?

19             MR. GLENDENNING:  Object to form.

20   A   No.

21   Q   (BY MR. RATHBUN)  What did you do next?

22   A   I continued to try and communicate with him by

23       verbal rapport, not in an aggressive manner.  I

24       didn't aggress him in any way.  Had him pretty much

25       in one area until a third party, which I don't even

Cindy L. Fenton, CSR

**EXHIBIT E**

1    know who it is, come walking from the -- from the

2    east in our direction carrying what I believed at

3    that time to be his clothes.  I flagged that person

4    away 'cause I didn't want him getting any closer

5    because it was obvious once Mr. Soto saw him he was

6    uncomfortable and that's what made him start running

7    from me.

8  Q  He took off running to the east?

9  A  Yes.

10 Q  What did you do?

11 A  I began chasing him.  Again, giving him verbal

12    commands for him to stop.  Sorry.  I'm getting

13    cramped up.

14 Q  You need to take a break?

15 A  No, I'm good.

16              And he didn't stop.  He continued to run;

17    and while he was running he actually tripped, caught

18    himself by his hands.  He continued to run.  At that

19    time apparently that's when the other officers

20    arrived.  At the time I did not know that.  We ran

21    around the corner of the building at which time I

22    fired the Taser.

23 Q  Okay.  First time you discharge your Taser was when

24    he ran around the corner?

25 A  Yes, sir.

**EXHIBIT E**

1   A   Yes, sir.

2   Q   You can't have the circuit without both of the

3       Tasers being either caught on the clothing or in

4       this case on the skin?

5   A   If one probe hits, you can touch them with the

6       actual device and it will do the same, but if you're

7       talking in the terms of probes, both probes have to

8       make contact to complete the circuit.

9   Q   So you -- your conclusion was one of the -- one of

10      the probes missed and then came around and made

11      contact on the front some way?

12  A   Made contact somehow.

13  Q   And that allowed it to work?

14  A   For a short period of time.

15  Q   Knocked him down?

16  A   Correct.

17  Q   What did you do then?

18  A   That point in time, Corporal Ratzlaff arrived on the

19      scene.  He was running up behind us.

20  Q   Let me ask you this.  At the time he -- he first is

21      knocked down with the Taser, are you the only

22      officer there?

23              MR. GLENDENNING:  Object to form.

24  A   I thought I was, but Ratzlaff was running up behind

25      me.

Cindy L. Fenton, CSR

**EXHIBIT E**

1    Q  (BY MR. RATHBUN)  But he was right behind you?

2    A  Yeah.

3    Q  All right.  So what happens then?

4    A  Ratzlaff goes on to him, like in a handcuffing

5       position.  Gets on his back.

6    Q  I interrupted.  Was he on his stomach?

7    A  Yes.

8            MR. GLENDENNING:  Who on whose stomach?

9    Q  (BY MR. RATHBUN)  Was Mr. Soto on his stomach?

10   A  Yes.

11   Q  So Ratzlaff goes up to handcuff him?

12   A  That's right.

13   Q  And then what happens?

14   A  Just a knee into -- onto him to get him in a

15      handcuffing position, at which time Mr. Soto did

16      a -- an amazing -- he did a push-up with Ratzlaff on

17      his back to a standing position.

18   Q  Okay.  Then what happened?

19   A  Ratzlaff, as he began to stand, I squeeze my trigger

20      again, saw there was no effect.  Didn't let it

21      complete the five seconds.  I turned it off.

22      Ratzlaff grabbed Mr. Soto by the arm, attempted to

23      do an arm/bar takedown.

24   Q  What's an arm/bar takedown?

25   A  Basically, a technique that we're taught in

**EXHIBIT E**

1    defensive tactics where you basically twist and lock

2    the arm into a -- a position where it makes it solid

3    like a board and use their arm as leverage to take

4    them down.  As he was doing that, something

5    happened.  I don't know.  Mr. Soto went down as well

6    as -- as Ratzlaff.

7  Q  Okay.  What did you do then?  And is it still you

8    and Ratzlaff are the only officers there at this

9    point?

10  A  Keating is also there at this point.

11  Q  Where does Keating come from?

12  A  He was with Ratzlaff in the same car.  He just

13    didn't run as fast.

