IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on           )
her behalf and as Next         )
Friend of minor JS,            )
minor HS and minor AS,         )
                               ) Case No. 08-1171-MLB
            Plaintiffs,         )
                               )
vs.                            )
                               )
CITY OF LIBERAL,               )
KANSAS,                        )
                               )
            Defendant.          )


D E P O S I T I O N




        The deposition of CHRISTOPHER HEAD was
taken on behalf of the plaintiff before
CINDY L. FENTON, a Certified Shorthand Reporter of
Kansas, at Jury Room, Seward County Courthouse, 415
North Washington, Liberal, Kansas, on December 9,
2008, commencing at 9:18 A.M.


**EXHIBIT G**

1   Q   Anything that you think we need to change to make it

2       correct or did you think it was pretty correct?

3   A   There was one thing, whenever Mr. Soto told us his

4       name, it says in here that he said his name was

5       Soto.  I think he actually had said his name was

6       John.  That's one --

7   Q   The top of page three where it -- Soto remarked that

8       he was Soto, at the top of page three, second

9       paragraph?

10  A   Yes.  I think -- I don't believe he said his name

11      was Soto.  I think he said his name was --

12  Q   John?

13  A   -- was John.  I'm pretty sure that's what he said.

14  Q   Anything else we need to change to make this

15      correct?

16  A   I believe it's all -- all right.

17  Q   You feel comfortable with it other than that?

18  A   Yes.

19  Q   All right.  Would you give me step-by-step kind of

20      what you recall about that day.

21              MR. GLENDENNING:  Object to form.

22  Q   (BY MR. RATHBUN)  In terms of responding to this.

23              MR. GLENDENNING:  Object to form.

24  Q   (BY MR. RATHBUN)  Go ahead.

25  A   Yes.  At about ten after 6:00, the Liberal police

Cindy L. Fenton, CSR

**EXHIBIT G**

17

1  department received a call of a naked man running

2  around the area of the south McDonald's.

3  Q  All right.  Let me stop you there.

4     The call of a naked man, is that something

5  that you heard before fairly frequently, very

6  infrequent, never heard it before?

7  A  Never heard it before.

8  Q  Okay.  So what did you think when you heard about

9     that?

10 A  The first thing I thought was that the individual

11    may be on PCP.

12 Q  You were aware from your training that sometimes

13    people that are high on PCP and/or on cocaine, you

14    often find them naked or sometimes find them naked?

15 A  Yes.

16 Q  So that right off in your head you thought this may

17    be a PCP or cocaine case?

18 A  Yes.

19 Q  All right.  What happened next?

20 A  At that time, being after 6:00, myself and McCord

21    were off duty.  We asked Sergeant Antrim, or I think

22    he was a corporal at the time, if he wanted us to

23    respond.

24 Q  Can I ask, you asked him in person or --

25 A  In person.  He was running out the door.

Cindy L. Fenton, CSR

**EXHIBIT G**

1    A    Yeah, district MVP.

2    Q    Offense or defense?  Was your MVP, was that for your

3         linebacker play?

4    A    I think so.

5    Q    Okay.  I interrupted you there.  I'm sorry.

6              You said you were on his back, I guess,

7         straddling his back.  What happened then?

8              MR. GLENDENNING:  Object to form.

9    A    It's -- I was on his -- my report stated I was on

10        his back.  I would like to clarify that by saying I

11        was not, like, in the middle of his back.  I was on

12        his -- the lower part of his back --

13   Q    (BY MR. RATHBUN)  Okay.

14   A    -- in order to get the handcuffs behind him.

15   Q    All right.

16   A    As I was straddling Mr. Soto, myself and McCord were

17        struggling with his right arm to get handcuffs on

18        it.  Other officers were on the left.  I don't know

19        who it was, but they were struggling with his left

20        arm.

21   Q    There were two officers on his left arm?

22   A    I don't know.  I don't know.

23   Q    Okay.

24   A    We got the corporal -- or McCord got the handcuff on

25        Soto's right arm.  We got to the middle of his back

**EXHIBIT G**

1    in order to cuff him with his other arm.  Soto was

2    still fighting.  He was fighting so much, he was

3    actually trying to claw at my stomach.

4  Q  Can I stop you there?

5         It sounds like he was very strong.

6  A  Very strong.  He was -- this was probably the

7    hardest struggle I've ever had in law enforcement.

8  Q  Almost like you hear sometimes like a super human

9    strength kind of thing?

10         MR. GLENDENNING:  Object to form.

11  A  I don't know if you would say super human strength,

12    but I would say that he was stronger than an average

13    person.

14  Q  (BY MR. RATHBUN)  How many officers were involved in

15    this in terms of trying to subdue him?  You and

16    McCord?

17  A  Myself, McCord, Ratzlaff, Antrim, Keating and I

18    believe Officer Dixon showed up shortly after.

