IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on      )
her behalf and as Next    )
Friend of minor JS,       )
minor HS and minor AS,    )
                          ) Case No. 08-1171-MLB
            Plaintiffs,   )
                          )
vs.                       )
                          )
CITY OF LIBERAL,          )
KANSAS,                   )
                          )
            Defendant.    )


D E P O S I T I O N




        The deposition of DAVID ODLE was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
2:18 P.M.


**EXHIBIT H**

1   Q   Okay.  So the dispatch card is related to this

2       specific incident and the CADVisor is all calls

3       coming in and out at that point?  Did I understand

4       that correctly or did I say that backwards?

5   A   That's -- that's my understanding is how they --

6       they break that up.  I've only seen Exhibit 12, that

7       type of a document, one other time, but I believe

8       that's how they break that up.

9   Q   All right.  Let's take a look at Exhibit 12 now.

10      That's the dispatch card; right?

11  A   Yes, it is.

12  Q   Who would have printed that off?

13  A   These come from our -- our dispatchers.

14  Q   Okay.

15  A   They're -- they have control over this, this

16      information.

17  Q   And if you look before we start with the specific

18      times, it has numbers for you, Antrim, Ratzlaff and

19      Dixon.  What are those?

20  A   Which numbers?  There's one on each side.

21  Q   I'm sorry.  The -- looks like the car numbers on the

22      left; right?

23  A   That's our unit number for the day, that is correct.

24  Q   And what's the number on the right?

25  A   Those are our radio numbers or the badge number.

Cindy L. Fenton, CSR

**EXHIBIT H**

1      That's how we differentiate between each other
2      before we are assigned a unit for the day.
3    Q  All right.  Is the operator, is that simply the
4      dispatcher, L. Willis?
5    A  Yes.  That is the dispatcher that is entering that
6      information at the time.
7    Q  All right.  And when we start out at August the 30th
8      of '06 at 6:01:21, 18:01:21 military time, now, do
9      those times come from -- is that like atomic clock
10     time so that we know they're correct?
11              MR. GLENDENNING:  Object to form and
12     foundation.
13   Q  (BY MR. RATHBUN)  Go ahead.
14   A  There is a clock in dispatch on the wall.  I'm told
15     it is an atomic clock.  Those times are entered by
16     the dispatcher or in this case the operator that's
17     named here.  They're the ones that physically look
18     at the clock.
19   Q  Look up at the atomic clock?
20   A  Key in the item.
21   Q  All right.  So in terms of trying to get this thing
22     pinned down on best time, at least we know that
23     operator is looking at an atomic clock when she's
24     doing this; right?
25              MR. GLENDENNING:  Object to form and

**EXHIBIT H**

1      foundation.

2   A   To my knowledge, that's what they do.  I'm not aware

3       of it being generated by another system.  It's my

4       understanding they physically look at the clock.

5   Q   (BY MR. RATHBUN)  Okay.  What would the first entry,

6       "successful single range match of 24 East Pancake

7       Boulevard."  Any idea what that means?

8   A   I don't know what that means.

9   Q   All right.  If we go down to 6:05:01, it tells us

10      that officer 552 is en route; right?

11  A   Yes, it does.

12  Q   We don't know who that is, though.  I wonder --

13          MR. GLENDENNING:  Why don't we --

14  Q   -- 'cause I don't know who 552 is.  Do you?

15  A   Not off the -- the -- not off the top of my head.

16      We've -- since this incident, officers that were

17      involved have since changed badge numbers because of

18      promotions and that sort of thing.  That would be

19      the 500 numbers.  So without checking --

20          MR. GLENDENNING:  Well, I don't know

21      whether you want me to try to be helpful with what I

22      think.  I don't want to inter -- and I don't want

23      him to testify to what he doesn't know, but there

24      does seem to be an indication up at the top of who

25      the officers are and what their numbers and --

**EXHIBIT H**

1          MR. RATHBUN:  But I don't see a 552.

2   A   In addition to the four names you see, myself,

3       Antrim, Ratzlaff and Dixon were the ones that were

4       indicated as being on duty at that time.  We also

5       had now Sergeant Keating and now Corporal McCord

6       also responding to this that were actually off

7       coming.  That may have been one of their badge

8       numbers.  I don't know.

