IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

CASE NO. 08-1171-MLB-DWB

TONYA A. BOWEN-SOTO, on her behalf
and as Next Friend of JS, HS and AS,

        Plaintiff,

vs.

CITY OF LIBERAL, KANSAS,

        Defendant,

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF ANDREW J. SCOTT, III

TUESDAY, MARCH 31st, 2009
515 EAST LAS OLAS BOULEVARD, SUITE 1300
FORT LAUDERDALE, FLORIDA
10:57 a.m. - 12:51 p.m.

STENOGRAPHICALLY REPORTED BY:
VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
ESQUIRE DEPOSITION SERVICES
FORT LAUDERDALE OFFICE

**EXHIBIT I**

1  favoritism.
2      Q.   The evidence storage company, is that a
3  company that offers services for storing evidence?
4      A.   Yes, it is.
5           The company's dormant now but it is a viable
6  company but it's not doing business right now.
7      Q.   I assume the primary benefit there would be
8  the security that you would offer for the evidence?
9      A.   Yes, and given my knowledge and expertise in
10 property storage of evidence and chain of custody.
11     Q.   Do you have any kind of medical training?
12     A.   No.
13     Q.   You have first aid, I would assume?
14     A.   Yes.  It's been awhile.
15     Q.   And that would include CPR training?
16     A.   Yes.
17     Q.   Do you have any training beyond that?
18     A.   No.
19     Q.   Any kind of EMT training or anything like
20 that?
21     A.   No.
22     Q.   How big of a community is Boca Raton?
23     A.   Boca Raton is a population of approximately
24 eighty-five thousand people, approximately twenty-seven
25 square miles, about a hundred and ninety-seven sworn,

**EXHIBIT I**

1  about another hundred and twelve, maybe a hundred and
2  twenty civilian population.  Excuse me.  A hundred and
3  twenty civilian staff.
4      Q.   Okay, so somewhere around three hundred total
5  staff in the police department?
6      A.   Yes.
7      Q.   Okay, does that community border other
8  communities to form a greater metropolis than just it?
9      A.   Well, it borders other communities, but is it
10 considered a metropolitan area with a specific name such
11 as the Miami area?  No, it doesn't.  It's not considered
12 part of West Palm Beach nor is it considered part of
13 Broward County.  It's a stand-alone city.  Sometimes
14 it's referred to as South County.
15     Q.   I understand that it's a stand-alone city but
16 are its borders right up against another populated city?
17     A.   Oh, sure.  That would be Deerfield Beach to
18 the south, Delray Beach to the north.
19     Q.   Okay, how about to the west?
20     A.   Unincorporated.
21     Q.   And to the east is the ocean?
22     A.   The ocean.
23     Q.   Have you ever been employed in a community of
24 the size and character of the City of Liberal, Kansas?
25     A.   I have.

**EXHIBIT I**

1  North Miami Beach is the city I retired from
2  as an Assistant Chief. We had about forty-five thousand
3  people in the community. We had a few more officers
4  than Liberal did.
5       Q.   How many officers did North Miami have when
6  you were there?
7       A.   North Miami Beach had approximately
8  ninety-five officers.
9       Q.   Okay, does that community form part of the
10 Greater Miami or metropolitan area?
11      A.   Yes, it does. It's considered part of the
12 Miami area.
13      Q.   In any of your previous employment have you
14 ever been responsible for actually writing a complete
15 policy and procedure manual for a police department?
16      A.   Yes.
17      Q.   When and where?
18      A.   That would be the North Miami Beach Police
19 Department and I was the accreditation manager. I was
20 that for several years and then I had the other
21 responsibility of reviewing all of the policies and
22 procedures for the Boca Raton Police Department when I
23 came onboard, but I didn't rewrite them as to your
24 question.
25      Q.   Okay, when you say came onboard, do you mean

**EXHIBIT I**

background investigation that I claimed that he was unethical and subsequently -- And that was within a five minute conversation when this individual was from another law enforcement agency on the west coast of Florida. The background investigator came in, interviewed me. I don't recall the exact nature of the conversation other than, you know, what type of employee was he and the interview lasted maybe five minutes and subsequently he claims that I disparaged his character.

    Q. What happened in that lawsuit?

    A. Dismissed.

    Q. Was it settled?

    A. No. It was dismissed.

    Q. Other than the three ethics complaints in that lawsuit, were there any other complaints or lawsuits made against you while you were at Boca Raton?

