IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA A. BOWEN-SOTO, on her )
behalf and as Next Friend )
of JS, HS and AS, )
       Plaintiff, )
vs. ) Case No. 08-1171-MLB-DWB
CITY OF LIBERAL, KANSAS, )
       Defendant. )

D E P O S I T I O N

The deposition of **JESSICA NAVARRETTE**, a witness, taken pursuant to Federal Code of Civil Procedure, before Susan Maier, a Certified Shorthand Reporter of Kansas, at Seward County Courthouse, 415 North Washingotn, Liberal, Kansas, on the 3rd day of March, 2009, at 11:00 a.m.

---

**Page 3**

I N D E X

JESSICA NAVARRETTE

| | |
|---|---|
| Direct Examination by Mr. Glendenning | 4 |
| Cross-Examination by Mr. Rathbun | 24 |
| Redirect Examination by Mr. Glendenning | 34 |
| Recross-Examination by Mr. Rathbun | 37 |
| Further Redirect by Mr. Glendenning | 39 |
| SIGNATURE OF WITNESS | 41 |
| CERTIFICATE OF CERTIFIED SHORTHAND REPORTER | 42 |

CONDENSED

---

**Page 2**

A P P E A R A N C E S

The plaintiff appeared by and through her attorney, Randall K. Rathbun of Depew, Gillen Rathbun & McInteer, 8301 East 21st Street North, Suite 450, Wichita, Kansas 67206-2936.

The defendant appeared by and through its attorney, Allen G. Glendenning of Watkins, Calcara, 1321 Main Street, Suite 300, Great Bend, Kansas 67530.

---

**Page 4**

JESSICA NAVARRETTE called as a witness, having been first duly sworn by the reporter, testified as follows:

DIRECT EXAMINATION

BY MR. GLENDENNING:

   Q   Would you state your name and address, please?

   A   Jessica Navarrette, 1691 North Calhoun, Liberal, Kansas.

   Q   Have you ever had your deposition taken before?

   A   No.

   Q   Have you talked to anybody about what a deposition is or what you might expect?

   A   They said just lots of questions.

   Q   Okay. Well, a deposition is an opportunity for the attorneys for parties in a lawsuit to ask you questions similar to what you might be asked if the case goes to trial and you're called to testify at trial. It helps us find out what your testimony may be, it may help us get the case resolved before having to go to trial. On the other hand, it kind of nails it down so that if you do come to trial and you say something different

**EXHIBIT L**

## Page 5

than you tell us here today, we can point out that your stories don't match, one or both of us. Do you understand that?
A   Yes.
Q   Do you understand everything you say here today is under oath the same as if we were in a courtroom?
A   Yes.
Q   And that everything is being taken down word-for-word by the court reporter?
A   Yes.
Q   So, if you are asked a question that you don't understand, don't try to answer it. Tell us you don't understand it. Will you do that?
A   Yes.
Q   If we talk too loud or too fast or bother you in any way, let us know that as well. Will you do that?
A   Okay.
Q   Have you brought with you the report from your EMS service on this run?
A   Yes, I have.
Q   Okay. And I've had marked as Deposition Exhibit No. 1 a copy of that report. Is that a true and accurate copy of the report you brought?

## Page 6

A   Yes, it is.
Q   I think it has -- Exhibit 1 actually has some additional CadVisor stuff on the back?
A   Yes, and it has a cardiac rhythm strip, also.
Q   Do you know why your report doesn't have the cardiac rhythm strip?
A   Because it was just a copy. I don't know why.
Q   Does the cardiac rhythm strip that's part of Exhibit 1 appear to be the cardiac rhythm strip applicable to this run?
A   Yes.
Q   And you work for the Seward County EMS?
A   That's correct.
Q   What's your official title?
A   Paramedic/shift supervisor.
Q   How long have you had that position?
A   Shift supervisor for five years. Paramedic, I've been here six-and-a-half years.
Q   Okay.
       MR. RATHBUN:   Jessica, could you speak up just a little bit? With that thing here it's kind of hard to hear you at this end.
A   I'm sorry.

