IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA A. BOWEN-SOTO, on
her behalf and as Next
Friend of JS, HS and AS,

        Plaintiff,

vs.

CITY OF LIBERAL, KANSAS,

        Defendant.

CASE

NO. 08-1171-MLB-DWB

~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

KRIS SPERRY, M.D.

1:50 p.m.

April 1, 2009

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia

Linda E. Cheek, RMR, CCR-A-752

**EXHIBIT M**

```
 1          And then in dealing with individuals who
 2   are restrained, what kind of risks are involved in
 3   the restraint process.  And then after someone is
 4   restrained the kinds -- well, the things that can
 5   evolve and develop such as vomiting, for instance, in
 6   someone who is restrained and physically
 7   incapacitated and cannot protect their airway.
 8   Fairly basic sorts of things.  And that's pretty much
 9   it.
10          Oh, and also, well, the effects of
11   different drugs themselves and what they will do
12   physiologically on, say, the heart rate and the blood
13   pressure, and just general guidelines as far as
14   stabilization, if they can do it, and then getting
15   the person to medical treatment.
16      Q.   I think the first complication that you
17   mentioned had to do with cardiac arrhythmias?
18      A.   Yes.
19      Q.   Is that one of the most common
20   complications in cases of excited delirium?
21      A.   As far as certainly very severe
22   complications, yes.
23      Q.   Have you ever worked in an emergency room?
24      A.   I have, but it's been since 1982.  So not
25   in the past 27 years.
```

1    Q.   Was that part of some kind of training or
2 internship?
3    A.   No, I was in my pathology residency at the
4 time, and I had done an internship before that and
5 then spent two years in the public health service.
6 So, I was a licensed physician and I had medical
7 training beyond pathology, so I worked for about a
8 year and a half after I started my residency in an
9 urgent care center and emergency room situation just
10 moonlighting.
11   Q.   Was that while you were in the public
12 health service?
13   A.   No.  That was after I finished my
14 commitment.
15   Q.   During that time, did you ever encounter
16 people that were in excited delirium?
17   A.   I don't recall that I did.
18   Q.   Did you encounter any people that were in
19 drug-induced psychosis?
20   A.   I did encounter a number of people who
21 were obviously under the influence of drugs, alcohol
22 or both, and who did exhibit aberrant mental behavior
23 up to and including psychosis.  What the sequence
24 would be, because the urgent care center that I
25 worked in was about, oh, about 20 miles outside of

1   so...
2       Q.    Have you ever been involved in providing
3   treatment to someone who is in excited delirium?
4       A.    No, I don't think I have.
5       Q.    How about drug-induced psychosis?
6       A.    Other than alcohol induced psychosis and
7   withdrawal, I don't recall that I personally have
8   treated someone who is in a non alcohol drug induced
9   psychotic state.
10      Q.    Have you reviewed any literature or
11  studies about the treatment of persons with excited
12  delirium or drug-induced psychosis?
13      A.    Yes.
14      Q.    Has that literature given you any feel for
15  how many of those people actually survive even when
16  they make it to the emergency room?
17      A.    Yes.
18      Q.    And what is that?
19      A.    Well, the mortality rate for true excited
20  delirium individuals up until a few years ago was
21  somewhere in the 20 to 30 percent range.  And more
22  prompt medical attention and improved diagnosis
23  really is what it is, and transport to hospitals, has
24  decreased that down, depending on who you read, it's
25  somewhere between maybe about 7 and 12 percent

1  of something, wouldn't it?
2       A.    Yes, a positive finding would be
3  indicative.
4       Q.    Of cocaine at the time of death?
5       A.    Correct.
6       Q.    Does formaldehyde or similar solutions
7  like that, can it fix the cocaine and keep it from
8  deteriorating or breaking down?
9       A.    No.  It really interferes with the ability
10 to analyze for cocaine.  That's one of the problems
11 with -- I mean even, say, take with doing autopsies
12 on people that are embalmed and then looking for
13 cocaine is that it's gone.  Embalming fluid, the
14 chemicals break it down.
15      Q.    Are you familiar with the National Medical
16 Services?
17      A.    Sure.
18      Q.    Have you ever used them?
19      A.    Oh, yes.
20      Q.    Do you use them now?
21      A.    On occasion, yes.
22      Q.    Do you consider them to be a good
23 laboratory?
24      A.    Yes.
25      Q.    The first opinion you have listed is, as I

