# EXHIBIT 11

Randall K. Rathbun #09765
Depew Gillen Rathbun & McInteer LC
8301 E. 21st Street, Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
randy@depewgillen.com

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

TONYA BOWEN-SOTO, as )
Administrator of the Estate of Juan Soto, Jr. )
)
Plaintiff, )
)
vs. ) Case No.: 08-1171-MLB
)
CITY OF LIBERAL, KANSAS, )
)
Defendant. )
)

## AFFIDAVIT OF KRIS SPERRY, M.D.

STATE OF GEORGIA )
)ss:
COUNTY OF Clayton )

COMES NOW your affiant, Kris Sperry, M.D., after being duly sworn upon oath, and states as follows:

1. I have been retained by the plaintiff in this case to provide opinions concerning the circumstances relating to the death of Juan Soto, Jr.

2. Attached hereto is a true and correct copy of the report I tendered in this matter on December 31, 2008. The opinions and conclusions are mine based upon my education, training and experience.

FURTHER YOUR AFFIANT SAYETH NOUGHT.

_Kris Sperry, M.D._

Subscribed and sworn to before me, a Notary Public within and for the County and State aforesaid, on this 15th day of March, 2010.

_Angelia M. Brenham_
NOTARY PUBLIC

My Appointment Expires: March 1, 2011

2

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

December 31, 2008

Re: Juan Soto, Jr.

I have reviewed extensive materials and records concerning the death of Juan Soto, Jr. These materials include the autopsy report and associated toxicology reports, photographs from the autopsy and the investigation, two videos of the restraint of Mr. Soto recorded by video equipment within two police vehicles, the Liberal Police Department Incident Narrative, and numerous documents generated by the Kansas Bureau of Investigation as part of that agency's investigation of Mr. Soto's death and as listed on an index provided to me that spanned almost four pages.

A brief summary of the events that culminated in Mr. Soto's death is as follows: On August 30, 2006, officers of the Liberal Police Department were dispatched following a report of a naked man running around a parking lot and street area. The subject, Juan Soto, Jr., was located, and this is documented in one of the law enforcement vehicle videos. Mr. Soto was naked, and screaming delusional utterings. Mr. Soto was walking away from one of the officers, and based upon Mr. Soto's inferred lack of compliance to requests to stop, the officer deployed a TASER. Multiple officers worked in concert to subdue and restrain Mr. Soto, and the TASER was again deployed in a "dry contact" mode. Mr. Soto was handcuffed, and then his legs and feet were restrained in a "hog tie" position. During this time, Mr. Soto remained on the asphalt/gravel surface. Mr. Soto was then carried to a patrol unit for transfer to the county jail, when it was observed that he was unconscious and had quit breathing. An ambulance was then requested, and CPR started. Mr. Soto was eventually transported to the hospital, where he was pronounced dead. From the radio traffic log, the time interval between when Officer Antrim arrived at the scene to find Mr. Soto, and when CPR was initiated, is documented at between 12 and 13 minutes.

An autopsy was performed the following day. Of note, the body was arterially embalmed after body fluids had been withdrawn for toxicology analysis, but prior to the initiation of the actual autopsy, and prior to the removal of the brain. This is documented within the body of the autopsy report, and within the photographs that were taken of the body during the external examination and the autopsy. No distinct or discrete anatomic cause of death was identified during the course of the autopsy. Although blood was reported to have been drawn before the embalming, there is no

Sperry Forensic Pathology Consultants
170 Nixon Road
Senoia, Georgia 30276-3291
Telephone: (770) 599-9528
e-mail Dr. Sperry: stiffdoc@bellsouth.net