14  Q  Okay.  And Ratzlaff and Keating, are they off duty?

15    Were they -- were they off duty at that point?

16  A  They came in a patrol car, but I don't recall if

17    they were on my shift at that time or not.

18  Q  Okay.  Then what happens?

19  A  About that time is when McCord and Head are arriving

20    in the pickup truck.

21  Q  Okay.  What happens then?

22  A  They began struggling to -- to get Mr. Soto

23    handcuffed.  While they're doing that, I attempt to

24    do a drive stun.

25  Q  What's a drive stun?

Cindy L. Fenton, CSR


**EXHIBIT E**

1   A   It's on the Taser.  You can remove the cartridge and

2       you can use it like a stun gun instead of shooting

3       the probes.

4   Q   There are probes and they make contact with the

5       individual?

6   A   There's two metallic points on the tip.  They're not

7       probes.  But there's two metallic tips and you make

8       contact with them.

9   Q   And you attempted at that point to drive stun him

10      where?

11  A   The left shoulder.

12  Q   All right.

13  A   Upper left shoulder.

14  Q   All right.  What happened then?

15  A   When I squeezed the trigger on the Taser to activate

16      it, I didn't hear the clicking that it normally

17      makes.  I also saw no reaction from Mr. Soto

18      whatsoever.  So I thought it was ineffective.  I

19      thought it didn't even work at that point in time.

20      So I went to a different location to -- to try

21      again.

22  Q   If there are people in contact with someone that you

23      are tasering, do they get tased as well?

24  A   No.  If they get wrapped up in the wires, yes,

25      but --

Cindy L. Fenton, CSR

**EXHIBIT E**

1  Q  But on a drive stun, if they are touching the

2     individual and you tase him, that has no effect on

3     them?

4  A  No, sir.

5  Q  So at the time you go to a different location to

6     attempt to tase him, how many officers are there

7     helping you?

8  A  McCord, Head, Ratzlaff, Keating.  There's four

9     officers there.

10 Q  Is Dixon at the legs then at that point?

11 A  Not at that point.

12 Q  Okay.  Then what happened?

13 A  They're continuing to struggle with him.  He's not

14    relinquishing his hands to get him in a handcuff

15    position.  They're struggling to get his hands.

16    They're not able to get his hands out to get him in

17    handcuffs.  At that time I go around and attempt to

18    do another drive stun.

19 Q  Where did you attempt to do this drive stun?

20 A  In the genitals.

21 Q  And is that a location that you're taught that's

22    especially susceptible for tasering?

23              MR. GLENDENNING:  Object to form.

24 Q  (BY MR. RATHBUN)  Go ahead.

25 A  Could you reask that?

**EXHIBIT E**

1    A    That's when the officers were finally able to get

2         him handcuffed.  They had to put one set of

3         handcuffs on one arm, on his left arm, one set on

4         his right arm, and then actually cuff those two

5         together 'cause they weren't able to get his hands

6         all the way behind his back.

7    Q    Okay.  You say here, "I advised communications that

8         Soto was handcuffed at approximately 1809 hours."

9         How do you know that?

10   A    From the radio logs.

11   Q    Okay.  You went -- that's -- that raises a question

12        that I had.  Did you have the radio logs and the

13        video to help you put this report together?

14   A    Yes.

15   Q    Okay.  So -- and when did you do this report?

16   A    The final approved version was 9-9 of '06.

17   Q    The final approved version, approved by who?

18   A    I don't know whose initials these are right here.  I

19        don't know.

20   Q    When did you dictate it?

21   A    I didn't dictate, but -- I'm sorry.  I didn't

22        dictate it.  I typed it.

23   Q    When did you type it?

24   A    I'm not sure.

25   Q    That evening, next day?

**EXHIBIT E**

1      something like that?

2   A  Yes, sir.

3   Q  All right.  What happened then?

4   A  As they were handcuffing him, at that time I did see

5      that one of the Taser probes was in his upper right

6      shoulder.  The other one was not attached to him and

7      laying on the ground to the south of him.