19  Q  Dixon was taking care of the legs?

20  A  I believe so.

21  Q  All right.  So after you got the handcuff on the

22    right hand, and did you get his arm pulled back?

23  A  Yes.

24  Q  All right.  Then what happened?

25  A  While he was clawing at my stomach, the other

Cindy L. Fenton, CSR

**EXHIBIT G**

25

1      officers were trying to bring his left arm to his

2      back to handcuff him.

3   Q  At the time, can I ask you, was -- did anyone have

4      their Taser --

5   A  Yes.

6   Q  -- unholstered?

7   A  Yes.

8   Q  How many Tasers were out?

9   A  I believe just one.

10  Q  And that was Antrim?

11  A  Corporal Antrim.

12  Q  And did you notice whether there were any drive

13     stuns while this was going on?

14  A  Yes.

15  Q  How many times?  Do you recall?

16  A  I know of at least one.  It was on his shoulder, the

17     trapezius muscle.  It had no effect on him.  He

18     didn't twinge, he didn't seem to -- it didn't seem

19     to bother him at all.

20  Q  Can you hear the clicking noise from the Taser while

21     it was going on?

22  A  Yes.

23  Q  At this -- at this -- while this was all going on,

24     was he saying anything that you considered bizarre

25     or weird, strange?

Cindy L. Fenton, CSR

**EXHIBIT G**

28

1  Q  Let me ask you, in Liberal a guy running around

2     naked, saying that you weren't Americans didn't

3     strike you as being crazy?

4                MR. GLENDENNING:  Object to form.

5  A  I'm not going to say that he was being crazy.  He

6     was just acting out of the ordinary.

7  Q  (BY MR. RATHBUN)  Okay.  Bizarre?

8  A  Yes.

9  Q  All right.  What happened next?

10 A  Knowing that it was going to possibly hurt Soto if

11    we were to pull his other arm back to get a

12    handcuff, I called for another set of handcuffs.

13    One had been on his left hand and then we could

14    handcuff the two handcuffs together.  That would

15    give him another six to eight inches, however long a

16    set of handcuffs are, that much more movement so he

17    didn't get hurt.

18                Once he was cuffed, I got off of him.  It

19    was about that time that he said that -- we were

20    trying to figure out who he was.  It was about that

21    time that he said his name.  I believe he said his

22    name was John.  Sergeant -- sorry.  Officer Keating

23    then recognized him and I tried to get ahold of

24    dispatch so we can contact his family members to see

25    if Mr. Soto had any medical problems or any mental

Cindy L. Fenton, CSR

**EXHIBIT G**

1    his question.

2    Q    Is that a hogtie or a hobble?

3              MR. GLENDENNING:   Object to the form and

4    foundation.

5    Q    (BY MR. RATHBUN)   Go ahead.

6    A    I would say that that's too close to be a hobble

7    restraint.   I think you need more.

8    Q    How far?

9    A    Two feet.   Just enough to keep them from kicking.

10   Q    Have you seen the videotape in this?

11   A    Yes.

12   Q    What's the distance between the feet and the hands

13   when he was restrained?

14   A    I would say probably about two feet, maybe.   I don't

15   know.   There's nothing to really show us to scale,

16   but I know that his feet were -- when his legs were

17   bent, they were barely on his thighs.   They weren't

18   close to being tightly against his buttocks nor his

19   hands.

20             MR. GLENDENNING:   You said parallel to his

21   thighs.

22   A    I'm sorry.   Like a 90-degree angle to his thighs.

23   Q    (BY MR. RATHBUN)   You said they were --

24   A    They appeared to be approximately a 90-degree angle

25   with his thighs.   He had room to move his feet back

Cindy L. Fenton, CSR

**EXHIBIT G**

1     and forth until the hobble restraint restrained him.

2    Q  So if his -- his legs are straight up at the knees?

3    A  When they picked him up, they were.

4    Q  And you've looked at the video?

5    A  Yes.

6    Q  Does it look like he could -- does it look like they

7     were pulled back further than that or straight up at

8     the knees or --

9               MR. GLENDENNING:  Object to form.

10    Q  (BY MR. RATHBUN)  Go ahead.

11    A  I don't understand the question.

12    Q  Sure.

13               You've looked at the video?

14    A  Yes.

15    Q  You saw that his legs were crossed?

16    A  Yes.  I saw they were crossed whenever they -- I

17     don't know if he uncrossed them when they picked him

18     up, though.

19    Q  I'm talking about when he's laying on the ground.

20     His legs were crossed; correct?

21    A  Yes.

22    Q  Feet were tied together?

23    A  Yes.

24    Q  Now, were his feet, if -- bent at the knees, feet

25     straight up in the air, that would be the 90 degrees

Cindy L. Fenton, CSR

**EXHIBIT G**