9          MR. RATHBUN:  Yeah.  I -- Allen, I thought

10      the same thing.  I thought it was Antrim but it's

11      not because Antrim --

12          MR. GLENDENNING:  I was assuming it was a

13      typo.

14          MR. RATHBUN:  I don't think it is.

15      Because if you look four seconds later we actually

16      have Antrim in there.

17  Q   (BY MR. RATHBUN)  What's the -- at scene, is that

18      what A-T-S-C-N-E means?

19  A   That's correct.

20  Q   And there's that 552 again.  Again at 6:05:56 it

21      tells us that Antrim is out with the subject.  It

22      tells us that Ratzlaff arrived at 6:07.  And it also

23      tells us that Antrim discharged or deployed his

24      Taser at 6:07:49; correct?

25          MR. GLENDENNING:  Object to form and

Cindy L. Fenton, CSR

**EXHIBIT H**

1    foundation.

2  Q   (BY MR. RATHBUN)  Go ahead.

3  A   And -- correct, it's -- that's what this document

4      says.

5  Q   When does it say that Odle got there?

6  A   The next two lines are P.D. 10.  That's me.

7  Q   Oh.  Why aren't you 511?

8  A   Because what happens is the -- when you start your

9      day, the watch commanders begin their days, in this

10     case, at 1730 -- 5:30 to 5:30 is our shifts.  The

11     officers on the shift starts their days 6:00 to

12     6:00.  That gives the watch commander a half hour to

13     get in, get set up and ready to go.

14             I had -- already was in service as my unit

15     designation of 10, P.D. 10 that day.  Antrim at that

16     time had yet to go in service as a unit number.

17     That's why they're indicating as a badge number.

18 Q   Oh, I see.  P.D. 10 is your vehicle number on the

19     left-hand side?

20 A   That's correct.

21 Q   Sorry about that.  Subject in custody at 6:08:57.

22     You were already there.  Had been there about a

23     minute.  Or, no, had been there -- yeah, been there

24     about a minute, it looks like.  Except -- explain

25     that to me.  It's got you at the scene at 6:07:51,

Cindy L. Fenton, CSR

**EXHIBIT H**

1      actions were correct.

2  Q   And to the extent they did anything wrong, it was

3      because they'd been trained the wrong way?

4              MR. GLENDENNING:  Object to form and

5      foundation.

6  A   I -- I don't believe their actions were incorrect.

7  Q   (BY MR. RATHBUN)  I understand that, but I asked a

8      different question.

9              MR. GLENDENNING:  No.

10 Q   (BY MR. RATHBUN)  They performed as how they'd been

11     trained; right?

12             MR. GLENDENNING:  Object to form and

13     foundation; and it's been asked and answered.

14 Q   (BY MR. RATHBUN)  Go ahead.

15 A   I believe they acted as they have been trained and

16     correctly.

17 Q   All right.  When you pull up to a scene and you've

18     got a naked guy standing there yelling that one of

19     your officers has a nuclear device, does that say to

20     you that this person has some problems?

21             MR. GLENDENNING:  Object to form and

22     foundation.