    A. No.

    Q. While you were actively employed as a police officer did you ever have occasion to deal with someone who was suffering from excited delirium?

    A. In retrospect, yes.

    Q. Okay, when?

    A. It would have to be in the early 1980's. I don't recall exactly what the instances were.

    Q. When you say in retrospect, does that mean you

**EXHIBIT I**

```
 1  didn't realize it at the time?
 2       A.   At the time back in the early 80's, and I'm
 3  talking about 1980, '81 the concept of excited delirium
 4  was just, I think, on the radar screen and so we did not
 5  know what it was precisely.
 6       Q.   Do you know what induced the excited deliriums
 7  in those cases in the early 1980's?
 8       A.   Heavy use of narcotics, particularly cocaine.
 9       Q.   That's a common cause of excited delirium,
10  isn't it, cocaine overdose?
11       A.   I'm not sure if it's cocaine overdose, that I
12  can't opine on, but --
13       Q.   Cocaine use?
14       A.   Cocaine in the body, yes.  Ingestion of
15  cocaine.
16       Q.   And since the early 1980's have you ever had
17  to deal personally with anyone with excited delirium?
18       A.   No.
19       Q.   While you were actively employed as a police
20  officer, did you ever carry a TASER?
21       A.   No.
22       Q.   Have you ever been involved in the deployment
23  of a TASER?
24       A.   No.
25            I've been subjected to a TASER being deployed
```

**EXHIBIT I**

1  on me but I've never personally deployed one, no.
2      Q.    And I assume that was in training?
3      A.    Yes.
4      Q.    You have had training in TASERs?
5      A.    Yes.
6      Q.    But you never had occasion to actually use one
7  or carry one?
8      A.    No.
9      Q.    When was your training?
10     A.    Training was back when we first brought them
11 on in 2002, but I also had another training in 2005, but
12 the initial training I did not participate in the class,
13 meaning the actual instruction of the class. I just
14 participated in being subjected to the stun of the
15 TASER.
16     Q.    So the first actual training you had in the
17 use of a TASER was 2005?
18     A.    2005, that is correct.
19     Q.    Who provided that training to you?
20     A.    It was in-house training by one of our
21 trainers.
22     Q.    And by in-house you mean inside your
23 organization?
24     A.    Yes. The Boca Raton Police Department.
25     Q.    Have you ever had any training on dealing with

**EXHIBIT I**

31

1  a person who is suffering from excited delirium?
2       A.    Not that I recall.
3       Q.    Did any of the policies that you were ever
4  involved in in reviewing or writing specifically deal
5  with a person -- How to deal with a person with excited
6  delirium?
7       A.    Going back to the mid 80's I don't recall that
8  it dealt specifically with excited delirium.  However,
9  it did deal with mentally ill individuals and at that
10 time we just kind of lumped those behavior patterns that
11 we considered, you know, not of the norm under a
12 mentally handicapped or mentally ill patient and so we
13 created a policy relevant to that.  I can't remember
14 specifically what it was it was so long ago.
15      Q.    But there's never been a policy that you were
16 responsible for reviewing or your writing that
17 specifically dealt with excited delirium?
18      A.    Other than being at the Boca Raton Police
19 Department I do recall a policy being reviewed with
20 regards to excited delirium/mental health but I can't
21 recall specifically what it was.
22      Q.    Did you ever have occasion to write or review
23 policies dealing with TASER deployment?
24      A.    Yes.
25      Q.    Okay, when have you done that?

**EXHIBIT I**

1  very cautious as to when you use the TASER relating to
2  an individual that's exhibiting certain types of
3  behavior patterns.
4       Q.   I think in your report you specifically said
5  that law enforcement actually sanctions the use of a
6  TASER even in cases of excited delirium?
7       A.   Yes.
8       Q.   And when you say sanctions, you mean approves?
9       A.   Yes.
10      Q.   Were you ever actively involved in training
11 police officers?
12      A.   Yes.
13      Q.   Okay, when was that?
14      A.   During the course of my career I was a
15 trainer.  I trained in the use of at the time batons, I
16 trained in Internal Affairs investigations, but that's
17 pretty much it, and I also trained folks on the S.W.A.T.
18 Team.
19      Q.   And in those activities as a trainer you were
20 given a specific thing to train on?
21      A.   I don't understand the question.
22      Q.   Well, you said you trained on batons, you
23 trained the S.W.A.T. Team and there was one other one.
24 I don't recall right now.
25      A.   Internal Affairs.