## Page 7

       MR. RATHBUN:   That's all right.
Q   So, you would have been a paramedic and the shift supervisor in August of 2006?
A   Yes.
Q   And could you tell us briefly what your training and experience is in EMS work?
A   I've been in EMS for approximately ten years. Started out as an EMT and went right on to paramedic school, which was two years of training.
Q   When did you complete paramedic school?
A   2001.
Q   Okay. As a paramedic are you allowed to administer drugs on a run?
A   Yes.
Q   Do you deal with -- As a paramedic do you handle the defibrillator?
A   Yes, I do.
Q   Do you have any special training beyond normal training on that?
A   We have -- I have an Advanced Cardiac Life Support and we have to remain certified in CPR.
Q   Are there certain heart conditions or arrhythmias that the defibrillator works on and some that it doesn't?
A   Yes.

## Page 8

Q   Can you tell us what those are?
A   Asystole, it will not work on. It will work on V-fib and V-tach.
Q   Okay. Does the Seward County EMS service have any standard policies, whether written or unwritten, with regard to what you're to do if you're called to a police scene and the subject is combative or resisting?
A   I don't think that we have any standing policy. I think we just let the police department handle it until we are needed.
Q   Okay. So you don't have a written policy?
A   I don't think so.
Q   And you don't think you have necessarily an unwritten policy that you call a policy, but you probably have a practice, right?
A   Yes.
Q   Okay. And what is that practice?
A   To let the police department handle it until we are needed.
Q   Okay. The police department -- The police would have to tell you when they are ready for you to come in?
A   Yes.
Q   Okay. If a subject were subdued and you

**EXHIBIT L**

Page 9

```
 1  were called in to look at him and then he became
 2  combative or resistive again, would you retreat
 3  until that situation was resolved by the officers?
 4     A   Depending on the patient's condition. If
 5  he was critical, I would hope to have the police
 6  department standing right there to be able to assist
 7  us.
 8     Q   Okay. Have you had any experience with
 9  subjects in excited delirium here in Liberal?
10     A   This was my first case.
11     Q   Is this the only case so far?
12     A   This is the only case so far.
13     Q   And that's in six-and-a-half years here?
14     A   Uh-huh.
15     Q   Yes?
16     A   I'm sorry, yes.
17     Q   "Huh-uh's" and "uh-huh's" kind of look
18  alike on the record.
19         Have you had any training in how to deal
20  with subjects that are in excited delirium?
21     A   Not before this call. We had a paramedic
22  refresher class that we had an officer discuss it.
23     Q   When was that refresher class?
24     A   About six months ago.
25     Q   Okay. Who was the officer that discussed
```

Page 10

```
 1  that with you?
 2     A   John Antrim.
 3     Q   Corporal Antrim of the Liberal Police
 4  Department?
 5     A   Corporal, yeah.
 6     Q   Based on that training is there anything
 7  that you would have done differently as a paramedic
 8  on this case?
 9     A   No, there's not.
10     Q   If you come to a subject that might be in
11  excited delirium and then he arrests, what do you
12  do?
13     A   Provide CPR and advanced cardiac life
14  support. We intubate them and follow our cardiac
15  protocol, whichever rhythm he was in.
16     Q   What's the advanced cardiac life support
17  beyond CPR that you would have provided?
18     A   Intubation, IV, cardiac drugs.
19     Q   You said depending upon the arrhythmia
20  that he may be in you have different protocol?
21     A   Yes.
22     Q   What's protocol for asystole?
23     A   Intubation, CPR and Epinephrine and
24  Atropine.
25     Q   Have you ever had occasion to work with a
```