1  understand it in here, is that it is your opinion
2  that the officers were negligent in not calling for
3  emergency response personnel immediately?
4      A.   Yes.
5      Q.   And your opinion is that that negligence
6  added physical or mental stress to Mr. Soto?
7      A.   Yes.
8      Q.   And you have also rendered the opinion
9  that he vomited and aspirated while prone and
10 restrained?
11     A.   Yes.
12     Q.   And that this was the cause of his death?
13     A.   Yes.  The immediate cause of his death,
14 yes.
15     Q.   Any other opinions that you rendered in
16 your report?
17         MR. RATHBUN:  You mean other than what it
18     says?  He's got a lot of opinions in here.
19         MR. GLENDENNING:  Well, I want to know
20     what he is offering as specific opinions because
21     I have tried to go through and pick out what he
22     specifically said, it is my opinion to a
23     reasonable degree of medical certainty.
24         MR. RATHBUN:  Well, he -- objection to the
25     form, Al.  I don't think that's appropriate

**EXHIBIT M**

1  contents deposition of the upper airway versus true
2  aspiration, is actually not terribly difficult from a
3  pathologic perspective.
4      Q.    If a person regurgitated and aspirated the
5  quantity of stomach contents that was seen in this
6  case, how would you go about reviving him?
7      A.    You would have to -- I mean if indeed that
8  occurred, that degree and severity occurred as was
9  present in Mr. Soto, what has to be done is to
10 aspirate or suck, that is, suck as much out as
11 possible and then restore oxygenation as quick as
12 possible.  I mean that's all that could be done.
13     Q.    If a person had regurgitated and aspirated
14 the amount of contents that was seen in Mr. Soto's
15 case, would it be possible for him to talk?
16     A.    No.  I would say most probably it would
17 not be.  He might be able to make some moaning
18 sounds -- well, it's possible -- at the time, at
19 least from the autopsy, that the amount that's
20 described is pretty profound.  If there is --
21 speaking is modulated by vibration of the vocal
22 cords.
23         So, anything that's obstructing the vocal
24 cords or limiting their movement will diminish the
25 ability to speak or make sounds.  Some sounds could

**EXHIBIT M**

1  be made probably but I would say be very difficult
2  for actual, actual formation of words.
3      Q.   Would you expect a person that aspirated
4  that quantity of material to be coughing or gagging?
5  Or having involuntary reflective action trying to
6  expel it?
7      A.   They might to some degree, yes.
8      Q.   Is it probable that they would?
9      A.   Is it probable?  Depends on how much
10 blockage that there is.  That is, if they -- if they
11 are able to do it, there can be some spasmodic
12 movements as part of gagging, but at the same time it
13 could occur with nothing at all.  I mean I have seen
14 situations where there is massive gastric aspiration
15 but never any -- I mean any recognition of signs or
16 symptoms up front.
17     Q.   Is it possible to vomit and aspirate while
18 lying on your back?
19     A.   Yes, if you are -- especially if you are
20 unconscious or semiconscious or impaired in some way,
21 yes, or you cannot move.
22     Q.   Would laying on your back actually
23 increase the likelihood of aspirating vomitus?
24     A.   It could.  Again, depending on the
25 situation.