Defendant's Exhibit
#1  Dec 4/1/09
BROWN&GALLO

record that the blood was subjected to toxicology testing; instead, urine was tested and found to be "positive" for cocaine, benzoylecgonine, methylecgonine, as well as hydroxyzine and diltiazem (both therapeutic drugs and not drugs of abuse). Portions of the brain were submitted to the University of Miami School of Medicine for analysis of neurochemical pathology, and the conclusion of their report was that the brain specimens exhibited a reduction of the dopamine transporter, and was consistent with similar findings in victims of cocaine induced agitated delirium victims. It does not appear from the report that the analysts were aware that the brain specimens had been perfused with embalming fluid prior to removal and freezing as per the standard protocol. The cause of death was determined to be "Excited delirium syndrome, secondary to acute cocaine intoxication." "Asphyxiation secondary to aspiration of gastric contents" was also denoted as a cause of death, in concert with the Excited Delirium Syndrome.

The Excited Delirium Syndrome (EDS) has been known and recognized since the mid- to late- 19th century. More contemporaneously, an acute form of EDS began to be recognized, often associated with the use of stimulant drugs, such as cocaine, but not always; a history of mental illness alone is sufficient to precipitate EDS. Since that time, extensive accumulations of EDS cases have been published in the scientific literature, and the awareness of individuals who exhibit EDS gradually entered in to both the medical and law enforcement communities. By 1997, an article in the British Medical Journal noted specifically that acute excited states are a medical emergency with a serious mortality. The introduction of less-than-lethal restraint devices, most specifically electronic control devices (such as the TASER), initiated a new look at EDS deaths, as it was initially (and mistakenly) thought by some that a TASER could somehow directly cause a death by interruption of the cardiac conduction cycle. At the time of Mr. Soto's death in August of 2006, the knowledge concerning EDS was prevalent throughout the law enforcement community in the United States, and seminars to train law enforcement officers in the recognition of individuals suffering from EDS and the need for emergent medical care in order to prevent life-threatening outcomes had become commonplace. Such training was readily available and discussions of EDS were often the topic of law enforcement bulletins and publications. Thus, at the time of Mr. Soto's death in August of 2006, it was known and recognized that that emergency medical personnel should be immediately summoned to be in attendance when a subject was even thought to be possibly the victim of EDS, so that the subject could be immediately transported to medical care, and also so that medical care could be administered to the subject at the scene.

The behavior, appearance, and actions of Mr. Soto on August 30, 2006, were clearly those of an individual who was manifesting psychosis, with delusions, aberrant behavior, and hallucinations. The immediate differential for law enforcement officers

should be that he was overtly psychotic from an underlying mental disorder, was under the influence of drugs or medications that could initiate the psychotic behavior, or that he was possibly suffering from the Excited Delirium Syndrome. Each of these differentials should have prompted the immediate summoning of paramedical or emergency response personnel, as Mr. Soto required immediate care. Furthermore, as it is known that the difficult and sometimes violent behavior of patients with these disorders can initiate struggles and altercations during the course of restraining them and bringing them to appropriate emergency medical care, having emergency medical personnel in attendance and on the scene is even more imperative, in order to prevent or intervene in possible life threatening events that are known complications of these disorders. It is my opinion, to a reasonable degree of medical certainty, that the officers who responded to the complaint regarding Juan Soto, Jr., and who restrained him, TASERed him, and placed him in a hog-tie position were negligent in not summoning emergency response personnel to be at the scene immediately and during the restraint, and that this negligence culminated in significant added physical and mental stress that caused Mr. Soto to die.

Although the urine drug screen revealed the presence of cocaine and inactive cocaine metabolites, no quantitative measurements were performed, and there apparently was no identification nor quantitation performed upon blood specimens. Thus, all that can be concluded is that Mr. Soto had ingested cocaine in some fashion within approximately the past 48 hours. Without detection and measurement of cocaine and it's metabolites within the blood, it is not possible to conclude to any certainty that he was actually under the influence of cocaine at the time of the restraint and his death. Therefore, although a cocaine-induced psychosis is within the differential diagnosis regarding the source of his medical problem and aberrant behavior, without confirmation of the presence of cocaine within his blood, this conclusion can only remain speculative.