8   Q  And you say he continued to fight with the officers?

9   A  He still struggled with them, yes.  They were

10     continually giving him verbal commands to stop

11     moving, stop wiggling.

12  Q  And, again, had no response to the Taser.  Did you

13     tase him again at that point?

14  A  No.

15  Q  What is -- when you say Soto again had no response

16     to the Taser, what does that mean?

17  A  That was after -- that was before that I advised

18     that he was handcuffed.  That was when I did his

19     right shoulder.

20  Q  Oh, I'm sorry.  Yes, I got --

21              So once he was secured, you then asked

22     Officer Keating to go and move your patrol car up?

23  A  That's correct.

24  Q  What happened next?

25  A  As he was moving my car up, Officer McCord as well

**EXHIBIT E**

1    as Officer Head stated that they had blood on their

2    hands.  I asked Officer Keating to get my hand

3    sanitizer out of the car and bring it to our

4    location.

5  Q  What happened next?

6  A  I directed somebody to -- to go get my camera.  If

7    you give me just one second I'll tell you who it

8    was.  Officer Head to get my camera.  Standard

9    practice is to take photographs of -- of the probes

10   in place and then photographs after the probes are

11   removed.  So I wanted to get some photographs.

12  Q  So I've noticed a couple pictures of Mr. Soto lying

13   on the ground.  Would that be the pictures of --

14   that someone took of the probes?

15          MR. GLENDENNING:  Object to form and

16   foundation.

17  A  Without seeing the pictures, I wouldn't know.

18  Q  (BY MR. RATHBUN)  How many pictures were taken of

19   him lying on the ground?

20  A  I didn't know.  Don't know.  I didn't do it.

21  Q  Who took the pictures?

22  A  Keating.

23          MR. GLENDENNING:  Object to form and

24   foundation.

25  Q  (BY MR. RATHBUN)  Were there other people taking

Cindy L. Fenton, CSR

**EXHIBIT E**

1    pictures of Mr. Soto other than Keating?  Did you

2    see?

3    A  Not that I know of.

4    Q  All right.  What happened next?

5    A  We -- Sergeant Odle arrived on the scene.  Was

6       briefed of the situation.  He asked if we felt that

7       we needed EMS to respond.  I told him no, 'cause we

8       were going to the hospital, anyway, for a mental

9       evaluation and then we were going to transport him.

10   Q  Okay.  What happened next?

11   A  I went to the bed of -- of the truck where I looked

12      through the clothing and I found Mr. Soto's I.D.

13   Q  Okay.  What did you do then?

14   A  I then took my clothes -- or I took his clothes to

15      the trunk of my car, got in my car, put my mike

16      pouch back into the -- the mike and turned the

17      camera off.

18   Q  Why did you do that?

19   A  'Cause we were fixing to load him up and the

20      incident, in my eyes, was over.  He was handcuffed

21      and secured and we were just going to load him up

22      and take him to the hospital.

23   Q  From the time you turned off the camera -- what

24      happened -- what happened after you turned off the

25      camera?

**EXHIBIT E**

1   A   After we turned off the camera, we went up -- we

2       went up and made sure everybody was taken care of.

3       We picked him up and carried him back to my car.  It

4       was a matter of minutes after we turned off the

5       camera.

6   Q   Okay.  Then what happened?

7   A   At the time we picked him up, Mr. Soto was still

8       moaning, making the noises he'd been making the

9       whole entire time, mumbling.  We picked him up,

10      began to carry him.  As we got towards the back door

11      of my police car, that's when Mr. Soto went limp.

12  Q   What did you do?

13  A   At that time I had them place him on the ground.

14      Laid him on his side, on his right side.  I noticed

15      that it appeared that he was having some difficulty

16      breathing.  At that time I requested an ambulance to

17      respond.

18  Q   What time would that have been?  You were indicating

19      on --

20  A   Approximately 1817.

21  Q   6:17?

22  A   Yes, 6:17 p.m.

23  Q   How do you know that?

24  A   Again, by the communication radio logs.

25  Q   And this would have been about, you say 6:09 was the

**EXHIBIT E**

1        time he was secured?

2    A   Yes, sir.

3    Q   6 -- let's see here.  I need to make sure.  It may

4        have been 6:07.  Look back at your report and tell

5        me, would you?