23 A   I have never responded directly to a scene initially

24     that had a guy naked making those statements.  It's

25     certainly not normal police work that we deal with,

                    Cindy L. Fenton, CSR

                        **EXHIBIT H**

1          those type of --
2     Q    It's not the normal thing you run into every day in
3          Liberal, Kansas?
4     A    Exactly.
5     Q    All right.  As you pulled up there, it was obvious
6          there was something wrong with this guy?
7               MR. GLENDENNING:  Object to form.
8     A    When -- when I arrived, he was handcuffed and lying
9          on the ground.
10    Q    (BY MR. RATHBUN)  Oh.  All right.  All right.
11         What's a -- I'm looking at your -- what's a hobble
12         restraint.
13    A    It is a length of nylon cord used to bind an
14         individual's feet together.
15    Q    All right.  Is there a difference between a hobble
16         restraint and a hog tie?
17              MR. GLENDENNING:  Object to form.
18    A    I'm -- I'm not really familiar with a hog tie, per
19         se, beyond what would be used to tie cattle or
20         something like that.  Hobble restraint is merely to
21         bind someone's feet together, physically together.
22    Q    (BY MR. RATHBUN)  And does it -- like, can I be
23         sitting in a chair and my feet -- sitting in a chair
24         with my feet out in front of me with my feet tied
25         together?  Is that hobble restraint?


                    Cindy L. Fenton, CSR



                    **EXHIBIT H**

1  Q   Okay.  How long did you get there before they

2      started carrying him back to Antrim's vehicle to

3      take him to -- let me back up.

4              Do you know what they were going to do

5      with him?

6  A   At what point?

7  Q   When they started carrying him back towards Antrim's

8      vehicle.

9  A   Prior -- prior to him being transported back to the

10     car, I asked Antrim if we needed medical assistance,

11     an ambulance.  He stated he didn't believe so, but

12     we were going to need to take him to be evaluated at

13     Southwest Med, the hospital.  It was my belief when

14     he was being transported to the car that he was

15     going to be transported directly to Southwest

16     Medical Center.

17 Q   And, in fact, you have here in your report the

18     officers then picked up Mr. Soto and began

19     transporting him back to Car 11 where he was going

20     to be transported to Southwest Medical Center; is

21     that correct?

22 A   That's correct.

23 Q   Okay.  Were you there when this was going on,

24     standing right there by the vehicle?

25 A   When we were transporting, yes, I was walking beside

Cindy L. Fenton, CSR

**EXHIBIT H**

44

1        the officers.

2    Q   When the officers sat him on the ground to open the

3        car door, it appeared that he became unconscious and

4        passed out.  Was that your observation?

5    A   That was my observation, yes.

6    Q   Was he sitting up and just fell over or how did --

7        what did you see?

8    A   When they were carrying the gentleman to the car, he

9        had -- was speaking to the officers or saying

10       something apparently to the officers.  We got back

11       to where the patrol unit was at.  He quit talking at

12       that point.  The officers sat him on the ground next

13       to the patrol car.  He became limp and slumped to

14       one side.

15   Q   Like sat him on the ground as in seated?

16   A   He was -- he was seated next to the -- towards the

17       rear of the patrol car.

18   Q   And then just kind of fell over to the side?

19   A   Just kind of slumped over, yes.

20   Q   Look at Deposition Exhibit 12, which is the time

21       frame and see if you can look at that to give me an

22       idea of the approximate time that happened.

23           MR. GLENDENNING:  Object to form and

24       foundation.

25   A   At what time he slumped over?

Cindy L. Fenton, CSR

**EXHIBIT H**

1  Q  Yeah.  Right.  I mean, if you read your report, the
2     next paragraph they start talking about Antrim going
3     to his unit to retrieve a CPR mask and they indicate
4     on there when CPR was started, was what time?
5  A  This states CPR started at 18:17:43.
6  Q  So from your observation, what you know, being there
7     at the scene, he slumped over at approximately what
8     time?
9  A  To compare that to this document, it would be
10    approximately around the time that this states
11    "requested 49," somewhere around the 18:17:28 time
12    frame, give or take.
13 Q  Remind me again.  I apologize.  What is 10-49?  Is
14    an ambulance?
15 A  Is request for an ambulance.
16 Q  Who called for the ambulance?  Do you remember?
17 A  I believe it was Antrim.
18 Q  Okay.  And so if the request for ambulance is made
19    at 6:17:28, he would have passed out at roughly
20    6:17, in that vicinity?
21 A  It would have been shortly before that.
22 Q  Shortly before that?
23 A  Yes.
24 Q  All right.  How far away was fire rescue?  When I
25    say call for ambulance, would that have been the

Cindy L. Fenton, CSR

**EXHIBIT H**