**EXHIBIT I**

1       A.    I don't think there was.
2       Q.    When officers came to your department, to
3  either North Miami Beach or Boca Raton and they had been
4  through the state sanctioned academies, did you expect
5  them to have a certain minimum amount of training?
6       A.    Yes.
7       Q.    Did you expect your departments to redo all of
8  that training or build upon that?
9       A.    Build upon it.
10      Q.    Have you ever worked as an expert witness on
11 any cases that you would consider to be similar to this
12 one in any significant way?
13      A.    Yes.
14      Q.    Which ones?
15      A.    Do you happen to have my testimony list before
16 you?
17      Q.    I don't have your updated one but I have the
18 one that was sent to me.
19      A.    Thank you.
20      Q.    Is it not in your file?
21      A.    I don't think I attached it to it.
22            There's one case in particular.
23      Q.    Here.  Let me do this.  Here's a separate copy
24 of it.
25      A.    Thank you, sir.

**EXHIBIT I**

1  A. Yes.
2  Q. Which would have been about ten or eleven
3  minutes after Antrim arrived on the scene?
4  A. Yes, and if I'm mistaken by all means I'll
5  take a look at the time line.
6  Q. When an officer arrives on the scene it's
7  going to take him a little bit of time to decipher what
8  he's dealing with, correct?
9  A. Sure.
10 Q. You wouldn't fault Officer Antrim for taking a
11 minute or two to determine whether he had a case of
12 excited delirium on his hands, would you?
13 A. No.
14 Q. So if he arrived at 6:06, took a couple of
15 minutes to determine that he had excited delirium and
16 immediately summoned an ambulance, the ambulance
17 wouldn't have arrived until around 6:13?
18 A. Are you asking a question or making a
19 statement?
20 Q. No. I'm asking it.
21    Would that be true based on what you know
22 about the response time in this case?
23 A. Could possibly be.
24 Q. Do you know when the cardiac arrest occurred?
25 A. No, I do not.

**EXHIBIT I**

1    question.  No, I don't.
2  BY MR. GLENDENNING:
3        Q.   In any of your training have you run across
4  any literature that tells you what the chances of
5  survival are?
6        A.   They're low.  I do not have a specific number.
7        Q.   I had asked you earlier about your personal
8  involvement with cases involving excited delirium.
9  Apart from that when you were Chief of Police or in a
10 command staff of Boca Raton did you ever have any cases
11 that you had to review as a command staff or as Chief of
12 Police that involved how your officers dealt with
13 someone in excited delirium?
14       A.   I don't recall if I did or I did not.
15       Q.   Do you even know whether excited delirium was
16 something your officers were encountering on any kind of
17 regular basis in Boca Raton?
18       A.   I wouldn't say it was on a regular basis.  I
19 am certain that some folks did encounter it.  I just
20 don't recall it right now.  We're working on ten years
21 worth of memory.
22       Q.   Do you have any information that anyone in the
23 City of Liberal ever encountered a case of excited
24 delirium prior to this one?
25       A.   Not to my knowledge.

**EXHIBIT I**

1    Q.   What's your definition of a hogtie?
2    A.   Anytime that an individual is restrained with
3 his hands behind his back, his ankles are subsequently
4 restrained as well and that the ankles are attached to
5 the handcuffs to his back.
6    Q.   What's a hobble restraint?
7    A.   A hobble restraint is a restraint that's
8 utilized to tie the legs together.
9    Q.   Have you ever heard or read any literature
10 that makes a distinction between hobble restraint and
11 hogtied based on how close the ankles are to the hands?
12   A.   Yes, I have, and that distance is under a foot
13 between the distance of the ankle and the distance to
14 the handcuffs would consider it a hogtie in some circles
15 and then any length beyond a foot would be considered a
16 hobble.
17   Q.   But in your definition you don't make that
18 distinction?
19   A.   No, and what I was trained and what we trained
20 our officers when I was trained in North Miami Beach,
21 and when I say trained, we were told never to hogtie
22 anybody and that hogtying there was no distinction
23 between the distance between a piece of rope or chain
24 from the attachment of the handcuffs to their ankles.
25        Anybody that has any type of attachment with