Page 11

```
 1  subject that has vomited and aspirated?
 2     A   Yes.
 3     Q   What do you do with that situation?
 4     A   You suction them and intubate them.
 5     Q   Is there any particular position you would
 6  try to get them in if you saw them vomiting?
 7     A   As long as they are not a trauma patient
 8  we would get them on their left side to try to
 9  suction out as much vomit as we could.
10     Q   Would you want them sitting up?
11     A   Well, if they are in a code blue status
12  it's not really conducive to have them sitting up.
13     Q   Well, I'm talking about before they
14  actually -- When they start vomiting, would you want
15  them sitting up?
16     A   You can sit them up or you can put them on
17  their left side.
18     Q   You wouldn't want them laying on their
19  back?
20     A   No.
21     Q   If they were face down, would that
22  increase or decrease or have any affect on the
23  chances of aspiration?
24     A   I think it would have a decrease on the
25  chance, because he's going to vomit and it's going
```

Page 12

```
 1  to go straight out of his mouth instead of having
 2  that chance of breathing it in.
 3     Q   Do you actually have a memory of this
 4  particular run on August 30, 2006?
 5     A   Yes, I do.
 6     Q   And you've looked at your report before
 7  you came in, is that correct?
 8     A   Yes.
 9     Q   Do you guys on the Seward County EMS
10  monitor emergency radios? Kind of keep an ear out
11  for what's happening out there?
12     A   Not usually.
13     Q   Okay. Do you remember having any
14  information about this event as it was transpiring
15  before you got the actual dispatch?
16     A   No.
17     Q   What time did you receive the dispatch?
18     A   At 18:17.
19     Q   Okay. Do you recall where you were when
20  the dispatch came in?
21     A   No, I don't. I don't know if we were at
22  the station or if we were out and about.
23     Q   Okay. Where would your station have been?
24     A   It's in front of the hospital.
25     Q   So how far would that be from where this
```

**EXHIBIT L**

## Page 21

Q And the reason you didn't get to the second drug is because you had to redo the intubation?
A Yes.
Q I think your report indicates that you observed a laceration on his face?
A Uh-huh.
Q Do you remember what that looked like as far as a cut, a scrape, a bruise?
A I don't remember what it looked like. From the report, it just says an abrasion.
Q Does abrasion mean something specific to you as opposed to a cut or a bruise?
A An abrasion is like a strawberry that you would get from sliding into base. And then a laceration is a cut.
Q You say this was an abrasion?
A In my "Head To Toe Assessment" it says laceration to the face.
Q Okay. But you don't remember what it was?
A I don't remember exactly what it was.
Q No one told you how it got there?
A No.
Q Could you even assess whether or not it was fresh as opposed to maybe a day old?

## Page 22

A Yeah. You know, if it's still bleeding you can tell if it's fresh. If it's scabbed over.
Q Do you have any information at all about what caused that?
A No, I don't.
Q Does a history of drug use affect a person's chances of survival if they are in asystole or do you know?
 MR. RATHBUN: Object as to foundation. I don't think she has the expertise. Go ahead and answer if you know.
A I guess it depends on the situation, but I don't know.
Q Okay. That's fine. If you don't know, just tell me you don't know.
A Okay.
Q It isn't a test. You don't flunk. I just need to understand what you do know and what you don't.
 Do you have any reason to think that if you would have arrived on the scene 15 minutes earlier that the outcome would have been any different?
A Is that before he was tased? If we had been on scene before he had been tased?

## Page 23

Q Let's put it this way. If you would have been on scene when he arrested, do you have any reason to believe the outcome would have been any different?
A I don't think it would have been.
Q Okay. Why not?
A I just -- From what I understand about excited delirium, I just don't feel like he would have had any chances.
Q Did you or anyone on your crew or the fire rescue to your knowledge do any suctioning of him?
A Not to my knowledge.
Q Were you aware that he had vomited?
A No.
Q Okay. Didn't have any vomit on the outside of him or anything?
A No.
Q Do you know if anyone was aware that he had vomited until after his death?
A Not that I know of.
Q Is it possible for someone to vomit and aspirate it without actually vomiting out?
A It doesn't take much to cause problems when you aspirate. So it could have been just a little bit. So, it's possible.