**EXHIBIT M**

1  head to one side or another will help alleviate that
2  to some extent but it's not perfect.
3       Q.   In coming to your conclusion about when
4  Mr. Soto aspirated, or vomited and aspirated, did you
5  see anything on the tapes that would let you point to
6  the point of where that happened?
7       A.   No, I could not identify anything
8  specifically that I would say was a marker for when
9  that occurred.
10      Q.   But we do know that during the times that
11 he was talking or making sounds, it would not yet
12 have occurred?
13      A.   I agree.
14      Q.   But you can't say when it occurred?
15      A.   No.  No.  With exactitude, no.
16      Q.   Can you say whether or not he went into
17 cardiac arrest before he vomited and aspirated?
18      A.   Well, yes, I would -- in this situation I
19 would not expect that the cardiac arrest would
20 precede vomiting and the aspiration; it would really
21 be the other way around.
22      Q.   Is it possible?
23      A.   Is it possible?
24      Q.   Let's me be clear.  Is it possible the
25 cardiac arrest could precede vomiting and aspiration?

**EXHIBIT M**

```
 1              MR. RATHBUN:  In this case?
 2       Q.     (By Mr. Glendenning)  In this case.
 3       A.     I think that it could be possible; I think
 4  it would be very improbable, though.
 5       Q.     I think you have indicated as part of the
 6  basis for your conclusion that the aspiration and
 7  vomitus and the lack of medical assistance being
 8  there at the time as the cause of death, that if
 9  medical help had been there, if EMTs had been there,
10  there would have been intervention immediately on his
11  vomiting and aspirating?
12       A.     I would expect and hope that there would,
13  yes.
14       Q.     You would expect and hope?
15       A.     Yes.
16       Q.     But you don't know that, do you?
17       A.     Well, if not, then that raises serious
18  questions about why the EMTs or paramedics are there
19  to begin with.
20       Q.     Well, are you aware that in this case the
21  EMT and paramedics that were there did not know that
22  he had vomited and aspirated?
23       A.     Yes.  I find that provocative.
24       Q.     If they don't know it, they won't treat
25  it, will they?
```

1      A.     Well, I think also it was a student, as I recall from Ms. Navrett's testimony, that did the intubation, which I find very fascinating. So, no, they did not seem to know that he had vomited and aspirated.

6      Q.     And if they didn't know that he had vomited and aspirated, they wouldn't have intervened on that point, would they?

9      A.     Well, if they did not know or had not figured it out in some way, then it would not lead to, I would say, intervention.

12     Q.     And in all likelihood, if they didn't intervene in the way you have said before as far as suctioning him, he would have died even if they had been there earlier, correct?

16     A.     If he vomited and aspirated and they were not aware and did not intervene or prevent this from happening or undertake steps to position him to reduce the likelihood, having said all of that, if he still vomited and aspirated and they did not figure it out, then, yes, he would have died.

22     Q.     Is there anything you can do for a person in excited delirium syndrome to reduce the chances of cardiac arrest?

25     A.     Sedation is the primary treatment and

**EXHIBIT M**

1　lowering the body temperature, if that is -- well,
2　once they reach medical therapy. But primarily
3　transport to a medical facility rapidly and
4　administering sedative drugs. Again, if the
5　paramedical personnel, if they are authorized to do
6　so.
7　　　　Q.　　And you don't know whether the Liberal
8　paramedics would have been authorized to administer
9　sedative drugs?
10　　　　A.　　No, I do not know.
11　　　　Q.　　Or even if they had any sedative drugs on
12　the ambulance?
13　　　　A.　　Correct. I can't tell you that.
14　　　　Q.　　Even if they were authorized and had them,
15　they would have to recognize that's what they needed
16　to do, correct?
17　　　　A.　　Well, yes.
18　　　　Q.　　And you understand from having reviewed
19　the deposition that the EMTs had had no experience or
20　training in dealing with someone with excited
21　delirium syndrome, correct?
22　　　　A.　　Yes, it seems to be that way.
23　　　　Q.　　And they testified that they wouldn't have
24　done anything different than what the police officers
25　were doing if they had been there earlier?