The testing that was performed at the University of Miami upon specimens of Mr. Soto's brain, wherein the conclusions were that Mr. Soto "suffered from a cocaine variant of dopaminergic overdrive syndrome," are seriously flawed and unreliable because the body, including the brain, had been subjected to arterial embalming prior to the removal of the brain. The testing procedures for the complex proteins and receptor binding sites require that fresh, unpreserved brain tissue be removed and frozen as soon as possible after death. Embalming fluid contains various preservative chemicals, including formaldehyde and phenols, which have the effect of coagulating proteins, thus rendering inaccurate any sort of testing in which the results are dependent upon the analysis of such proteins and their biologic activity. Thus, any conclusion that the brain dopamine receptor analysis supports a contention that Mr. Soto was actually the victim of the Excited Delirium Syndrome is not possible.

The autopsy examination revealed that Mr. Soto had sustained massive aspiration of his gastric contents, and the trachea as well as the primary and secondary bronchi were described as being "filled with vomit." Aspiration of the vomitus in to the peripheral parts of the lungs was also found microscopically. This degree and extent of gastric contents aspiration is not only extremely serious but frankly life-threatening in the short order and generally lethal if untreated or if intervention is not undertaken. This massive aspiration would have readily been precipitated and complicated by the placement of Mr. Soto in the "hog-tie" position with the handcuffs and leg restraints, as well as allowing him to remain in a prone (face-down) position. In this position, it would not be possible for him to prevent himself from aspirating his vomitus. This is another significant reason not only why emergency medical personnel should have been immediately in attendance, so as to prevent aspiration or intervene when Mr. Soto vomited, but also why the law enforcement officers who restrained him should not have allowed him to remain in the prone, "hog-tie" restrained position. Fully restraining Mr. Soto's ability to move would render it impossible for him to keep from aspirating vomit, and the longer he remained restrained and prone, the greater the risk.

It is my opinion, to a reasonable degree of medical certainty, that Juan Soto, Jr., was suffering from an immediately recognizable psychotic condition when law enforcement officers first encountered him. The presence of cocaine and cocaine metabolites (unquantitated) within the urine does not prove that he was actually under the influence of cocaine, or thus suffering from cocaine-induced delirium, at the time of the restraint and his death. The pre-autopsy embalming, prior to the removal of the brain, completely negates the results and validity of the results of dopamine receptor testing, and thus cannot be relied upon in order to support a contention that Mr. Soto was suffering from the Excited Delirium Syndrome at the time of his restraint. After being restrained, Mr. Soto was allowed to stay in the prone, full restraint position for many minutes, and during this period, vomited and massively aspirated his gastric contents, which then precipitated a cardiorespiratory arrest from which he ultimately died. It is my opinion, to a reasonable degree of medical certainty, that the officers of the Liberal Police Department were negligent in their failure to have emergency medical personnel in immediate attendance at the time that the decision to restrain Mr. Soto was made, so that his care could be immediately turned over to such personnel; this opinion is irrespective of the underlying reason for Mr. Soto's psychotic manifestations. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Soto vomited while in the full-restrained prone position and massively aspirated his vomit, which is the immediate and proximate cause of his death. Had his care been immediately assumed by emergency medical personnel after he was subdued by the law enforcement officers, and had he not been allowed to remain in the full-restrained prone position after he was subdued, this occurrence would most probably not have happened. Even if he had vomited while under the care of emergency medical personnel, the intervention to

prevent aspiration would have been immediate, and more probably than not, he would have survived.

My training and experience is set forth within my Curriculum Vitae, which is attached. The list of times in which I have provided either deposition or courtroom testimony since December of 2002 is also attached. I charge $400 per hour for the review of cases and consulting, $750 per hour for deposition testimony, and $4500 per day plus any applicable travel and lodging expenses for live courtroom testimony.

Kris Sperry, M. D.