6    A   6:09 p.m. is when I advised communications that he

7        was handcuffed.

8    Q   All right.  How long after that did you turn off

9        your camera?

10   A   I turned off the camera approximately 1815, by the

11       communications logs.

12   Q   And how would the communication log know that?

13   A   I don't know.  That was just -- it's an approximate

14       from the time we picked him up to the time that we

15       requested an ambulance.

16   Q   You didn't look on the logs to see that you turned

17       off your camera at 8:15 (sic); that's just your

18       estimate from looking at the logs?

19   A   Right.

20   Q   I had misunderstood you.  I thought you said

21       according to radio logs --

22   A   I --

23   Q   -- at 8:15 -- or 1815 which implied to me that you

24       had looked at the radio logs to see an entry for

25       turning off the camera.

Cindy L. Fenton, CSR

**EXHIBIT E**

1  A  No, no, no.  I'm sorry.

2  Q  That's all right.  It's not your fault.

3         So you think you turned off the camera

4     about 6:15.  6:17 you called for EMS?

5  A  Uh-huh.

6         MR. GLENDENNING:  Yes?

7  A  Yes.  Sorry.

8  Q  (BY MR. RATHBUN)  What happened when you saw that he

9     wasn't breathing?

10 A  When he was having the difficulty breathing, I had

11    Officer Dixon remove the -- the hog tie or the dog

12    leash that he was secured with.

13 Q  Why is that?  Why was that?

14 A  Why was that?  Just to relieve him from his

15    restraints.  We also removed the handcuffs.

16 Q  Okay.

17 A  Had Officer McCord check to see if there was a

18    pulse.  Officer McCord checked his pulse and stated

19    that there was one.  I continued to monitor him

20    until it appeared that he was no longer breathing.

21    Immediately after he stopped breathing, I had --

22 Q  Let me ask you there.  So McCord felt for a pulse

23    and found one?

24 A  Yes.

25 Q  You later felt for a pulse and didn't find one?

                    Cindy L. Fenton, CSR

**EXHIBIT E**

1   A   After it appeared that he had stopped breathing,

2       yes.

3   Q   Okay.  So if at 6:17 you called for EMS, when did

4       McCord find a pulse?

5                   MR. GLENDENNING:  Object to form and

6       foundation.

7   A   It would all have been around the same time 'cause I

8       was telling him to do that as I was calling for an

9       ambulance.

10  Q   Okay.  So he found a pulse roughly around 6:17?

11  A   Approximately.

12  Q   You're calling for an ambulance?

13  A   Yes, sir.

14  Q   Then what happens?

15  A   At that time, Mr. Soto was breathing.  He was

16      breathing through pursed lips.

17  Q   What does that say to you?

18  A   That he's having some difficulty, henceforth, why I

19      asked for the ambulance.

20  Q   Okay.

21  A   I continued to monitor him, at which time that it

22      appeared he stopped breathing.  Checked for a pulse.

23      Didn't find a pulse and CPR was began immediately.

24  Q   How long did you do CPR before the EMS folks got

25      there?

Cindy L. Fenton, CSR

**EXHIBIT E**

1    A    Seemed like an eternity, but the exact time, I don't

2         know.

3    Q    Do you indicate in your report when they got there?

4    A    Fire rescue arrived at 1818.

5    Q    So about a minute, a minute after?

6    A    Approximately one minute.

7    Q    Took them about a minute to get there?

8    A    Approximately.

9    Q    Does that sound right?

10   A    Approximately.

11   Q    Okay.  What happened when they got there?

12   A    When they got there, they applied the AED.

13   Q    What's an AED?

14   A    The automatic external defibrillator.

15   Q    And did they use the defibrillator?

16   A    They pressed the analyze button and it advised no

17        shock.

18   Q    Why would it -- have you used a defibrillator

19        before?

20   A    Yes, sir.

21   Q    Under what circumstances does it advise no shock?

22             MR. GLENDENNING:  Object to form and

23        foundation.

24   A    When there's not a shockable cardiac rhythm.

25   Q    (BY MR. RATHBUN)  What does that mean?

**EXHIBIT E**