**EXHIBIT I**

```
 1      A.    I don't understand the question.
 2      Q.    Can a department have policies that they
 3   haven't put in writing that they're understood and
 4   passed on orally?
 5      A.    You mean past practice?
 6      Q.    Yes.  That would be one way.
 7      A.    Custom, sure.
 8      Q.    Policies can be general or they can be
 9   specific?
10      A.    Correct.
11      Q.    It wouldn't be possible to make a policy that
12   had a specific line or paragraph about every possible
13   situation an officer may encounter, would it?
14      A.    No.  Policies aren't meant to be that way.
15      Q.    All right, and, for example, you can have a
16   policy of no excessive force and you don't have to list
17   every possible way that an officer could use excessive
18   force?
19      A.    If that's the extent of your policy that
20   you're citing speculatively that would be a diminished
21   policy.
22      Q.    But it wouldn't be required that the policy
23   list every possible way in which force could be used
24   excessively, would it?
25      A.    No, no policy's ever written that way.
```

**EXHIBIT I**

1  officer?
2      A.   I do recall that one of the officers involved
3  in this case indicated that he has hogtied -- I think
4  used the hogtie one other time.  I don't know
5  specifically what it was and I don't remember the name
6  of the officer.
7      Q.   So as far as you know the hogtying has been
8  used in Liberal, Kansas twice?
9      A.   I can't even speculate on that.
10     Q.   But that's as far as you know?  You only know
11 of two instances?
12     A.   I guess, yes, based on what we're talking
13 about.
14     Q.   Do you know whether or not any of the
15 supervisors that were on the scene with Mr. Soto that
16 day were aware that he was hogtied?
17     A.   Yes.
18     Q.   How do you know that?
19     A.   If I recall correctly the deposition testimony
20 of Mr. Antrim -- excuse me -- Corporal Antrim was a
21 supervisor on the scene and he was a witness to that and
22 I believe another sergeant came up on the scene, I think
23 that was Sergeant Odle, O-d-l-e, I believe he was on the
24 scene as well.
25     Q.   Do you know if Sergeant Odle actually observed

**EXHIBIT I**

1  knowledge that the restraint was less than a foot if it
2  were?
3      A.   Not to my knowledge.
4      Q.   I think you indicated in your report that use
5  of a hogtie has long been inconsistent with standard law
6  enforcement practices?
7      A.   Correct.
8      Q.   And, again, we're using the broad definition
9  of hogtie as any restraint that connects ankles and
10 feet?
11     A.   That's correct.
12     Q.   How long has that been inconsistent with
13 standard law enforcement practices?
14     A.   Probably the mid 80's.
15     Q.   Has that issue been one that's been a
16 standard -- Strike that.
17          Have the law enforcement practices suggesting
18 that hogtying should not be used, is that something
19 that's been a standard part of the police officer basic
20 training since the 80's?
21     A.   I don't think hogtying has been an aspect of
22 training in academies, particularly the academy's I'm
23 familiar with here in Florida.
24          It could be different in Kansas.
25     Q.   You don't know if hogtying comes up in any of

**EXHIBIT I**

1       at all.
2   BY MR. RATHBUN:
3       Q.   Before you get out of the car you pull up and
4   see somebody standing there naked in the middle of a
5   public area screaming crazy things, hitting themselves,
6   swatting at flies, I mean, it was obvious this guy had
7   serious problems?
8           MR. GLENDENNING:  Object to form and
9       foundation.
10  BY MR. RATHBUN:
11      Q.   Go ahead.
12      A.   It appeared that he was significantly
13  troubled, yes.
14      Q.   Now, let me make certain I understand this on
15  the issue of the hogtie.  You're not saying that the
16  hogtie involved here was greater than one foot, are you?
17      A.   No.  The issue is the fact that he was
18  hogtied.
19      Q.   All right, but I mean you're not assuming
20  factually that it was in excess of a foot, are you?
21      A.   No.
22          MR. RATHBUN:  I have nothing further.
23                  REDIRECT EXAMINATION
24  BY MR. GLENDENNING:
25      Q.   Sir, you wouldn't expect the EMTs to actually

**EXHIBIT I**

1  attempt to do anything with Mr. Soto until he was
2  subdued and restrained, correct?
3       A.   That is correct.
4       Q.   And from reviewing the tapes -- Well, let me
5  just ask you it this way:  There's a distinction between
6  mental illness and excited delirium but initially they
7  can look alike, correct?
8       A.   They can, yes.
9       Q.   At what point in this case do you think it
10 should have been apparent that he was in excited
11 delirium as opposed to just drunk or mentally ill?
12      A.   Well, based on the DVD memorialization of the
13 incident probably within the first minute while he was
14 still chatting with him, meaning Antrim was speaking or
15 trying to communicate with Mr. Soto that this was
16 something beyond just mental illness based upon the
17 psychological description that Corporal Antrim gave.
18      Q.   How long into Mr. Antrim's contact with
19 Mr. Soto was it that Mr. Soto fled?
20      A.   I would say about two minutes and thirty
21 seconds.
22           Hold on.  Let me check here real quick.
23           Probably a couple minutes.
24      Q.   The reason that it's important to get a person
25 subdued immediately who is suffering from excited