## Page 24

Q Without any actual visible vomiting outside the body?
A Yes.
Q I have no further questions for you.

CROSS-EXAMINATION
BY MR. RATHBUN:
Q Is it Mrs. or Miss? What do you prefer to go by?
A Ms.
Q Ms. Navarrette, I just have a few questions here I want to follow-up if I could. Your paramedic school, describe that for me, if you would? How long's it last?
A It was two years.
Q And is that full time?
A Full time.
Q And where did you take that training?
A Coffeyville Community College.
Q And so, is that like an Associate's degree that gives you a paramedical degree?
A It is now an Associate's degree. When I took it, it was not.
Q Okay. And what you have in that training, would that be like English courses, math, all that

**EXHIBIT L**

Page 25

1  plus some medical, or would it be all medical
2  training?
3      A    It is now. It is the Associate's degree.
4  You have to have the English. And when I took it,
5  it was just all medical training.
6      Q    How many hours of medical training was
7  that? In other words, was it like an Associate's
8  degree is? Sixty hours of college? Was that five
9  days a week classes all day long, or --
10     A    We did two days a week, five hours a day.
11     Q    Evening courses, day courses?
12     A    Evening courses.
13     Q    Okay. All right. Now, whether there's no
14 written or defined policy that you are aware of, if
15 you get a call from the police saying, "We've got
16 someone that's in distress", you get right over
17 there, right?
18     A    Yes, that's correct.
19     Q    I'd like to figure out, if we could, by
20 looking at your -- I think I know the answer, but I
21 want to make sure I'm right. Let's look at your Cad
22 report that's attached.
23     A    (Witness complied.)
24     Q    If you look at the Cad sheets, it looks to
25 me like -- you would know this from looking -- but

Page 26

1  it looks like Antrim, if you look at 522, was on the
2  scene at 6:05?
3      A    Okay.
4      Q    Does that look right?
5      A    Yes, that's correct.
6      Q    Okay. I'm trying to figure out how long
7  transpired between the time he arrived at the scene
8  and the time you arrived at the scene. Can you do
9  that calculation for me?
10     A    Sure. He arrived on scene at 18:05 and we
11 arrived on the scene at 18:22.
12     Q    So, you got there 17 minutes after he did?
13     A    Yes.
14     Q    Certainly if he had called you at 6:05,
15 you would have been there -- is it fair to
16 extrapolate that you would have been there at 6:10?
17     A    Approximately 6:10. It took us
18 approximately four minutes to get on scene.
19     Q    It looked to me like you were en route at
20 6:17 and arrived at 6:22. And that's where I came
21 up with the five minutes.
22     A    We were en route at 6:18.
23     Q    Oh, 6:18?
24     A    Yes.
25     Q    So you got there in four minutes. So

Page 27

1  roughly you could have been there at 6:09 or 6:10,
2  correct?
3      A    Correct.
4      Q    Now, I'm a little confused by something
5  that you said. You said you had never been involved
6  with someone with excited delirium. You don't know
7  that to be the case, because when you got there he
8  wasn't excited delirium, was he?
9      A    No.
10     Q    He was dead when you got there?
11     A    Yes.
12     Q    And I say -- When I say "dead", he hadn't
13 been officially pronounced dead, but if we look at
14 your charts from the very first time we get on
15 pulse, no motor response. There was nothing to
16 indicate when you did your first assessment at 6:22
17 that he was alive at that point, right?
18     A    Correct.
19     Q    And, in fact, that never changed
20 throughout?
21     A    Never changed.
22     Q    So, by the time -- For all intents and
23 purposes even though he had -- even though he hadn't
24 been declared dead, he was dead when you got there?
25         MR. GLENDENNING:   Object to form and