**EXHIBIT M**

1    A.    Yes.
2    Q.    In that case he would have died anyway
3 even if they had been there earlier, correct?
4    A.    That's what it would seem to be, yes.
5    Q.    Is it beyond your expertise -- this may be
6 beyond your expertise to answer this, but let me just
7 ask it anyway.
8    A.    Sure.
9    Q.    When police officers get out to a scene
10 where somebody is in excited delirium or
11 cocaine-induced psychosis, they need to get that
12 person subdued, correct?
13    A.    Well, it's an awfully broad question.
14    Q.    Well, let me narrow it down.
15         If they don't subdue him, he is not going
16 to get medical assistance?
17    A.    Okay. From that perspective, I mean the
18 person needs to be transported to medical assistance.
19 Now, you know, what decisions are made in order to
20 subdue and restrain the person or to get them medical
21 treatment is something, you know, those decisions
22 obviously have to be made based upon the situation at
23 hand, and I don't have a problem with that. But --
24    Q.    We'll do this step by step.
25    A.    Okay.

```
 1    Q.    But the first thing is, when we arrive on
 2  the scene and we have got a naked man in a public
 3  place about half a block from McDonald's at 5:00
 4  o'clock in the evening and he is exhibiting signs of
 5  excited delirium or cocaine-induced psychosis, we
 6  need to get him in custody, correct?
 7    A.    Yes.  They need to get him to treatment
 8  certainly.  At least they can't -- I guess they can't
 9  just let him go on about his business, I would agree
10  with that.
11    Q.    And if they summoned EMTs immediately,
12  EMTs aren't going to be able to do anything for him
13  until the police have gotten him in custody, correct?
14    A.    Correct.
15    Q.    When they tried to take him into custody,
16  you saw in this case that he was resistive and
17  combative?
18    A.    Correct.
19    Q.    Which I think you have also said is
20  consistent with what you would expect in excited
21  delirium cases?
22    A.    Yes.
23    Q.    And until that combativeness is overcome,
24  there isn't much the EMTs can do for him?
25    A.    Correct.  The EMTs, I mean they cannot
```

**EXHIBIT M**

1  intervene in some way until the man is brought under
2  control.
3      Q.   Is it within your area of expertise to
4  opine on how the police officers should restrain a
5  man who is very strong, kicking and fighting and not
6  responding to things like TASERs?
7      A.   I guess are you asking as far as what
8  specific -- what specifically should be done?  I mean
9  what specific restraint modalities should be
10 utilized, is that what you are asking me?
11     Q.   Sure.  Sure.
12     A.   No, I wouldn't have -- I would not say I
13 have an opinion on the specific nature of what needs
14 to be done other than anything -- well, unless the
15 situation really warrants it.  Of course, utilization
16 of deadly force.  Beyond that any less than lethal
17 force that's necessary to subdue him so that the
18 paramedical personnel can take over, I would say that
19 to an extent anyway comes under the judgment of the
20 officers.
21     Q.   And any decision they make in that regard
22 is going to involve some risk of harm or death to
23 that subject, isn't it?
24     A.   That's true.
25     Q.   In fact, with excited delirium syndrome

**EXHIBIT M**

1    A.    Oh, no, I can't tell you whether he would
2  have or not, depending on, you know, how it is --
3  what he did, what he would have done and also what
4  the officers would have done in response.  No.
5    Q.    Are you assuming when you make the
6  statement that the lack of or the failure to call
7  medical assistance sooner caused increased physical
8  and mental stress, that if the EMTs had arrived
9  earlier, they would have done something different
10 than what was done?
11   A.    Yes.  As I said earlier, that's what I
12 would have hoped.
13   Q.    But you know that's probably not true
14 based on the testimony?  Correct?
15   A.    Sadly that, at least from what I read of
16 Ms. Navrett, I don't -- I'm not sure that from what
17 she says she would have known what to do.
18   Q.    And, therefore, when EMTs were summoned
19 would have no effect on the amount of physical or
20 mental stress he suffered, right?
21   A.    Well, of course it being retrospective,
22 but that's -- if no one knew what they were doing,
23 that's very unfortunate all the way around.
24   Q.    I think my question is:  If the EMTs
25 didn't do anything different, wouldn't have done