**EXHIBIT I**



AJS Consulting, Inc.
750 Elm Tree Lane
Boca Raton, Florida 33486
(561) 302-0756 Tel
(561) 892-8250 Fax
ascott@ajspoliceconsulting.com
www.ajspoliceconsulting.com

December 31, 2008

**CASE:**

**In The United States District Court District of Kansas; Case # 08-1171-MLB**

Tonya Bowen - Soto
v.
City of Liberal

**ATTORNEY:**

Randall K. Rathbun

**FIRM ADDRESS:**

Depew Gillen
Rathbun & McInteer, LC
8301 East 21$^{st}$ Street North, Suite 450
Wichita, KS 67206-2936

(T): 316-262-4000
(F): 316-265-3819

**DATE RETAINED:**

October 7, 2008.

**ITEMS REVIEWED:**

I received the below listed items for review:

1. Investigation report re: receipt of Kansas Standard Offense report.

EXHIBIT I

DEFENDANT'S
EXHIBIT
1  Scott
3-31-09 VC

noted in the case being discussed (ultimately termed Excited Delirium Syndrome). As a result of the lack of knowledge about this particular type of syndrome officers were utilizing inadequate techniques and practices when apprehending these individuals. Individuals exhibiting Excited Delirium were subjected to hogtying, potential positional asphyxia, excessive force, and delayed medical attention.

The use of a TASER weapon on individuals exhibiting Excited Delirium behaviors has been sanctioned by law enforcement. However, law enforcement had been cautioned that emergency medical personnel should be immediately available once a TASER type weapon was used on an individual exhibiting the behaviors similar to Mr. Soto. Furthermore, information was available to law enforcement about the perils of sudden death of individuals exhibiting Excited Delirium behaviors and persons exhibiting such behaviors should be seen by medical personnel as soon as possible. These recommended protocols have been available to law enforcement on a national basis since 2004 relating to individuals exhibiting Excited Delirium behaviors who were not subjected to a TASER deployment, and in 2005 involving the use of TASERs on individuals exhibiting Excited Delirium behaviors. National law enforcement associations such as the International Association of Chiefs of Police and the Police Executive Research Forum have provided ample information to law enforcements agencies throughout the country to assist them in revising department policies and training protocols prior to the incident involving Mr. Soto.

The sworn personnel of the Liberal Kansas Police Department did not receive adequate training regarding individuals exhibiting Excited Delirium Syndrome behaviors. The Liberal Police Department did not provide proper training to its members on the subject of Excited Delirium and the use of TASERs on individuals exhibiting such behaviors, when such training and information was readily available prior to the Soto incident. Officers of the Liberal Kansas Police Department received TASER training as it relates to the use of different models of the TASER weapon, specifically the M26 and the newer TASER model X26. In 2006 TASER International warned law enforcement agencies that were in possession of TASER weapons that officers should be cautious when utilizing the TASER on individuals exhibiting bizarre behavior. Specifically, on April 12, 2006 TASER International provided a product warning to law enforcement specifically identifying the health risks related to Sudden In-Custody Death Syndrome. In said bulletin the warning stated "if a subject is exhibiting signs or behaviors that are associated with Sudden In-Custody Death Syndrome, consider combining use of a TASER device with immediate physical restraint techniques and medical assistance. Signs of Sudden In-Custody Death Syndrome include: extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain, paranoia, exhaustive exertion, "superhuman" strength, hallucinations, sweating profusely, etc." Additionally the Police Executive Research Forum made available to law enforcement information regarding the use of a TASER device on individuals exhibiting such behavior. The Police Executive Research Forum cautioned agencies to have emergency medical staff respond immediately after the deployment of a TASER device on an individual exhibiting such behaviors. Similarly, the IACP Model Policy *Electric Control Weapon* issued in 2005, recommended individuals exhibiting uncontrolled agitation or hyperactivity prior to Electronic Control Weapon deployment should be taken to an emergency medical facility for evaluation after deployment.

# EXHIBIT I