Page 28

1  foundation.
2      Q    You can answer.
3      A    Okay. Yes.
4      Q    All right. You may have noticed we'll
5  object from time to time.
6      A    Okay.
7      Q    But you still need to answer.
8          So the excited delirium is nothing that
9  you really observed or know anything about. That's
10 just something you heard later on?
11     A    Yes.
12     Q    And as far as you know -- Have you seen
13 Dr. Peterson's, his pathology report?
14     A    I think I saw it shortly after we did the
15 run, but --
16     Q    Okay. Probably one of most dangerous
17 things around is a lawyer getting on the internet
18 trying to do some research. But I noticed this
19 morning just reading EMS articles that if someone is
20 in a position where they could aspirate, vomit,
21 according to stuff I read it said they should be
22 head down on a right lateral position with suction.
23 I noticed you said left. Does it matter, or is that
24 --
25     A    It doesn't matter.

**EXHIBIT L**

## Page 33

Q When you said the lacerations were -- I think you said the lacerations were fresh, right?
A I didn't know.
Q Were they bleeding?
    MR. GLENDENNING: Object to form.
A I don't remember.
Q Had you been there when this gentleman arrested there are things that you could have done immediately, right?
    MR. GLENDENNING: Object to form.
A Yes.
Q That you weren't able to do since you weren't there?
    MR. GLENDENNING: Object to form.
A Correct. Can I say something about the last statement?
Q Sure.
A We did everything when we got there that we would have done if we would have been there earlier.
Q Sure. The problem is, it was just delayed, right?
    MR. GLENDENNING: Object to form.
A It was delayed because that's just when we got called.

## Page 34

Q I'm not being in any way critical of you. You obviously, if you haven't been called, you can't be there.
A Okay.
Q I'm not critical of you. Your point is, if you are not called, you can't do anything until you get there?
A Correct.
Q Thank you for your time.
    MR. GLENDENNING: I have just a few follow-up questions.

REDIRECT EXAMINATION
BY MR. GLENDENNING:
Q If you had arrived on the scene while Mr. Soto was still struggling with the police officers, you obviously wouldn't have done anything while that struggle was going on, right?
A No, we wouldn't have.
Q Okay. And then after the struggle was over and he was subdued, if he was talking, making sounds and didn't appear to be in distress, would you have done anything at that point?
A No, we wouldn't have.
Q Okay. Would you have intervened at all

## Page 35

until he arrested?
A Not unless the police department requested us to go ahead and transport him.
Q Okay. And at that point you would have just put him in your ambulance and taken him?
A Yes.
Q You wouldn't be doing CPR on him?
A Not if he hadn't arrested.
Q You wouldn't be intubating him?
A No.
Q You wouldn't be doing any IV's?
A No.
Q Not until he arrested would you have actually performed any treatment on him?
A Correct.
Q And if he didn't -- If you had no indication that he was vomiting, would you be laying him on his side like you talked about as being what you would do if a patient was vomiting?
A No.
Q When he did arrest, what you would do the first thing is start CPR?
A Correct.
Q If that wasn't immediately successful then you would start moving up the chain of those other

## Page 36

treatments you talked about, correct?
A Correct.
Q But you would try CPR for awhile before you started intubating him, wouldn't you?
A CPR would be initiated and we would start with a bag valve mask to provide artificial ventilation.
Q Okay. And then the drug, the IV would come after that?
A After we had intubated.
Q I think you said earlier that there's nothing you would have done that you didn't do in this case, correct?
A Correct.
Q And suctioning -- In hindsight, suctioning might have been something that would have been helpful in this case, correct?
A If there would have been vomitus in the airway.
Q Okay. I think you said you had seen Dr. Peterson's report?
A Yeah, I think a couple of days afterwards we looked at it.
Q He indicated that the cause of death was aspirated vomitus?