**EXHIBIT M**

```
 1  anything different than the officers had been doing,
 2  if they had been summoned earlier, then the failure
 3  to call them earlier had no effect on the amount of
 4  psychological or physical stress that he had,
 5  correct?
 6      A.   I understand what you are asking.  And if
 7  indeed they would not have done anything different at
 8  all and everything else, you know, the sequence of
 9  events would have progressed in the way that it did,
10  then there would have been no difference.
11      Q.   And in making your statement in that
12  regard you also assume that if they had arrived and
13  his care had been turned over to them, that he could
14  have been released from the hogtie restraint and put
15  in a different position?
16      A.   He could have been turned on his side; he
17  wouldn't necessarily have to have been released from
18  the hogtie position, but he could have been turned on
19  his side virtually immediately.
20      Q.   And that might have reduced the chances of
21  aspiration?
22      A.   Oh, yes. And someone who would have been
23  in attendance there -- well, again, I would hope --
24  it's perhaps a sad testament, but if the paramedics
25  are caring for him and turning him on his side, they
```

**EXHIBIT M**

```
 1   would also be monitoring his -- beginning to monitor
 2   his breathing, his pulse, his respirations, his blood
 3   pressure, things such as that.  In other words,
 4   conducting their initial evaluation rather than
 5   standing by and doing nothing.
 6        Q.    But it's still possible that he could have
 7   aspirated, vomited and died?
 8              MR. RATHBUN:  Object as to what's
 9        possible.
10        Q.    (By Mr. Glendenning)  Vomited, aspirated
11   and died.
12              MR. RATHBUN:  Object as to what's
13        possible.
14              Go ahead.
15        Q.    (By Mr. Glendenning)  Even if he were on
16   his side?
17        A.    Oh, is it possible?  Yes.
18        Q.    If a person is alive and has no cardiac
19   arrest and has vomiting and aspiration and cardiac
20   arrest results thereafter, how long does it take for
21   them to get into asystole?
22        A.    Asystole?  I don't know that that has ever
23   really been studied particularly, that I don't know.
24        Q.    Are there different kinds of cardiac
25   arrhythmias that can occur?
```

```
 1    A.    Sure, depending on the drug that's used,
 2  how it's delivered and the quantity.  Sure.
 3    Q.    Specifically Valium?
 4    A.    Valium, again, it depends on how much one
 5  uses.  That's all I can tell you.  A small dose will
 6  take longer to absorb.  A larger dose will be
 7  absorbed quicker.
 8    Q.    Of course, one of the problems you have
 9  there is if you give too large of a dose, you'll stop
10  the heart?
11    A.    Not with Valium, no, you won't stop the
12  heart.  I mean, you can give --
13    Q.    You mean in a person who is already
14  suffering from excited delirium syndrome?
15    A.    As far as sedation goes, I don't know that
16  Valium itself will have an effect on stopping the
17  heart, it really has no cardiac activity.
18    Q.    Is it possible that giving too much Valium
19  to a person in exited delirium syndrome would kill
20  them?
21    A.    I don't know whether it's possible or not.
22  I've not encountered that.
23    Q.    If in fact Mr. Soto's death was cardiac
24  arrest secondary to cocaine-induced excited delirium
25  syndrome, statistically he would have died even if
```

**EXHIBIT M**

1  the EMTs had been summoned immediately; true?
2       A.   Okay.  Now, just to make sure I understand
3  what you are asking.  If his cardiac arrest was there
4  at the scene, is that what --
5       Q.   Yes.
6       A.   Okay.  Statistically, yes.
7            MR. GLENDENNING:  I have no further
8       questions.
9                       DIRECT EXAMINATION
10 BY MR. RATHBUN:
11      Q.   Doctor, a question or two on first
12 opinions in your report.
13           You intend to testify about everything you
14 said in your report; do you not?
15      A.   Yes.
16      Q.   Assuming I ask you those questions?
17      A.   Yes.
18      Q.   All right.  I have a question about --
19 question or two here about Ms. Navrett's deposition
20 testimony which I have here in front of me.  And you
21 don't because I have it.
22      A.   You took mine?  Okay.
23      Q.   I have your copy.
24           I'm wondering whether we are giving the
25 Liberal EMS enough credit here because, isn't it true

**EXHIBIT M**