**EXHIBIT L**

## Page 37

```
 1    A    I don't remember what it said.
 2    Q    But in any event, if this man was found to
 3  have vomitus in his bronchi and in his lungs --
 4    A    Airways, yes.
 5    Q    -- then something that in hindsight might
 6  have been helpful would have been suctioning?
 7    A    Correct.
 8    Q    But if nobody knows that's needed, that
 9  isn't something you automatically do?
10    A    Correct.
11    Q    But if that's not done, unbeknownst to
12  everybody he's vomited, then these other reviving
13  attempts might be impeded by his airways?
14    A    It's possible.
15    Q    I have no further questions.
16
17              RECROSS-EXAMINATION
18  BY MR. RATHBUN:
19    Q    We can go back and forth rehashing this
20  same ground. The stuff you told me earlier while
21  you were under oath, you don't want do change any of
22  that, do you?
23    A    No.
24    Q    Let me ask you this: I have never --
25  luckily have never been put in a position where I
```

## Page 38

```
 1  have to perform CPR on someone. Have you ever been
 2  in a position performing CPR where it is someone
 3  that has thrown up the contents of their stomach?
 4  Have you ever been in that position?
 5    A    Yes.
 6    Q    Can you tell when someone has vomited the
 7  contents of their stomach when you are doing CPR?
 8  Isn't that pretty obvious?
 9         MR. GLENDENNING:    Object to form.
10    A    Yes.
11    Q    All right. So, if there had been a heavy
12  regurgitation of the contents of the stomach and you
13  know what you're doing, you could tell that
14  individual had thrown up his stomach contents,
15  right?
16         MR. GLENDENNING:    Object to form.
17    A    If there was a heavy amount, yes.
18    Q    All right.
19    A    But, like I said earlier, it doesn't take
20  much to cause aspiration.
21    Q    We can kind of go by what the autopsy says
22  in terms of the amount of stomach material that was
23  thrown up.
24    A    (Nods affirmative.)
25    Q    You shook your head. You need to say
```

## Page 39

```
 1  "yes" or "no" or "what"?
 2    A    I'm just sitting here.
 3         MR. GLENDENNING:    Object to the form,
 4  I guess. I don't know if there was a question. You
 5  commented.
 6         MR. RATHBUN:    That's a fair
 7  observation.
 8    Q    Let me ask you this. When you suction
 9  someone with a bag, I've seen the bag that you do
10  the CPR. Does it -- You put the suction bag on
11  their -- Let me back up and start all over again
12  because that's a horrible question. You don't
13  actually get down -- Because of the danger of
14  diseases, you don't actually get down and do CPR on
15  a guy like Mr. Soto?
16    A    We use a valve bag mask.
17    Q    How does that work?
18    A    It has a mask that seals around the nose
19  and the mouth and it has a bag attached to oxygen
20  and you seal the mask and you bag the patient and it
21  artificially ventilates the patient.
22    Q    All right. Nothing further. Thank you.
23
24          FURTHER REDIRECT EXAMINATION
25  BY MR. GLENDENNING:
```

## Page 40

```
 1    Q    Is it possible for aspiration of vomitus
 2  to occur without vomitus being in sufficient
 3  quantity for someone performing CPR to notice?
 4    A    I believe it's possible.
 5    Q    I have nothing further.
 6         This will be typed up in a booklet form.
 7  It will be mailed out to you and you can sit down
 8  and read through it and make sure it was taken down
 9  correctly and you said what you meant to say and
10  heard what you thought you heard. If you see
11  anything there that is incorrect, there will be a
12  correction page for you to note your correction on
13  and then sign off on it as your testimony under oath
14  and send it back to the court reporter. Will you do
15  that?
16    A    Sure.
17              END OF DEPOSITION
18            * * * * * * * * * *
```

**EXHIBIT L**