# DEPOSITION EXCERPTS

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on          )
her behalf and as Next        )
Friend of minor JS,           )
minor HS and minor AS,        )
                              )
          Plaintiffs,         )  Case No. 08-1171-MLB
                              )
vs.                           )
                              )
CITY OF LIBERAL,              )
KANSAS,                       )
                              )
          Defendant.          )

D E P O S I T I O N

The deposition of JON ANTRIM was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
8:05 A.M.

---

2

**APPEARANCES**

The **plaintiffs** appeared in person by TONYA
BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas  67530



---

3

**I N D E X**

                                              Page

JON ANTRIM
  Direct Examination by Mr. Rathbun              4

**Exhibits**

                                              ID'd

Deposition Exhibit 1 (1618)                     15
Deposition Exhibit 2 (1583)                     20
Deposition Exhibit 3 (1593)                     22
Deposition Exhibit 4 (155-159)                  33
Deposition Exhibit 5 (213-219)                  33

---

4

**JON ANTRIM,**
called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:
**DIRECT EXAMINATION**
BY MR. RATHBUN:

Q  State your name.

A  **John Antrim.**

Q  What do you do for a living?

A  **I am a police officer with the City of Liberal.**

Q  At one point corporal, but now sergeant, as I
   understand?

A  **That's correct.**

Q  All right.  Sergeant, have you ever given a
   deposition before?

A  **First time, sir.**

Q  All right.  Let me kind of run through what I call
   the rules of the road and we'll get this thing under
   way.  When we started, you put your right hand up in
   the air and took an oath, which you've probably done
   many times before.

A  **Yes, sir.**

Q  Since you're under oath, it's very important that
   you understand my questions before you attempt to
   answer them.  So if at any point I ask a question
   which sounds in any way confused or garbled, will

29

1   you know that are alcohol intoxicated?
2          MR. GLENDENNING: Object to form.
3   A None that I'm aware.
4   Q (BY MR. RATHBUN) And the one way you would know
5     that is obviously if you'd received training for
6     that; correct?
7   A Yes, sir.
8   Q Use of force just because of the liability potential
9     that it offers you, that it maybe subjects you to as
10    a police officer, is that something that you have
11    tried to study over the years?
12  A Yes, sir.
13  Q And you have gone through training sessions in terms
14    of use of force?
15  A Yes, sir.
16  Q If I ask you to tell me the difference between -- if
17    I talk about somebody being hog tied, you know what
18    that means?
19  A Yes, sir.
20  Q What does that mean?
21  A Basically they're handcuffed and then their feet are
22    tied with a hobbled restraint or whatever is
23    available and then that is attached to their
24    handcuffs.
25  Q And what's the difference, if there is, between a

30

1   hobble restraint and hog tying?
2   A The hobble restraint is not actually attached to the
3     handcuffs.
4   Q It's just your legs --
5   A Legs are tied together.
6   Q Well, your legs are tied together -- okay.
7          Are there times -- what is the -- what's
8     the policy of the Liberal police department in terms
9     of when you use hobble and when you use hog tie, if
10    there is one? I'm not suggesting that there is.
11  A I don't believe there is one.
12  Q So it's left up -- when to hog tie and when to
13    hobble is left up to the officer's discretion?
14  A Yes, sir.
15  Q And you've never had training to teach you maybe
16    when you should use one and when you should use the
17    other?
18  A They've talked about it as to the point of they
19    caution us using the hog tie. Haven't prohibited
20    it. Just based upon circumstances, we are allowed
21    to still use that.
22  Q And what would be the -- when did they talk to you
23    about that?
24  A It's -- it's always been cautioned not to -- to use
25    the hog tie, dependent upon circumstances.

31

1   Q What does that mean? What circumstances would it be
2     dependent upon?
3   A The behavior of the -- of the person.
4   Q What does that mean?
5   A They're combative, if they're kicking, if they're
6     kicking out the windows, obviously, the -- the hog
7     tie, as you refer to it, would be a viable option.
8   Q Or if they're combative on the ground, struggling
9     with you, is it Liberal police department policy
10    that hog tying is okay in that case?
11  A If they're kicking and they won't stop, yes.
12  Q All right. So, basically, as you understand the
13    policy and as you've been taught, the hog tie should
14    only be used where you're getting resistance to
15    taking someone down? Would that be a fair
16    statement?
17          MR. GLENDENNING: Object to form.
18  A It's used to stop the resistance of that person.
19    Just because they resist doesn't mean that we're
20    going to do it, but if they're kicking and won't
21    comply then -- then, yes.
22  Q If they're kicking and struggling, that's the signal
23    that hog tie is okay?
24          MR. GLENDENNING: Object to form.
25  A Yes.

32

1   Q (BY MR. RATHBUN) All right. How many times have
2     you used a Taser on a member of the public?
3   A An exact number, I can't quote you. I can give you
4     a range.
5   Q Just a range would be all right.
6   A Between 10 and 20.
7   Q All right. And did this start shortly after you
8     were given your first M26?
9   A Several months.
10  Q All right. And would you characterize your usage of
11    the Taser as being average -- let me ask -- I mean,
12    maybe you don't even know how other officers on the
13    force do this. When I say officers, I don't mean
14    that specific rank. I mean other -- other --
15          MR. GLENDENNING: Is there a question?
16          MR. RATHBUN: I didn't get there yet.
17          MR. GLENDENNING: Okay.
18  Q (BY MR. RATHBUN) Let me just start all over. Do
19    you think you use the Taser less, average or more
20    than anyone else on the force?
21          MR. GLENDENNING: Object to form and
22    foundation.
23  A I -- I don't know. There's officers I don't work
24    with. There's shifts I don't even see so I don't
25    know.

33

MR. RATHBUN) Yeah. Okay. Do you ride by
rself or do you have a partner?
de by myself.
ey. People that are on your shift and the
cers that you're around, do you have a opinion
to whether you are average in your usage, less or
re?
    MR. GLENDENNING: Same objections, form
 foundation.
on't know.
 MR. RATHBUN) I think I may have misunderstood
lier and you need to kind of straighten me out on
. I think you said you were recertified
netime in '07 on the X26. Did I misunderstand
t?
ter part of '07, early part of '08.
ay. Any additional training that you had when
t happened?
    MR. GLENDENNING: Object to form.
 MR. RATHBUN) Other than -- I mean, beyond what
 had the last time you had the training with it.
at was the date that we looked when you were --
ked like '04.
5 of '04.
 you have any training that was different?

34

sir. Other than the fact where we actually did
e scenarios of we were put into a scenario with a
e player. This time, rather than just shooting a
get, we actually had to -- to make a decision.
ay. And who did that training?
utenant Mulanex.
re there the videos to help you with that?
s.
d was this the videos that Taser provided?
s.
u watched a video and then you went through some
e demonstrations?
ah. We went through a lecture -- a lecture as
ell as the actual scenarios.
n trying to pull that up. I'm sure that I just
erlooked it, but -- here is a certification. Let
e ask you what this is. This is Document 1646.
    MR. GLENDENNING: Is that going to be an
hibit or --
    MR. RATHBUN: No, I'm just seeing if
at's the one he's talking about.
o. This is the actual certification application to
aser for -- no. Hold on.
BY MR. RATHBUN) Here is your -- I've also got your
ne of '04 certification test on the X26. Can you

35

1  tell me what that is?
2  A Apparently, it's an application for certification
3     dated 6-5-06, and I don't know if we had a refresher
4     that date. I don't recall.
5  Q Okay. Your recollection is your recertification was
6     actually in '07?
7          MR. GLENDENNING: Object to the form.
8  A There's a potential that we've had more. I just
9     know the most recent one was '07, '08.
10 Q (BY MR. RATHBUN) Do you have to recertify every
11    year, or do you recall, on the Taser?
12 A I don't know.
13 Q All right.
14 A I just show up when they tell me to be there.
15 Q All right. I would like for you to walk me through,
16    if you would, step-by-step of the incident involving
17    Mr. Soto. And let me get my incident report pulled
18    up here so I can follow along with you, and -- are
19    you going to be referring to your incident report or
20    the -- in fact, why don't I just go ahead and mark it
21    both of those while we're at it.
22         MR. GLENDENNING: You looking for his
23 narrative and KBI --
24         MR. RATHBUN: Yeah. I'm going to mark it.
25         MR. GLENDENNING: 155 is the narrative and

36

1     213.
2          MR. RATHBUN: I'm just trying to pull it
3     up.
4          (Marked Deposition Exhibit 4 and 5.)
5          MR. GLENDENNING: 213 through what?
6          MR. RATHBUN: 213 through 219, which is a
7     drawing.
8  Q (BY MR. RATHBUN) You can look at those if you want,
9     but I think they're the same things you have there.
10 A Yeah, they're the same.
11 Q All right. Tell me about that day. And that was,
12    what, August the 30th of '06?
13 A (Non-verbal response.)
14 Q What was your shift that day?
15 A 6:00 p.m. to 6:00 a.m.
16 Q So you came on to work. What had you done that day?
17    Do you recall? What day of the week was this?
18 A I don't know what day of the week it was. Arrived
19    at -- at the police department and went to roll
20    call.
21 Q For a 6:00 shift, what time do you get there?
22 A I typically get there 15 minutes early.
23 Q You dress out or are you already dressed?
24 A We're already dressed.
25 Q And roll call is at what time?

Witness: JON ANTRIM

37

1    A  1800, 6:00 p.m.
2    Q  Tell me what happened that day.
3            MR. GLENDENNING:  Object to form.  It's
     overbroad.
5    Q  (BY MR. RATHBUN)  Okay.
6    A  In relation to this incident?
7    Q  Yes.
8    A  At approximately 6:01, I responded to the area of
9       McDonald's south.
10   Q  I'm going to interrupt as we go along.  I apologize
11      in advance for that.
12           So you were sitting in roll call and you
13      got a call?
14   A  Yes.
15   Q  How did that come about?
16   A  Came out as a male outside of McDonald's south that
17      was naked, screaming obscenities at customers.
18   Q  Okay.  What did you do?
19   A  As I was responding, we received additional
20      information that he was by Furniture Mart.
21   Q  Let me ask you, in terms of timing, you were Car 11;
22      right?
23   A  Yes, sir.
24   Q  I notice the time stamp on your car was about
25      three -- three minutes different than the time stamp

38

1       on Dixon's video.  Have you noticed that?  Have you
2       compared the two?
3    A  No, sir.
4    Q  How is the timing set?
5    A  I don't know.
6    Q  All right.  So, anyway, you -- I interrupted you
7       there.  You said you received notice that he moved
8       over by the Furniture Mart.
9    A  That is correct, which is across the street to the
10      west of McDonald's south.
11   Q  All right.
12   A  I arrived in the general area and I turned onto
13      Coolidge, which is the street that runs along
14      Furniture Mart.
15   Q  Okay.  Okay.
16   A  As I made the turn, communication advised me that
17      the reporting party told them I had turned the wrong
18      way and that the subject was over by
19      Sherwin-Williams.  I turned around and at that time
20      I turned onto the south side of Sherwin-Williams,
21      where I encountered Mr. Soto.
22   Q  Okay.  What did you do?
23   A  I turned my video camera on at that point in time.
24      However, they are digital and they actually record
25      30 seconds before you turn them on.  Henceforth, why

39

1       you see me go into the Furniture Mart.  I removed my
2       mike pouch from -- from the charger that is inside
3       the car and then I -- I put it on my person.
4    Q  Okay.  Let's back up.  You turn on your -- the video
5       in the car.  How do you do that?
6    A  By pushing the record button.
7    Q  Okay.  Does the car need to be running for that to
8       work?
9    A  No.
10   Q  Does it record until you turn it off?
11   A  Yes.
12   Q  And the audio portion, how does that work on the
13      tape?
14   A  We carry a -- mike pouch or pack.  You stick it
15      wherever you want.  I put it in my pocket and it
16      records.
17   Q  Do you carry that around all the time when you're on
18      duty?
19   A  Yeah.
20           MR. GLENDENNING:  Well, let me object to
21      the form.  It's unclear as to whether you mean on
22      hie person or in his car.
23   Q  (BY MR. RATHBUN)  Yeah, I'm sorry.  On your person.
24      Do you carry it on your person at all times while
25      you're on duty?

40

1    A  Not all the time, no, because sometimes it has to
2       charge.
3    Q  Okay.  But when it's not charging, do you have it on
4       your person?
5    A  In most cases, yes.
6    Q  Is that a communication device, as well, or does
7       that just simply record what you're saying?
8    A  It just records to the camera.
9    Q  All right.  Any instructions from administration
10      about when you should have the camera on and when
11      you should have the audio portion going?
12   A  If the camera's on, they like for the audio to be on
13      as well.
14   Q  All right.  And when did you turn on the camera?
15   A  Depends on the situation.  It also activates with
16      the lights.  If you turn the emergency lights on,
17      the camera automatically activates.  I use it quite
18      regularly.
19   Q  Okay.  What's the idea of the -- I mean, the video
20      camera, did they tell you, are there specific
21      instructions on when you use it?
22   A  No.
23   Q  It's simply up to the officer whether he wants to
24      use it or not?
25   A  Strongly suggested to use it in most circumstances

41

1   if you can, but, yes, basically up to the officer.
2   Q  And is it mostly when you have interaction with the
3      public?
4   A  Yes.
5   Q  They strongly advise that you use it?
6   A  If possible.
7   Q  All right.  If I understand what you said, I notice
8      in watching the video on 11, it actually starts
9      before you turn into Sherwin-Williams?
10  A  Yes.
11  Q  Was that because of the 30 second delay you talked
12     about?
13  A  Yes.
14  Q  Not delay, but it goes back and picks up the
15     30 seconds before you turn it on?
16  A  Yes.
17  Q  So as you got out, you -- did you have to activate
18     your mike pack or was it already --
19  A  Once you hit the record button and you pull it out
20     of the charger, it automatically kicks on.
21  Q  And was it in the car charger at that point?
22  A  When I turned the camera on, yes.
23  Q  So you picked it out, put it in your pocket?
24  A  Yes.
25  Q  What happened next?

42

1   A  As I got out of my car, I drew my X26 and held it
2      behind my back.
3   Q  And why did you do that?
4   A  At that point in time I was by myself.  We have seen
5      videos of disrobed people that potentially are under
6      the influence of PCP, exhibit super human strength
7      and things of that nature.  So, basically, as a
8      protection for myself at that time in case something
9      went bad.
10  Q  What did you -- when you pulled up, Mr. Soto was
11     speaking in gibberish?
12  A  He was looking at the roof of the building.  Had his
13     hands over his face and, yeah, he was just -- he was
14     talking.  At first I didn't understand what he was
15     saying.
16  Q  Was it plain to you right off the bath that this guy
17     had problems?
18  A  I knew it was unusual.
19  Q  I mean -- and you don't come upon naked people very
20     often, I am assuming.
    A  First time.
22  Q  So you knew that -- you knew that something was
23     obviously not right with this guy?
24  A  Correct.
25  Q  Could you tell what it was?  I mean, did it seem to

43

1      you like he was intoxicated or could you tell?
2   A  I had no idea what was going on with him.
3   Q  You could tell by his gibberish that something was
4      wrong mentally; correct?
5          MR. GLENDENNING:  Object to the form.
6   Q  (BY MR. RATHBUN)  I mean, he wasn't making sense on
7      what he was saying; right?
8          MR. GLENDENNING:  Object to the form.  At
9      what point?
10  Q  (BY MR. RATHBUN)  Was he ever making sense to you in
11     what he was saying?
12         MR. GLENDENNING:  Object to form.
13  A  I understood what he was saying.
14  Q  (BY MR. RATHBUN)  But it wasn't making sense to you?
15         MR. GLENDENNING:  Object to form.
16  A  I comprehended what he was saying.  I knew what he
17     was saying and, I mean, it made sense to me what he
18     was saying.
19  Q  (BY MR. RATHBUN)  You could understand it -- okay.
20     Let me try and explain this because I'm apparently
21     not doing a very good job.
22         You could understand his words but when he
23     said things like you weren't an American and all
24     this, did it make sense to you?
25         MR. GLENDENNING:  Object to form.

44

1   A  I thought it I was awkward.
2   Q  (BY MR. RATHBUN)  Awkward.  When he accused you --
3      he said you had a nuclear device?  Does that ring a
4      bell, or not?
5   A  I have he said, "oh, I see you got a fucking -- you
6      got an explosion device."
7   Q  Did that make sense to you?
8          MR. GLENDENNING:  Object to form.
9   A  I thought maybe at that point in time he had seen
10     the Taser and that's what he was referring to.  So I
11     didn't --
12  Q  (BY MR. RATHBUN)  Did he mention anything about the
13     fact that you weren't an American?
14  A  Yes, he did.
15  Q  Did that make sense to you?
16         MR. GLENDENNING:  Object to form.
17  A  Could you reask that?  I understand his words.
18  Q  (BY MR. RATHBUN)  I mean, right.  You know what --
19     when you say you understand his words, you could
20     hear them and you know what "you're not an
21     American," you know what those words mean; right?
22  A  Right.
23  Q  But did it make sense to you that he was saying
24     that?  I mean, was that something that someone who
25     is naked out by Sherwin-Williams, is that something

45

1    that made sense to you that they would say?

2            MR. GLENDENNING:  Object to form.

3    A  I don't know what his mental state is.  I don't know

4       what's going on.  So to say that it's not normal, I

5       don't know.

6    Q  (BY MR. RATHBUN)  Okay.  So in your viewpoint you

7       can't say it was abnormal at all that he thought

8       that you had an explosive device and that you

9       weren't an American?  Nothing there caused you any

10      concern about his mental stability?

11           MR. GLENDENNING:  Object to form.  It's

12      vague and compound.

13   Q  (BY MR. RATHBUN)  Go ahead.

14   A  He was making awkward statements which would lead me

15      to believe that something was going on.

16   Q  When you say awkward, what do you mean?

17   A  Saying I had an explosive device, saying I wasn't

18      the police.

19   Q  Right.  What does "awkward" mean to you?

20   A  Not normal.

21   Q  Okay.  So you would consider those things whether --

22      apparently I'm using a word that you're

23      uncomfortable with, but would you consider that to

24      be abnormal?

25   A  Yes.

46

1    Q  All right.  So what did you do then?

2    A  Um --

3    Q  I'm sorry.  I need to stop you.

4            So we have a guy standing out there naked

5       saying things that are abnormal.  What did your

6       training tell you to do at that point?

7    A  To try and establish verbal rapport with him.

8    Q  All right.  And so what did you do to try and

9       establish that verbal rapport?

10   A  I identified myself.  I tried to communicate with

11      him.  He kept referring to the sheriff's office had

12      sprayed something in his eyes that were burning his

13      eyes.  Tried to get him to verbally comply to allow

14      me to take him into custody.  Numerous times I told

15      him I wanted to help him, as well as I told him I

16      wanted to help get the stuff out of his eyes.

17   Q  Had you been trained prior to this to call for

18      medical assistance with a situation like this?

19           MR. GLENDENNING:  Object to form.

20   A  No.

21   Q  (BY MR. RATHBUN)  What did you do next?

22   A  I continued to try and communicate with him by

23      verbal rapport, not in an aggressive manner.  I

24      didn't aggress him in any way.  Had him pretty much

25      in one area until a third party, which I don't even

47

1    know who it is, come walking from the -- from the

2    east in our direction carrying what I believed at

3    that time to be his clothes.  I flagged that person

4    away 'cause I didn't want him getting any closer

5    because it was obvious once Mr. Soto saw him he was

6    uncomfortable and that's what made him start running

7    from me.

8    Q  He took off running to the east?

9    A  Yes.

10   Q  What did you do?

11   A  I began chasing him.  Again, giving him verbal

12      commands for him to stop.  Sorry.  I'm getting

13      cramped up.

14   Q  You need to take a break?

15   A  No, I'm good.

16           And he didn't stop.  He continued to run;

17      and while he was running he actually tripped, caught

18      himself by his hands.  He continued to run.  At that

19      time apparently that's when the other officers

20      arrived.  At the time I did not know that.  We ran

21      around the corner of the building at which time I

22      fired the Taser.

23   Q  Okay.  First time you discharge your Taser was when

24      he ran around the corner?

25   A  Yes, sir.

48

1    Q  Who was in the pickup?

2    A  Mc --

3            MR. GLENDENNING:  Object to form.

4    A  McCord and Head.

5    Q  (BY MR. RATHBUN)  So he goes around the corner.  You

6       discharge your Taser.

7    A  That's correct.

8    Q  What happens?

9    A  Initially, it had no affect on him and I thought

10      that I had missed him.  He continued to run for a

11      short amount of time, at which time he stiffened up

12      and he fell to the ground.

13   Q  Did you ever figure out what made him stiffen up at

14      some point?

15   A  Whenever we got him in handcuffs, I noticed that

16      only one probe was actually -- had hit him and I

17      believe probably what happened is the other one went

18      over the top and when it fell over it hit him,

19      'cause all you have to have is contact with the

20      wire.

21   Q  This sends out two -- when you discharge your Taser,

22      it sends out two wires?

23   A  Yes, sir.

24   Q  Do they -- do they both have to make contact for

25      there to be -- for the Taser to work?

**49**

1  A  Yes, sir.

2  Q  You can't have the circuit without both of the

3     Tasers being either caught on the clothing or in

4     this case on the skin?

5  A  If one probe hits, you can touch them with the

6     actual device and it will do the same, but if you're

7     talking in the terms of probes, both probes have to

8     make contact to complete the circuit.

9  Q  So you -- your conclusion was one of the -- one of

10    the probes missed and then came around and made

11    contact on the front some way?

12 A  Made contact somehow.

13 Q  And that allowed it to work?

14 A  For a short period of time.

15 Q  Knocked him down?

16 A  Correct.

17 Q  What did you do then?

18 A  That point in time, Corporal Ratzlaff arrived on the

19    scene.  He was running up behind us.

20 Q  Let me ask you this.  At the time he -- he first is

21    knocked down with the Taser, are you the only

22    officer there?

23       MR. GLENDENNING:  Object to form.

24 A  I thought I was, but Ratzlaff was running up behind

25    me.

**50**

1  Q  (BY MR. RATHBUN)  But he was right behind you?

2  A  Yeah.

3  Q  All right.  So what happens then?

4  A  Ratzlaff goes on to him, like in a handcuffing

5     position.  Gets on his back.

6  Q  I interrupted.  Was he on his stomach?

7  A  Yes.

8        MR. GLENDENNING:  Who on whose stomach?

9  Q  (BY MR. RATHBUN)  Was Mr. Soto on his stomach?

10 A  Yes.

11 Q  So Ratzlaff goes up to handcuff him?

12 A  That's right.

13 Q  And then what happens?

14 A  Just a knee into -- onto him to get him in a

15    handcuffing position, at which time Mr. Soto did

16    a -- an amazing -- he did a push-up with Ratzlaff on

17    his back to a standing position.

18 Q  Okay.  Then what happened?

19 A  Ratzlaff, as he began to stand, I squeeze my trigger

20    again, saw there was no effect.  Didn't let it

21    complete the five seconds.  I turned it off.

22    Ratzlaff grabbed Mr. Soto by the arm, attempted to

23    do an arm/bar takedown.

24 Q  What's an arm/bar takedown?

25 A  Basically, a technique that we're taught in

**51**

1     defensive tactics where you basically twist and lock

2     the arm into a -- a position where it makes it solid

3     like a board and use their arm as leverage to take

4     them down.  As he was doing that, something

5     happened.  I don't know.  Mr. Soto went down as well

6     as -- as Ratzlaff.

7  Q  Okay.  What did you do then?  And is it still you

8     and Ratzlaff are the only officers there at this

9     point?

10 A  Keating is also there at this point.

11 Q  Where does Keating come from?

12 A  He was with Ratzlaff in the same car.  He just

13    didn't run as fast.

14 Q  Okay.  And Ratzlaff and Keating, are they off duty?

15    Were they -- were they off duty at that point?

16 A  They came in a patrol car, but I don't recall if

17    they were on my shift at that time or not.

18 Q  Okay.  Then what happens?

19 A  About that time is when McCord and Head are arriving

20    in the pickup truck.

21 Q  Okay.  What happens then?

22 A  They began struggling to -- to get Mr. Soto

23    handcuffed.  While they're doing that, I attempt to

24    do a drive stun.

25 Q  What's a drive stun?

**52**

1  A  It's on the Taser.  You can remove the cartridge and

2     you can use it like a stun gun instead of shooting

3     the probes.

4  Q  There are probes and they make contact with the

5     individual?

6  A  There's two metallic points on the tip.  They're not

7     probes.  But there's two metallic tips and you make

8     contact with them.

9  Q  And you attempted at that point to drive stun him

10    where?

11 A  The left shoulder.

12 Q  All right.

13 A  Upper left shoulder.

14 Q  All right.  What happened then?

15 A  When I squeezed the trigger on the Taser to activate

16    it, I didn't hear the clicking that it normally

17    makes.  I also saw no reaction from Mr. Soto

18    whatsoever.  So I thought it was ineffective.  I

19    thought it didn't even work at that point in time.

20    So I went to a different location to -- to try

21    again.

22 Q  If there are people in contact with someone that you

23    are tasering, do they get tased as well?

24 A  No.  If they get wrapped up in the wires, yes,

25    but --

53

1   Q   But on a drive stun, if they are touching the
2       individual and you tase him, that has no effect on
3       them?
    A   No, sir.
5   Q   So at the time you go to a different location to
6       attempt to tase him, how many officers are there
7       helping you?
8   A   McCord, Head, Ratzlaff, Keating. There's four
9       officers there.
10  Q   Is Dixon at the legs then at that point?
11  A   Not at that point.
12  Q   Okay. Then what happened?
13  A   They're continuing to struggle with him. He's not
14      relinquishing his hands to get him in a handcuff
15      position. They're struggling to get his hands.
16      They're not able to get his hands out to get him in
17      handcuffs. At that time I go around and attempt to
18      do another drive stun.
19  Q   Where did you attempt to do this drive stun?
20  A   In the genitals.
21  Q   And is that a location that you're taught that's
22      especially susceptible for tasering?
23          MR. GLENDENNING: Object to form.
24  Q   (BY MR. RATHBUN) Go ahead.
    A   Could you reask that?

54

1   Q   Sure. Why the genitals?
2   A   We were taught by our instructors that that was a --
3       a spot where the drive stun would be effective.
4   Q   Any other areas that the drive stun is supposed to
5       be effective besides the genital area?
6   A   Uh-huh.
7   Q   I mean, are there other areas that are supposed to
8       be, like -- are supposed to be more susceptible as
9       well as the genital areas?
10          MR. GLENDENNING: Object to form.
11  A   Anywhere there's a large muscle mass, it will be
12      effective.
13  Q   (BY MR. RATHBUN) Okay. So at this point, you have
14      had -- had the initial Taser with the probes that
15      knocked him down?
16          MR. GLENDENNING: Object to form and
17      foundation.
18  Q   (BY MR. RATHBUN) Did you try and tase him again
19      while the probes were in or was it just that one
20      time with the probes?
            MR. GLENDENNING: Object to form.
22  A   As he stood up, I tried again, but the probe, it
23      didn't work.
24  Q   (BY MR. RATHBUN) Wouldn't make -- hadn't made
25      contact?

55

1   A   Right.
2   Q   All right. So there was the first that knocked him
3       down, the second that was ineffective with the
4       probe. Then a drive stun where?
5           MR. GLENDENNING: Object to form.
6   A   The first drive stun --
7   Q   Yes.
8   A   -- was in his left shoulder.
9   Q   All right. The second drive stun was where?
10  A   The second one I attempted was in the genitalia, but
11      I never made contact.
12  Q   Okay. Did you try another drive stun?
13  A   I tried a third and that was in his right shoulder,
14      brachial area up here.
15  Q   Okay. And did you try after that?
16  A   (Non-verbal response.) No.
17  Q   That's why we have court reporters. They catch that
18      kind of stuff.
19          So it looks to me like there were five
20      discharges in total. Would that be right?
21  A   Yes.
22  Q   Two with the probe and three drives?
23  A   Yes.
24  Q   We've been going about an hour and 15 minutes.
25      Let's take a very short break. We're making good

56

1       time.
2           (Recess taken from 9:18 a.m. to 9:23
3       a.m.)
4   Q   (BY MR. RATHBUN) I notice in looking at your report
5       that you say, due to the position, you attempted to
6       drive -- this is -- would be at -- let me get the
7       page for you here. This would be the page -- page
8       three of your report.
9   A   Correct.
10  Q   And I notice it talks up here at the top that -- it
11      talks about you attempting to -- this says "dry
12      stun." It's drive stun; right?
13  A   It's drive stun, yes.
14  Q   Drive stun in the groin, but you couldn't because of
15      the position of his legs; correct?
16  A   Correct.
17  Q   All right. You could hear the Taser clicking, but
18      you could tell it wasn't making contact?
19  A   Correct.
20  Q   All right. And at this time, Officer Dixon was
21      working on his legs, or on his feet, I mean?
22  A   At that time; yes, sir.
23  Q   Okay. What happened next?
24  A   That's when I went to the right shoulder.
25  Q   All right. And then what happened?

**65**

1  A  After it appeared that he had stopped breathing,
2    yes.
3  Q  Okay.  So if at 6:17 you called for EMS, when did
     McCord find a pulse?
5      MR. GLENDENNING:  Object to form and
6    foundation.
7  A  It would all have been around the same time 'cause I
8    was telling him to do that as I was calling for an
9    ambulance.
10 Q  Okay.  So he found a pulse roughly around 6:17?
11 A  Approximately.
12 Q  You're calling for an ambulance?
13 A  Yes, sir.
14 Q  Then what happens?
15 A  At that time, Mr. Soto was breathing.  He was
16   breathing through pursed lips.
17 Q  What does that say to you?
18 A  That he's having some difficulty, henceforth, why I
19   asked for the ambulance.
20 Q  Okay.
21 A  I continued to monitor him, at which time that it
22   appeared he stopped breathing.  Checked for a pulse.
23   Didn't find a pulse and CPR was began immediately.
24 Q  How long did you do CPR before the EMS folks got
25   there?

**66**

1  A  Seemed like an eternity, but the exact time, I don't
2    know.
3  Q  Do you indicate in your report when they got there?
4  A  Fire rescue arrived at 1818.
5  Q  So about a minute, a minute after?
6  A  Approximately one minute.
7  Q  Took them about a minute to get there?
8  A  Approximately.
9  Q  Does that sound right?
10 A  Approximately.
11 Q  Okay.  What happened when they got there?
12 A  When they got there, they applied the AED.
13 Q  What's an AED?
14 A  The automatic external defibrillator.
15 Q  And did they use the defibrillator?
16 A  They pressed the analyze button and it advised no
17   shock.
18 Q  Why would it -- have you used a defibrillator
19   before?
20 A  Yes, sir.
21 Q  Under what circumstances does it advise no shock?
22     MR. GLENDENNING:  Object to form and
23   foundation.
24 A  When there's not a shockable cardiac rhythm.
25 Q  (BY MR. RATHBUN)  What does that mean?

**67**

1  A  Cardiac rhythms, depending on the nature of V-fib or
2    V-tach is the only thing it will shock; and if it's
3    anything besides that, it will not shock.
4  Q  Does that mean there were no rhythms at all?
5  A  Not necessarily.
6  Q  Okay.  You're going to get to use some of your
7    medical training here and explain this to me.  I
8    don't understand.  When it says no shock, why would
9    it say that?
10 A  Because the monitor or the AED will only shock if it
11   is showing V-Fib, ventricular fibrillation, or
12   V-tach, pulseless V-tach.  That's the only two
13   rhythms that thing is -- those are the only two
14   shockable rhythms.
15 Q  So that means he didn't have a shockable rhythm?
16 A  That's correct.
17 Q  Did he have a pulse at all at that point?
18 A  No.
19 Q  And he obviously wasn't breathing at that point?
20 A  Correct.
21 Q  How long had he stopped breathing before EMS got
22   there?
23 A  I don't know what time the actual ambulance arrived,
24   but the fire rescue arrived at approximately, like I
25   said, one minute after.

**68**

1  Q  Okay.  Was he still breathing?  Did he still have a
2    pulse when fire rescue got there?
3  A  We had started CPR.
4  Q  Which meant he did not have a pulse?
5  A  Correct.
6  Q  All right.  The only time you do CPR is if you don't
7    find a pulse?
8  A  Correct.
9  Q  All right.  What -- what did the fire rescue guys do
10   when they got there?  You've already told us, are
11   they the ones that hooked up the -- what is it, AED?
12 A  Yes.
13 Q  So what happened after the AED advised no shock?
14 A  I actually switched roles from performing chest
15   compressions -- or I'm sorry -- from performing the
16   breaths.  I went to performing chest compressions.
17 Q  And for the breaths, do you have a mask that fits
18   over his face with a pump?
19 A  We didn't have the bag.  We have the -- the face
20   mask that you literally have to blow into.
21 Q  Okay.  All right.  What happened then?
22 A  I continued CPR until EMS arrived.  Once EMS
23   arrived, I stepped out of their way to let them do
24   what they needed to.
25 Q  Do you know what time EMS arrived?

73

1  A  No.  No, sir.
2  Q  Okay.
3      (Video running.)
4  Q  (BY MR. RATHBUN)  Okay.  And then we see a couple --
5     are those a couple other officers running up at this
6     point?
7  A  This one is Ratzlaff.
8  Q  Ratzlaff?
9  A  This is Keating.
10  Q  At 6:02:46 Ratzlaff in front and Keating behind;
11     right?
12  A  Yes, sir.
13      (Video running.)
14  Q  At 6:02:50, a pickup pulls by your cruiser and I
15     think I've already asked you who was in that pickup.
16     That was --
17  A  McCord and Head.
18      (Video running.)
19  Q  All right.  At 6:03:26 another cruiser comes by, and
20     which car is that?
21  A  Car 5.  That's Dixon's car.
22  Q  That's the one that also had a video going?
23      MR. GLENDENNING:  Object to form.
24  Q  (BY MR. RATHBUN)  Correct?
25  A  Yes, sir.

74

1      (Video running.)
2  Q  (BY MR. RATHBUN)  Why are we not getting any sound?
3  A  In all practicality, we're too far away from the car
4     for it to even be working, so the little we're
5     getting is good.
6  Q  Who's that that said "you broke my name tag"?
7  A  McCord.
8      (Video running.)
9  Q  (BY MR. RATHBUN)  At 6:05 we see an individual
10     walking up.  Is that Keating?
11  A  Yes, that's Keating.
12  Q  And that's -- I think you indicated you asked him to
13     drive your car up; is that right?
14  A  Correct.
15  Q  So that's what he's doing at this point?
16  A  Yes.
17      (Video running.)
18  Q  (BY MR. RATHBUN)  Who was it that mentioned they had
19     blood and you better not have AIDS?
20  A  McCord.
21      (Video running.)
22  Q  At this point it's 6:05:28.  Dixon is holding his
23     legs, but are they bound at that point?  Do you
24     recall?
25  A  No, sir.

75

1  Q  All right.
2      MR. GLENDENNING:  Wait a minute.  They
3     weren't or you don't recall?
4  A  At this point, they were not bound yet.
5      (Video running.)
6  Q  (BY MR. RATHBUN)  Who was it that said, sir -- it's
7     now 6:06:01 -- "sir, relax, let's not start this
8     again"?
9  A  McCord?
10  Q  Okay.
11      (Video running.)
12  Q  (BY MR. RATHBUN)  The individual -- at 6:06:23, the
13     individual walks up to Car Number 5, who is that?
14  A  Head.
15  Q  And what was he doing, do you know?
16  A  I believe he's looking for a camera at this point.
17      (Video running.)
18  Q  Okay.  It's 6:06:34.  An individual walks through
19     the front.  Who is that?
20  A  Sergeant Odle.
21  Q  Okay.  Had he been there the whole time or did he
22     arrive --
23  A  He arrived.
24  Q  -- at this point?  Okay.
25      (Video running.)

76

1  Q  Is he still talking at this point?
2  A  Moaning.
3      MR. GLENDENNING:  And for the record, we
4     mean Mr. Soto?
5      MR. RATHBUN:  Yes.  And that was at
6     6:07:26.
7      (Video running.)
8  Q  (BY MR. RATHBUN)  Has he been hog tied at that
9     point, do you know?
10      MR. GLENDENNING:  Object to form.
11  A  I don't -- I don't recall.  At some point in time
12     during this, he was.
13  Q  (BY MR. RATHBUN)  You have -- but you haven't seen
14     him do that as we've been watching here, have you
15     or --
16  A  I don't know.
17      (Video running)
18  Q  (BY MR. RATHBUN)  At 6:08:32, who is that that just
19     walked in front of the screen?
20  A  Me.
21  Q  Is that you?  All right.  Okay.  And that's the end
22     of it.
23      At this point had you called to indicate
24     that you were going to transport him somewhere or
25     were you going to call ahead or --

77

1      MR. GLENDENNING: Okay. At what point?
2  Q  (BY MR. RATHBUN) When he turned off the camera.
?  A  **I had made the comment to Odle on the video -- you**
      **could hear it -- that I was going to be taking him**
5      **to the hospital. We don't normally call and let**
6      **them know we're coming. We just take 'em to the**
7      **hospital and then they take 'em into triage and go**
8      **from there.**
9  Q  Do you have to get in your car and turn the camera
10     off?
11 A  **Yes.**
12 Q  That's the only camera that would have had a --
13     that's the only video camera that would have had a
14     view of the last couple minutes of his life;
15     correct?
16     MR. GLENDENNING: Object to form.
17 A  **To my knowledge, yes.**
18 Q  (BY MR. RATHBUN) Position wise, of where he was?
19     Could you get us on the next one, please.
20     (A second video was started.)
21 Q  (BY MR. RATHBUN) All right. Car Number 5.
22     (An off-the-record discussion was
23     had.)
24 Q  (BY MR. RATHBUN) Okay. This starts going at -- let
25     me ask you here. What does the B stand for?

78

1  A  **Brake. Means he's touching his brakes.**
2      (Video running.)
3  Q  (BY MR. RATHBUN) Okay. So at this point, 6:06:09
4      on this camera, he's -- Dixon is pulling up behind
5      the pickup?
6  A  **That's correct.**
7  Q  And we see in the foreground, in the background of
8      the left-hand side, who do we see there, or can you
9      make any of those out?
10 A  **Can I turn it this way?**
11 Q  Sure.
12 A  **Head and McCord are down here and if we play a**
13     **little bit more, maybe I can tell better.**
14 Q  The problem is, he pulls up and you just can't see
15     much.
16     (Video running.)
17 Q  (BY MR. RATHBUN) So when he's parked there at
18     6:06:12, you can just see one individual there?
19 A  **That's McCord.**
20 Q  Okay. What's -- explain to me there -- I'm going to
21     stop it at 6:07, basically. The officer's picked
22     him up. What was going on there? Could you tell?
23 A  **That's where he started squirming and kicking. If**
24     **you'll rewind it just a little bit. Little bit**
25     **more.**

79

1      (Video running.)
2  Q  (BY MR. RATHBUN) Okay. They stand up at 6:06:45.
3      It looked like they moved him over.
4  A  **No. He started squirming and rolling and trying to**
5      **kick.**
6  Q  Who's got his legs there?
7  A  **Dixon.**
8  Q  All right. Dixon's holding his legs crossed and
9      then holding his legs down?
10 A  **Uh-huh.**
11 Q  Who's on the front of him?
12     MR. GLENDENNING: Object to form.
13 Q  (BY MR. RATHBUN) Probably can't -- we can't see in
14     this, can we?
15 A  **I don't know.**
16 Q  I'm going to jump ahead a couple minutes.
17     (Video running.)
18 Q  (BY MR. RATHBUN) Now, who is this at -- whoops.
19     Oh, I messed that up. I'm sorry.
20     (Video running.)
21 Q  At 6:10:25 who is that that's staying in front of
22     the -- is that Sergeant Odle?
23 A  **That's me.**
24 Q  Oh, that was you. What were you doing there?
25 A  **I don't recall.**

80

1  Q  Okay.
2      (Video running.)
3  Q  (BY MR. RATHBUN) Is that you again?
4  A  **Yes.**
5  Q  At 6:10:59 you were looking for something in the
6      back of the pickup. What were you looking for;
7      clothes?
8  A  **That's when I picked up his clothes to take them to**
9      **my car.**
10 Q  Okay. And that's when we see you before, walk
11     around and you turn your camera off?
12 A  **Yeah, eventually.**
13     (Video running.)
14 Q  (BY MR. RATHBUN) All righty. Who just -- at
15     6:12:17, who just walked in front of us there?
16 A  **That's Ratzlaff.**
17 Q  And Ratzlaff, is that when they're doing the hog
18     tie?
19 A  **It appears, yes.**
20 Q  Okay.
21     (Video running.)
22 Q  (BY MR. RATHBUN) All right. So it looks like it's
23     6:13:09 and he's being hog tied and he's being
24     carried now somewhere and that's the last in this
25     videotape you see him. Right?

CINDY L. FENTON, CSR  620-277-2346

**Page 1**

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on        )
her behalf and as Next      )
Friend of minor JS,         )
minor HS and minor AS,      )
                            ) Case No. 08-1171-MLB
            Plaintiffs,     )
                            )
vs.                         )
                            )
CITY OF LIBERAL,            )
KANSAS,                     )
            Defendant.      )

D E P O S I T I O N

        The deposition of CHRISTOPHER HEAD was
taken on behalf of the plaintiff before
CINDY L. FENTON, a Certified Shorthand Reporter of
Kansas, at Jury Room, Seward County Courthouse, 415
North Washington, Liberal, Kansas, on December 9,
2008, commencing at 9:18 A.M.

**Page 2**

APPEARANCES

The **plaintiffs** appeared by:

**RANDALL K. RATHBUN**

Depew, Gillen, Rathbun & McInteer

8301 East 21 Street, Suite 450

Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**

Watkins Calcara, Chtd.

P. O. Drawer 1110

Great Bend, Kansas  67530

**Page 3**

# I N D E X

                                              Page

CHRISTOPHER HEAD

Direct Examination by Mr. Rathbun              4

## Exhibits

                                              ID'd

Deposition Exhibit 1                           10
Deposition Exhibit 2                           50
Deposition Exhibit 3                           46
Deposition Exhibit 4                           22
Deposition Exhibit 5                           55

**Page 4**

1        (Marked Deposition Exhibit 1, 2, 3 and
2   4.)
3        **CHRISTOPHER HEAD,**
4   called as a witness on behalf of the plaintiff,
5   having been first duly sworn, testified as follows:
6        **DIRECT EXAMINATION**
7   BY MR. RATHBUN:
8   Q  What's your name?
9   A  **Christopher Nelson Head.**
10  Q  Where you live, Officer?
11  A  **Liberal, Kansas.**
12  Q  All right.  Have you ever given a deposition before?
13  A  **No, sir.**
14  Q  All right.  You understand when we started you put
15     your right hand up in the air and took an oath?
16  A  **Yes.**
17  Q  Since you did that, it's very important that you
18     understand my questions before you attempt to answer
19     them.  So if at any point I ask a question which
20     sounds confused or garbled, will you ask me to
21     straighten it up?
22  A  **Yes, I will.**
23  Q  If you go ahead and answer the questions today,
24     then, will it be fair for the jury and I to assume
25     that you understood the question?

41

1  Q  That's good.  That's what you're supposed to do when
2     you don't understand it, ask me to clarify.
3  A  When I answered it, I thought that's what you meant.
4  Q  Okay.  Here's what --
5  A  Please rephrase.
6  Q  Here's what I'm trying to find out.  Does the way a
7     person is restrained, does that have anything to do
8     with positional asphyxia?
9            MR. GLENDENNING:  Object to form.
10 A  It could.
11 Q  (BY MR. RATHBUN)  What about officers sitting on a
12    subject, would that have anything to do with a
13    positional asphyxia?
14           MR. GLENDENNING:  Object to form.
15 A  If we sat on them long enough, yes.  In the wrong
16    position, of course.
17 Q  (BY MR. RATHBUN)  Were you involved in picking him
18    up to carry him to the patrol car?
19 A  No, sir.
20 Q  You were just walking along with them or watching
21    them or --
22 A  I was standing off to the north, which would be
23    closer to the Sherwin-Williams building and I was --
24    I saw them when they picked him up to carry him.
25 Q  As they were carrying him, you noticed that he was

42

1     ejaculated?
2  A  I noticed there was semen.  I didn't know when it
3     happened but I did notice there was semen.
4  Q  What did -- were you -- actually, you saw a
5     milky-colored fluid coming from his penis?
6  A  Yes.
7  Q  So you saw him actually ejaculating?
8            MR. GLENDENNING:  Object to form.  It's
9     been asked and answered and no foundation.
10 Q  (BY MR. RATHBUN)  Go ahead.
11 A  I don't know if he had already ejaculated when they
12    pick him up and it was just leaking out or if he
13    ejaculated as soon as they picked him up.  I don't
14    know.  I just saw semen coming from his penis.
15 Q  What did that say to you?
16 A  That -- I don't know.  I didn't have anything to
17    think about at that time.  It was something I'd
18    never seen before.  I felt that he probably had a
19    mental illness and I couldn't think of any other
20    reason for something like that to happen.
21 Q  You didn't think this guy's dying when he
22    ejaculated?
23 A  No.
24           MR. GLENDENNING:  Object to form.
25 Q  (BY MR. RATHBUN)  Had you ever heard of anything

43

1     like that before, that you lose control of your body
2     functions when you die?
3  A  I've never heard of anyone ejaculating when they
4     die.
5  Q  What have you heard of?
6            MR. GLENDENNING:  Object to form.
7  Q  (BY MR. RATHBUN)  Bladder --
8  A  Bladder functions, yes.  I've been around lots of
9     dead people and I've never seen one ejaculate when
10    they die.
11 Q  Have you been around people as they're dying?
12 A  A few times, yes.
13 Q  How many times?
14 A  Three or four, car accidents, things like that.
15 Q  Were they naked?
16 A  No.
17 Q  Have you ever been around someone who has been naked
18    as they're dying?
19 A  Yes.
20 Q  When would that have been?
21 A  I don't know.  Medical calls.  You go to a house,
22    someone is passing away in the shower, something
23    like that.  I've never seen nor heard of anyone
24    ejaculating while they die.
25 Q  Okay.  When you saw this ejaculate, you advised that

44

1     if he was placed in a patrol car, you needed to make
2     sure that he was able to breathe; correct?
3            MR. GLENDENNING:  Object to form.
4  Q  (BY MR. RATHBUN)  Go ahead.
5  A  After I seen that he had ejaculated, I told Corporal
6     Antrim that he had -- it appeared that he had
7     ejaculated, and when they got him to the patrol car
8     I told him that he needed to be put in a position
9     where he could breathe in the patrol car.
10 Q  And at that time you found out that he wasn't
11    breathing; correct?
12 A  Yeah.  Right about within a couple seconds I looked
13    at him and he didn't appear to be breathing.
14 Q  Was he sitting in the patrol car at that point?
15 A  No.
16 Q  Where was he?
17 A  He was placed beside the door at the -- of the back
18    of the -- I don't know, I think Unit Five.  I'm not
19    exactly sure.  I'm pretty sure it was Unit Five.
20 Q  Okay.
21 A  He was placed on the ground near the passenger -- or
22    the back passenger door.
23 Q  Stomach down?
24 A  Yes.
25 Q  You looked and you could see that he wasn't

CINDY L. FENTON, CSR  620-277-2346

---

45

1 breathing?

2 A The look on his face didn't look right. I thought

3 immediately he needed medical attention. Then I saw

   he wasn't breathing. The restraints were taken off.

5 Q When you said it didn't look like, it looked like he

6    was dying?

7 A The look on his face, yes.

8 Q A blank stare?

9 A Yes.

10 Q Have you seen dead people before?

11 A Yes.

12 Q Did it look similar to that look?

13 A Yes.

14 Q Did you find -- did you find -- I'm --

15        (An off-the-record discussion was had

16    by counsel.)

17 Q (BY MR. RATHBUN) Did you -- when you thought it

18    didn't look right and it looked like he was dying,

19    what did you do then?

20 A I told Sergeant -- sorry, Corporal Antrim. He's a

21    sergeant now.

22 Q I understand that. Just call him Antrim.

23 A I told Antrim, him being a paramedic, the restraints

24    were taken off of him, and CPR was started.

25 Q Okay. How long had passed in your way of thinking

---

46

1    between the time that you had arrived on the scene

2    and this situation?

3 A Maybe ten minutes, maybe. I don't know. I didn't

4    look at the clock on the --

5 Q I understand.

6 A Approximately ten minutes, probably.

7 Q How long did it take to get him restrained during

8    the ten minutes -- if it is ten minutes, how much of

9    this was involved -- in this ten minutes was

10    involved in the struggle while you were there?

11        MR. GLENDENNING: Object to form.

12 A Probably three or four minutes.

13 Q (BY MR. RATHBUN) And what was happening the other

14    six to seven minutes?

15        MR. GLENDENNING: Object to form.

16 A We're trying to locate family members; trying to

17    find something to cover him up with; some officers

18    were trying to find witnesses. And, basically,

19    trying to figure out what had just happened.

20 Q (BY MR. RATHBUN) Did you hear anybody say we better

21    get this guy to the hospital?

22 A No.

23 Q What is excited delirium?

24 A It's when someone is acting out of their mind,

25    possibly naked, having some kind of mental problems.

---

47

1 Q Was this guy classic excited delirium?

2        MR. GLENDENNING: Object to form and

3    foundation.

4 Q (BY MR. RATHBUN) Go ahead.

5 A After this happened, we had classes on that, and,

6    yes, classic, appeared to be.

7 Q In fact, it looks like -- I'm going to hand you that

8    Exhibit 3.

9 A Uh-huh.

10 Q What is that?

11 A It's training that we went through, put on by

12    Lieutenant Mulanax and Lieutenant McCord, on excited

13    delirium. Basic awareness, signs and symptoms of

14    excited delirium.

15 Q Tell me what -- tell me what you learned in this

16    training.

17        MR. GLENDENNING: Object to form.

18 A We learned that the people that -- that are going

19    through these -- this excited delirium need to be

20    restrained as soon as possible and taken to the

21    hospital.

22 Q (BY MR. RATHBUN) Did you learn anything about when

23    to call for medical assistance?

24 A Yes. As soon as they're placed into custody or in

25    control.

---

48

1 Q As soon as they're placed into custody or when you

2    arrive at the scene?

3 A Well, if -- we don't want to bring other people into

4    a scene that's not secure.

5 Q I'm not arguing with you. I'm just trying to --

6        Is your training you don't call for

7    medical assistance until you have the victim -- the

8    subject subdued?

9        MR. GLENDENNING: Object to form.

10 A Well, I believe that we call them -- I may be wrong,

11    but I believe that we call them whenever the person

12    is restrained and then we get medical assistance as

13    soon as possible thereafter.

14 Q (BY MR. RATHBUN) You're not wrong if that's what

15    you've been trained. I'm just trying to figure out

16    what you have been trained.

17 A Right.

18 Q And your training is you don't call for medical

19    assistance until they've been subdued?

20        MR. GLENDENNING: Object to form. It's

21    been asked and answered.

22 Q (BY MR. RATHBUN) Go ahead.

23 A I believe we wait until we get them under control

24    before we call for medical assistance. We don't

25    know what we have until we get to the location.

---

CINDY L. FENTON, CSR  620-277-2346

49

1  Q  Sure.  And when you get to the location and you see
2     someone running around saying you have a nuclear
3     device and running around naked and screaming, at
4     that point do you know you have excited delirium?
5           MR. GLENDENNING:  Object to form.
6  A  I say a possibility of excited delirium there, yes.
7  Q  (BY MR. RATHBUN)  But your training, of course, is
8     to wait until the individual is subdued before you
9     would call for medical backup?
10 A  I believe it is.
11          MR. GLENDENNING:  Object to form.
12 Q  (BY MR. RATHBUN)  All right.  Now, do you remember
13    what the -- it looks like synopsis, what was taught.
14    And one of the things taught was the basic
15    awareness, signs or symptoms of excited delirium?
16 A  Yes.
17 Q  And those signs or symptoms is what you already
18    described?
19 A  Yes.
20 Q  You can't recall anything other than that?
21 A  I can't recall at this time.
22 Q  Okay.  Now, is it true that you had -- hadn't really
23    heard of excited delirium until looks like March the
24    15th of 2007?
~~ A  Yes.

50

1  Q  And in all the training that you had got prior to
2     that time, you'd never heard of that term?
3  A  No.
4  Q  Had you ever heard of the term sudden in-custody
5     death syndrome?
6  A  No.
7  Q  In a situation like this where you're confronted,
8     did you find this training to be helpful to you?
9           MR. GLENDENNING:  Object to form.
10 A  Yes.  If we had this training before that, yes.
11 Q  (BY MR. RATHBUN)  I'm not asking for outcomes,
12    because we can't guess on outcomes, but certainly
13    this situation could have been handled -- would have
14    been handled differently if this training had been
15    received prior to March of '07; correct?
16          MR. GLENDENNING:  Object to form.
17 A  Yes.  Could have been.
18 Q  (BY MR. RATHBUN)  All right.  Let me show you
19    Deposition Exhibit 2.  Have you seen that before?
20 A  Yes.
   Q  Does that look like your name up there?
~~ A  Yes.
23 Q  And your I.D. number, was it 66 -- I can't read it.
24    What is that?
25 A  It's CO, for certified officer, number 67.

51

1  Q  All right.  Thanks.
2           When's the last time you saw this?
3  A  March 15th, '07.
4  Q  Okay.  Look at question nine.  You think that was a
5     correct answer there?
6  A  Yes.
7  Q  All right.
8  A  I don't think it's reasonable to call someone there
9     until the situation is under control.
10 Q  And that's what your training has taught you?
11 A  Yes.
12          MR. GLENDENNING:  Object to form.
13 Q  (BY MR. RATHBUN)  And in your way of thinking,
14    calling EMS and having them stand by out on Kansas
15    Street would have been unreasonable?
16 A  We don't know where the person's going to run.  You
17    don't know if he's going to run to that ambulance
18    and grab hostages.  I don't believe it's reasonable
19    until the situation is under control.
20 Q  So your viewpoint is, had you called an ambulance,
21    this man could have run to the ambulance and taken a
22    hostage and, therefore, it would be unreasonable to
23    call EMS?
24 A  Yes.  I -- I mean, speculation, but --
25 Q  All right.

52

1  A  My training, experience has been to secure the scene
2     before you bring anyone else into it.
3  Q  Okay.  In your viewpoint, that applies whether it's
4     a violent, aggressive criminal or someone that's
5     mentally impaired or high on drugs or whatever?
6           MR. GLENDENNING:  Object to form.
7  Q  (BY MR. RATHBUN)  You treat those all the same?
8           MR. GLENDENNING:  Object to form.
9  A  Yes.
10 Q  (BY MR. RATHBUN)  All right.  You may not know this
11    and I -- the question may not even make sense to
12    you, but are you aware that different versions of
13    training manuals come in over the time with the
14    Tasers?
15 A  No.
16 Q  Do you know, for instance, if, like, a version 11
17    training manual comes and you get trained for that
18    and then a version 12 comes, then you get trained
19    for that, does that -- how often do you get Taser
20    training?
21          MR. GLENDENNING:  Object to form.
22 A  Once.
23 Q  (BY MR. RATHBUN)  Just your initial certification?
24 A  I can't say that.  We actually have -- we have the
25    initial certification and then we have a training in

**Page 1**

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on )
her behalf and as Next )
Friend of minor JS, )
minor HS and minor AS, )
                       ) Case No. 08-1171-MLB
        Plaintiffs, )
                       )
vs.                    )
                       )
CITY OF LIBERAL, )
KANSAS. )
                       )
        Defendant. )

D E P O S I T I O N

The deposition of JEFF KEATING was taken
on behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
12:25 P.M.

---

**Page 2**

APPEARANCES

The **plaintiffs** appeared in person by TONYA

BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**

Depew, Gillen, Rathbun & McInteer

8301 East 21 Street, Suite 450

Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**

Watkins Calcara, Chtd.

P. O. Drawer 1110

Great Bend, Kansas  67530

---

**Page 3**

I N D E X

                                              Page

JEFF KEATING

Direct Examination by Mr. Rathbun               4

Exhibits

                          ID'd

Deposition Exhibit 7 (00007-00009)              6

Deposition Exhibit 8 (206-209)                  7

---

**Page 4**

**JEFF KEATING,**

called as a witness on behalf of the plaintiff,

having been first duly sworn, testified as follows:

(Marked Deposition Exhibits 7 and 8.)

**DIRECT EXAMINATION**

BY MR. RATHBUN:

Q  What's your name?

A  **Jeffrey Dale Keating.**

Q  What do you do for a living?

A  **I'm a police officer for the City of Liberal.**

Q  Mr. Keating, have you ever had your deposition taken

   before?

A  **In other trials -- or other matters, yes.**

Q  A deposition or trial testimony?

A  **Deposition.**

Q  What would that be about?

A  **One of them was a case I was involved in when I was**

   **chief of police for Tyrone, Oklahoma.**

Q  What would that have involved?  Just --

A  **That was involved with a suit that the City and I**

   **were named in for violation of constitutional rights**

   **I believe is what it was.**

Q  An allegation of excessive force or --

A  **Yes, I believe so.**

Q  Was that case settled or tried?

21

1    and then you can answer or she'll start yelling at
2    us.
3    Q  (BY MR. RATHBUN)  You would say that is bizarre but
     not crazy?
5         MR. GLENDENNING:  Object to form.
6    A  I'm not a psychologist, so I can't determine.
7    Q  (BY MR. RATHBUN)  I know you're not a psychologist.
8    You told me your background.  But in your viewpoint
9    you're not able to figure out when someone's acting
10   crazy?
11        MR. GLENDENNING:  Object to form.
12   Q  (BY MR. RATHBUN)  Go ahead.
13   A  Bizarre behavior can be classified as acting crazy,
14   I guess.  I mean --
15   Q  Did you get -- have you got instruction from the
16   Liberal P.D. on how to handle people that are acting
17   bizarre or crazy, whatever word you want to use?  Is
18   there any training that you received along those
19   lines?
20        MR. GLENDENNING:  Object to form.
21   A  We've received training on how to act -- how to
22   respond to mentally challenged people, things of
23   that nature, through the Southwest Guidance Center.
24   Q  And what's mentally changed?  What do you mean by
     that?  You mean someone with a mental disability?

22

1    A  Yes.
2    Q  The way you would envision someone with a mental
3    disability, would they be acting different than what
4    Mr. Soto was acting that day?
5         MR. GLENDENNING:  Object to form.
6    A  Yes.
7    Q  (BY MR. RATHBUN)  Okay.  How -- someone with a
8    mental disability, how would they be acting?
9         MR. GLENDENNING:  Object to form.
10   A  Dealing with -- from working with Mosaic, the
11   clients there, they act similar, but I like I said,
12   you have to take the totality of the circumstances
13   in, things of that nature.  You have to consider
14   previous knowledge with people.
15   Q  Previous knowledge as in what you knew about
16   Mr. Soto?
17   A  Yes.
18   Q  You knew that he had -- that he may be a drug
19   addict?
20   A  Yes.
     Q  And that played into your thought process as well in
22   terms of what was going on when you saw him?
23   A  Yes.
24   Q  Okay.  Have you had any training in how to deal with
25   people that are acting bizarre/crazy and you know

23

1    maybe have drug problems?
2    A  We have --
3         MR. GLENDENNING:  Object to form.  Go
4    ahead.
5    A  We have since that incident, yes.
6    Q  (BY MR. RATHBUN)  That's training for excited
7    delirium?
8    A  Yes.
9    Q  But prior to this, you'd received no training along
10   those lines?
11        MR. GLENDENNING:  Object to form.
12   A  No, not that I recall.
13   Q  (BY MR. RATHBUN)  Okay.  What did you learn in that
14   training that would have been helpful for you in
15   dealing with this situation?
16        MR. GLENDENNING:  Object to form.
17   A  Probably to have EMS on standby.
18   Q  (BY MR. RATHBUN)  Anything else?
19   A  No, not that I recall.
20   Q  Okay.  When you get somebody down on the ground
21   that's acting crazy/bizarre and may have some drug
22   problems, do you treat them any differently --
23        MR. GLENDENNING:  Object to form.
24   Q  -- in your training?
25        MR. GLENDENNING:  Object to form.

24

1    A  It all depends on the circumstance, how they are
2    resisting, things of that nature.
3    Q  (BY MR. RATHBUN)  Is it appropriate to -- in your
4    viewpoint, is it appropriate to drive stun someone
5    that's being held down on the ground?
6         MR. GLENDENNING:  Object to form.
7    A  Yes.
8    Q  (BY MR. RATHBUN)  All right.  Let's go through your
9    report, if we can, please.  And why don't you kind
10   of tell me step by step -- and you can refer to your
11   report if you like -- what you recall about that
12   day.
13        MR. GLENDENNING:  Object to form.
14   A  It was during shift change at the police department.
15   Dispatch toned out a call of a naked individual at
16   McDonald's in the parking lot.  Sergeant Antrim took
17   the call.  Corporal Ratzlaff responded with him.  I
18   climbed in the car with Corporal Ratzlaff to assist
19   him.
20   Q  (BY MR. RATHBUN)  Did you -- let's see.  You were
21   just coming to work at that time; is that right?
22   A  I was just getting off shift.
23   Q  So you'd been working that day and your shift was
24   over?
25   A  Yes.

CINDY L. FENTON, CSR   620-277-2346

33

1  Q  And when would this have been, do you know?

2  A  In the '90s.

3  Q  Sometime between '88 and '94?

   A  Yes.

5  Q  Had you seen him since then?

6  A  No.

7  Q  So what was going on that evening before when you

8     said you had called to go to -- I forgot what street

9     you said. Washington Street?

10 A  Uh-huh.

11 Q  What was going on that evening?

12 A  Just that Officer Almes had reported a subject

13    wearing a yellow shirt, I believe, that was seen

14    running from a known drug house. Basically, when

15    Deputy Finn had located him in the garage, we just

16    did a field interrogation of him and released him.

17    Told me -- in fact, we talked. I asked John if he

18    was still on probation or parole. He said no; that

19    he'd done his time in prison and was out. Told me

20    he was living with his mother and I forget the

21    address he stated he was living at. But it was in

22    Liberal.

23 Q  Uh-huh. And you let him go at that point?

24 A  Yes.

25 Q  All right. That was the first time you'd seen him

34

1     since back in Tyrone?

2  A  (Non-verbal response.)

3  Q  Yes?

4  A  Yes.

5  Q  All right. And at that point, again, he started

6     actively resisting the officers, according to your

7     notes? You can look if you want.

8  A  Uh, yes.

9  Q  I'm sorry. We're back to --

10 A  Back to --

11       MR. GLENDENNING:  Object to form.

12 Q  (BY MR. RATHBUN)  We're back to the scene now. He

13    stated Jeff something, and he acted as if he had

14    recognized you; right?

15 A  Yes.

16 Q  And at that point, again, he started actively

17    resisting the officers and trying to roll over and

18    kick at the officers?

19 A  Yes.

20 Q  So what happened then?

21 A  At that point that's when I left and went to a

22    patrol car to get a camera because it's --

23 Q  What was the purpose for the camera?

24 A  It's department policy that, if possible, you

25    photograph whenever a Taser is deployed where the

35

1     probes hit on the person.

2  Q  Why is that?

3  A  For evidence.

4  Q  So you did that?

5  A  I went and got the camera. I came back. Had

6     photographed the location where the probe had struck

7     Soto in the back and I photographed where the probe

8     was found that hit the pavement. And I believe I

9     photographed where he had -- where he had gotten

10    entangled in the wire from the probe that was in

11    him.

12 Q  Okay. What happened then?

13 A  At that point --

14 Q  Is he still kicking -- I mean, is he still kicking

15    at this point?

16 A  Yes.

17       MR. GLENDENNING:  Object to form.

18 A  Yes.

19 Q  (BY MR. RATHBUN)  Okay. What happened then?

20 A  At that point I went to take the camera back to the

21    car, being I wasn't -- wasn't in the area.

22 Q  What did they do with the legs, do you know?

23 A  I know I observed that they used a nylon restraint

24    to control his kicking.

25 Q  How did they do that?

36

1  A  They tied his legs up and basically brought 'em back

2     up to his back to try to -- and that's for officer

3     safety and his safety as well.

4  Q  So you cross the legs and then tie the legs together

5     and then pull the legs back so that they can't kick?

6  A  That's how it's normally done, but I didn't get

7     close enough to see how they'd done it.

8  Q  You ever heard that referred to as hog tie?

9  A  Sure.

10 Q  Is that what that would be? Is that what that would

11    have been?

12 A  Yes.

13 Q  What happened then?

14 A  Like I said, I was putting the camera up. I saw

15    Corporal Antrim and Officer McCord, and I don't

16    recall who the third officer was, carry him to

17    Antrim's patrol car.

18 Q  How long would that have taken from the time they

19    got the hog tie on to them carrying him to the car?

20 A  I don't recall how long that took.

21 Q  Just time enough for you to put your camera away?

22 A  Yes.

23 Q  Were you doing anything else?

24 A  No.

25 Q  Okay. What did you see as they were taking him to

CINDY L. FENTON, CSR  620-277-2346

**Page 1**

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on
her behalf and as Next
Friend of minor JS,
minor HS and minor AS,

Plaintiffs,                    Case No. 08-1171-MLB

vs.

CITY OF LIBERAL,
KANSAS,

Defendant.

D E P O S I T I O N

The deposition of JOHN McCORD was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
1:26 P.M.

**Page 2**

## APPEARANCES

The **plaintiffs** appeared in person by TONYA
BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas  67530

**Page 3**

### I N D E X

Page

JOHN McCORD
 Direct Examination by Mr. Rathbun                    4

### Exhibits

ID'd

Deposition Exhibit 9 (0010-0012)                    18

**Page 4**

1  (Marked Deposition Exhibit 9.)
2  **JOHN McCORD**,
3  called as a witness on behalf of the plaintiff,
4  having been first duly sworn, testified as follows:
5  **DIRECT EXAMINATION**
6  BY MR. RATHBUN:
7  Q  What's your name?
8  A  **John McCord.**
9  Q  What do you do for a living?
10 A  **I'm a police officer.**
11 Q  You ever had your deposition taken before?
12 A  **Never.**
13 Q  All right.  Let's go over what I call the rules of
14    the road here so you can kind of know what's going
15    to be going on today.  When you came in here, you
16    put your right hand up in the air and took an oath,
17    which means it's very, very important that you
18    understand my questions before you attempt to answer
19    them.  So if I ask a question which sounds confused
20    or garbled in any way, will you ask me to straighten
21    it out?
22 A  **Sure.**
23 Q  Can we just have an understanding today if you don't
24    understand it, then you're not going to answer it?
25    Okay?

CINDY L. FENTON, CSR   620-277-2346

**13**

1   cut off date?
2   A  They didn't -- they didn't say a specific age.
3   Q  Well, didn't you ask?  I mean, you're the one's
4       gonna have to pull the trigger.  Don't you kind of
5       want to know what they mean by elderly?
6   A  Well, it's a -- it's a guideline.  They're not
7       saying that you cannot use it on them.  It's just a
8       guideline.  That if the situation would call for the
9       use of a Taser, then you can use a Taser.
10  Q  So there really isn't anybody that they say you
11      shouldn't use a Taser on --
12          MR. GLENDENNING:  Object to form.
13  A  I don't know.
14  Q  -- correct?
15          MR. GLENDENNING:  Same objection.
16  Q  (BY MR. RATHBUN)  Officer, here's the deal.  You're
17      in the position where you have to make the --
18      potentially have to make this call every day.
19  A  Right.
20  Q  And so I'm assuming you want to know who you can use
21      it on and who you can't use it on; right?
22  A  Yes.
23  Q  So someone tells you you shouldn't use it on the
24      elderly, what do you do with that information?
25  A  If the situation calls for the use of a Taser, use a

**14**

1       Taser.
2   Q  Regardless of age?
3   A  Like I say, it's a guideline.  It's not something
4       that is set in stone that you will not use a Taser
5       on this type of people.
6   Q  Okay.  And this -- all right.  Have you recently had
7       a course on excited delirium?
8   A  Yes.
9   Q  What does that mean to you?
10  A  Excited delirium?
11  Q  Yeah.
12  A  It's when a person that has an emotional state due
13      to high levels of narcotics or -- or something like
14      that, plus the -- the adrenalin dump that have,
15      their body starts to shut down.  They act bizarre.
16  Q  And how do you tell that, that acting bizarre, how
17      do you tell that -- how do you distinguish that from
18      someone with dementia?  Or can you?
19  A  You can't.
20  Q  Is it okay to use the Taser on individuals with
21      excited delirium?
22  A  Yes.
23  Q  Any restrictions on that that you're aware of?
24  A  Not that I'm aware of.
25  Q  This course that you took, did you learn anything

**15**

1       different in how you treat people, how you handle a
2       situation with someone with excited delirium as
3       opposed to a normal individual?
4   A  Yes.
5   Q  And how do you do different -- how do you do things
6       differently?
7   A  It's recommended that a Taser would be used faster
8       than -- used faster on a person that's -- that's
9       showing signs of excited delirium so we can get that
10      person under control and get medical help for them.
11  Q  Use it more and faster or just faster?
12  A  Faster.
13  Q  Can you use it more, too?
14          MR. GLENDENNING:  Object to form.
15  A  Depends on the situation.
16  Q  (BY MR. RATHBUN)  Okay.  Any other thing that you
17      should do with individuals like this?
18          MR. GLENDENNING:  Object to form.
19  Q  (BY MR. RATHBUN)  Go ahead.
20  A  I'm sorry.
21          MR. GLENDENNING:  Go ahead.  I just made
22      an objection.
23  A  Can you repeat your question?  I'm sorry.
24  Q  (BY MR. RATHBUN)  Is there anything else you should
25      do differently with individuals like this?

**16**

1          MR. GLENDENNING:  Object to form.
2   A  We immediately notify EMS, the ambulance.
3   Q  (BY MR. RATHBUN)  And when you first pull up --
4          MR. GLENDENNING:  Object to form.
5   Q  (BY MR. RATHBUN)  When you first pull up and see
6       someone like this?
7          MR. GLENDENNING:  Is there a question?
8          MR. RATHBUN:  I meant that to be a
9       question.
10         MR. GLENDENNING:  Well, I object to the
11      form.
12  Q  (BY MR. RATHBUN)  Well, let me back up.
13         You call EMS immediately or after you've
14      tasered them?
15         MR. GLENDENNING:  Object to form.
16  A  We call them when we -- when we feel that it's
17      excited delirium.
18  Q  (BY MR. RATHBUN)  On August the 30th of 2006 when
19      you pulled up there by Sherwin-Williams and saw
20      Mr. Soto, did you, with the training that you now
21      have, do you recognize that as excited delirium?
22         MR. GLENDENNING:  Object to form.
23  A  With the training we have -- we had now, yes.
24  Q  (BY MR. RATHBUN)  And so with the training you have
25      now, you know that you would have been better off

17

1   calling EMS right when you drove up?

2           MR. GLENDENNING: Object to form.

3   A I don't know what happened. I wasn't the first

4     person on the scene. So that's not my call to make.

5   Q (BY MR. RATHBUN) Well, when you got there, was it

6     obvious to you we had a guy that was in excited

7     delirium, to use your term?

8   A With the training now, yes.

9   Q So what does the training now tell you when you pull

10    up to a scene and see someone with excited delirium?

11  A That that person needs medical attention.

12  Q So with hindsight, do you now acknowledge that EMS

13    should have been called immediately?

14          MR. GLENDENNING: Object to form.

15  A No, because we didn't have that training back then

16    to --

17  Q (BY MR. RATHBUN) Yeah. And please, I'm not being

18    critical of you because you only do what you've been

19    trained, but I mean with the training that you now

20    have, do you now realize it would have been better

21    to contact EMS immediately?

22          MR. GLENDENNING: Object to form.

23  A Yes.

24          MR. GLENDENNING: He's already answered

25    it.

18

1   A Yes.

2   Q (BY MR. RATHBUN) All right. Officer, would you

3     look at Exhibit 9 and make sure that's the same

4     thing you're looking at?

5   A It is.

6   Q All right. And what's the little number down in the

7     bottom right-hand corner there that's got a --

8     probably a D by it?

9   A It's D00010.

10  Q Okay. And is that your report?

11  A Yes, it is.

12  Q And did anyone contribute to that report?

13  A No.

14  Q And when did you do this report?

15  A I did it 8-31-06 at 10:00 in the morning.

16  Q So you did it the next morning about 10:00?

17  A Yes.

18  Q Would that be correct?

19  A Yes.

20  Q Okay. At the time you did this report, did you have

21    the -- did you have anything to assist you in terms

22    of pictures, video, anything like that?

23  A Not -- I don't remember if we did or not.

24  Q Generally when you do a narrative, an incident

25    narrative like this, if you had the -- if you would

19

1   have had one of the videos available would you have

2     relied upon it to help you with the narrative?

3   A Yes.

4   Q How do you get access to these videos?

5   A Watching on the -- the in-car camera.

6   Q Would you have to have been in Car 11 or Car 5 to

7     watch it or can you pull it up at the station?

8   A At that time you would have had to go into the car.

9   Q Okay. And you don't know if you happened to get in

10    Dixon or Antrim's vehicle and watch their video

11    before you did this report?

12  A Not that I remember.

13  Q All right. What was your shift that day?

14  A I was on day watch shift.

15  Q So you were -- you were off work when this happened?

16  A Yes.

17  Q Did anyone ask you to go over to the scene or was

18    that just a -- kind of a voluntary thing you did?

19  A That was voluntary.

20  Q Okay. And why did you do that?

21  A Was going to help out -- help out the other

22    officers.

23  Q How many people did you think it would need -- you

24    would need over there?

25  A I only know of one person that was there on scene.

20

1   Q You only knew of one person?

2   A Yes. When I -- when I headed that way, there was

3     only one person on scene.

4   Q Is that white pickup, is that yours?

5   A Yes.

6   Q And did you have anyone with you?

7   A Yes.

8   Q And who was that?

9   A Officer Chris Head.

10  Q So Head and you -- was Head also off? Did he also

11    have day shift that day?

12  A Yes.

13  Q So Head and you jumped in your pickup and headed

14    over there?

15  A We eventually ended up over there.

16  Q Where did you go first?

17  A We were driving down the street. We were on Second

18    Street when -- when Sergeant Antrim had arrived

19    there on the scene.

20  Q Did you leave the station to go there or were you

21    headed somewhere else?

22  A We were headed down Second Street. Initially, we

23    were -- we were told by Sergeant at the time, now

24    Lieutenant Odle, that their crew was going to get it

25    because it was in between night -- or the shift

25

1  A  When I pulled in, I seen Antrim had his Taser
2     pointed at him.  Ratzlaff was -- was on the ground
3     struggling with Soto.  As I stopped my truck and got
4     out, Soto had grabbed Ratzlaff by the back of the
5     leg, causing him to fall backwards and I went over
6     and grabbed ahold of his right arm.
7  Q  Was he on the ground at the time on his knees or --
8  A  For certain, I'm not sure which position.  He was
9     low 'cause I remember having to scoop down to grab
10    his -- his arm.
11 Q  You grabbed his right arm?
12 A  Yes.
13 Q  Ratzlaff and was Head there at the time?
14 A  Yes.  We got there, same time, we arrived together.
15 Q  And Head was helping Ratzlaff on the left arm?
16 A  I remember Head -- no, I think Head was on the same
17    arm that I had.
18 Q  Okay.  So both you guys were working on the right
19    arm.  Is anybody helping Ratzlaff on the left arm?
20 A  I think Keating.  I think Keating was on his left
21    arm.
22 Q  Okay.  And was he -- was anyone -- did anyone have
23    any of their weight on him to hold him down,
24    Mr. Soto?
25 A  I know I didn't at that time.

26

1  Q  Did anybody else?
2  A  I'm trying to look in the narrative --
3  Q  Sure.
4  A  -- if it was in there or not.  According to my
5     narrative it said that Head was on his back.
6  Q  Okay.  At this -- at this time, was Antrim trying to
7     drive stun him or was it later?
8  A  It was around that.
9  Q  They keep saying "dry" in here.  Drive stun?
10 A  Drive stun, yes.
11 Q  Drive stunning him?
12 A  It was sometime around that -- that time frame.
13 Q  So you got your handcuffs then on his right, right
14    hand?
15 A  Yes.
16 Q  Right wrist.  And then it looks like Ratzlaff put
17    handcuffs on his left wrist?
18 A  Yes.
19 Q  Okay.  Then it looks like to secure his feet they
20    got some leash from a dog, tied his feet; is that
21    correct?
22 A  Eventually.
23 Q  Okay.  I'm reading here.  "A pair of handcuffs came
24    from Officer Ratzlaff and we secured his left hand."
25 A  Uh-huh.

27

1  Q  Then the next paragraph, it said secured his feet so
2     he would not start to kick.  How much time ran
3     between those two?
4  A  I honestly don't know.
5  Q  When you said "eventually," it made it seem like
6     maybe you were suggesting more time had gone by?
7  A  After he was handcuffed, I remember Dixon was
8     holding his feet down and he eventually let up off
9     his -- off his feet and then Soto started kicking.
10 Q  So then you tied his -- not you, but his feet were
11    tied at that point?
12 A  Yes.
13 Q  And how did that work?  Were they crossed?
14 A  I don't know.
15 Q  You watched the video last evening?
16 A  Yes.
17 Q  Did you happen to notice?
18 A  I -- I didn't see his feet.
19 Q  Okay.  Would it be correct that his -- according to
20    your report here --
21 A  They wrapped the rope around his feet, bent his
22    knees and then tied the rope to the handcuffs,
23 Q  Is that called hog tying?
24 A  Used to be.
25 Q  What's it called now?

28

1  A  I don't know what the technical term is for it, but
2     it's the same concept.
3  Q  You don't call it hog tying now?
4  A  We don't call it hog tying, but that's how we secure
5     people's feet.
6  Q  Well, are you not supposed to hog tie now?
7         MR. GLENDENNING:  Object to form.
8  A  Oh, we don't call it hog tying anymore, but it's the
9     same principle.
10 Q  It's the same thing; you just don't call it that?
11 A  Sure.
12 Q  All right.  After you got him secured, you noticed
13    then you had blood on your hands --
14 A  Yes.
15 Q  -- from a wound on Mr. Soto's head?
16 A  Yes.
17 Q  What do you -- you're saying they are, the next
18    paragraph, "As we waited for Officer Keating to get
19    the camera from the car, I kept my right knee on
20    Soto's back on the right side."  Now, what was the
21    purpose for the camera?
22 A  To photograph where the Taser dart had hit Soto.
23        MR. RATHBUN:  Allen, would you pull up
24    picture MVC 968 S.
25        MR. GLENDENNING:  You mean 698?

**Page 1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on          )
her behalf and as Next        )
Friend of minor JS,           )
minor HS and minor AS,        )
                              )  Case No. 08-1171-MLB
          Plaintiffs,         )
                              )
vs.                           )
                              )
CITY OF LIBERAL,              )
KANSAS,                       )
                              )
          Defendant.          )

D E P O S I T I O N

          The deposition of DENNIS MULANAX was taken
on behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on December 9, 2008, commencing at
11:03 A.M.

**Page 2**

APPEARANCES

The **plaintiffs** appeared by:

**RANDALL K. RATHBUN**

Depew, Gillen, Rathbun & McInteer

8301 East 21 Street, Suite 450

Wichita, Kansas   67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**

Watkins Calcara, Chtd.

P. O. Drawer 1110

Great Bend, Kansas   67530

**Page 3**

I N D E X

                                          Page

DENNIS MULANAX
  Direct Examination by Mr. Rathbun          4

Exhibits

                                          ID'd

Deposition Exhibit 1                         61
Deposition Exhibit 2                         33
Deposition Exhibit 3                          6

**Page 4**

(Deposition Exhibit 1, 2 and 3.)

**DENNIS MULANAX,**

called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. RATHBUN:

Q What's your name?

**A Dennis Mulanax.**

Q Where do you live?

**A Liberal, Kansas.**

Q Have you had your deposition taken before?

**A Yes, I have.**

Q How many times?

**A Once.**

Q What would that have involved?

**A It was with a civil suit in which an officer was**

**suing a supervisor.**

Q For some sort of harassment?

**A Racial discrimination.**

Q All right.  How long ago was that deposition?

**A Fifteen --**

Q It doesn't matter.

**A Fifteen years ago.**

Q In terms of process, I'm going to ask you questions

today.  You put your hand up in the air and took an

9

1 Q Where were you born?

2 A Biloxi, Mississippi.

3 Q How did you happen to get up to Kansas?

A Well, I was -- my dad was in the military and when

5   he retired, he retired back in his home area of

6   Forgan, Oklahoma.  Actually went to high school in

7   Germany.  When my dad retired, we moved back to the

8   states.  Went to college.  Got my bachelor's degree.

9 Q Where?

10 A In Alva, Northwestern Oklahoma State University.

11 Q In?

12 A Criminal justice.

13 Q When did you get that degree?

14 A In December of 1988.

15 Q And what did you do after that?

16 A I went to work for the Liberal police department.

17 Q You've been here ever since?

18 A Yes, sir.  I began in February of 1989.

19 Q Have you ever been demoted for any reason?

20 A No, sir.

21 Q You are currently a lieutenant?

22 A Yes, sir.

23 Q To whom do you report?

24 A Chief Sill.

25 Q You report directly to the chief?

10

1 A Well --

2 Q Is there a captain between the two of you?

3 A Right now, in the operations division there's not a

4   captain.  Before, yes, there was a captain.  I would

5   report directly to him.

6 Q And that was?

7 A Captain John Hardy.

8 Q When did -- Harding?

9 A Hardy.

10 Q Hardy?  When did Hardy leave?

11 A Last month.

12 Q And so the captain's position is now open?

13 A Yes.

14 Q Is that going to be filled or is that --

15 A I have no idea.  We're -- well, I have no idea.

16 Q A budgetary matter?

17 A Could be.  We're just restructuring, as far as I

18   know.  We -- I've heard talk of being similar to

19   other departments that just have lieutenants oversee

20   the divisions or what-not, so at this time I really

21   don't know.

22 Q Do you currently oversee any division?

23 A No.

24 Q What is your job now?

25 A I am the lieutenant of operations.

11

1 Q And tell me what that means.

2 A It basically means for my position, my position is

3   kind of a unique position.  I don't know if unique

4   is the right word, but I'm kind of involved in

5   several aspects of the department.  Training, I

6   oversee the field training.  I -- I'm the

7   intoxilyzer custodian.  I train new hired officers.

8   I'm involved in policy development, day-to-day

9   operations.  There's not really anything that I

10   specifically do all the time.  I'm pretty spread out

11   throughout the department.

12 Q Okay.  What's KLETC?

13 A Kansas Law Enforcement Training Center.

14 Q Do you coordinate your training with the KLETC?

15 A Clarification, please.

16 Q Do you find out what sort of training your officers

17   receive at KLETC and supplement that, or do they

18   just give the basic certification and you train

19   after that?

20       MR. GLENDENNING:  Object to form.  Go

21   ahead.

22 Q (BY MR. RATHBUN)  He's going to object today.

23 A That's all right.

24 Q But you get to go ahead and answer, anyway.

25 A It has -- it has and is -- at times it's a

12

1   combination.  We always like to follow KLETC

2   standards and procedures.  For example, my firearms

3   training, a lot of that material was gathered from

4   my instructor at the academy and I try to more or

5   less work with them so we -- so we're on the same

6   page.  We don't -- by no means do I see that we

7   contradict them or try to contradict them.  So --

8 Q When you say academy, are you talking about KLETC?

9 A Yes.

10 Q Have your officers received Taser training from

11   KLETC or do you do the Taser training?

12 A Yes.

13 Q Yes, both?

14 A Yes.

15 Q They receive training there?

16 A Yes.

17 Q And is that with their initial certification?

18 A Yes.

19 Q And then you train them in addition?

20 A Yes.

21 Q Today earlier I believe Officer Head told us that he

22   had had training once on the Taser.  Would that have

23   been through you or KLETC?

24 A Would have been through me.

25 Q Okay.  And why would he have only been trained once?

17

1    mind other than maybe it's unusual and that's it.
2  A  That's about it and that immediate attention needs
3     to be given to find out what's -- what's going on
      and so to --
5  Q  And you wouldn't think the fact that he was acting
6     bizarre or naked or down on his hands and knees
7     acting strange, that in and of itself wouldn't say
8     anything to you or alert you to any possible
9     conclusions as an officer?
10          MR. GLENDENNING: Object to the form.
11  A  Well, yes, I would.
12  Q  (BY MR. RATHBUN)  And what would that alert you to?
13  A  It would alert me to -- well, those -- to my
14     knowledge now, those are classic signs of excited
15     delirium.
16  Q  And when you say --
17  A  Or some of the classic signs.  Not all.
18  Q  And when you say "now," that wasn't classic signs
19     back in -- back in August of '06?
20          MR. GLENDENNING: Object to form.
21  A  A naked man acting bizarre, no, and even today with
22     more and more that I've studied and learned about
23     excited delirium, yes, but I have on occasion in the
24     past dealt with nudity.
25  Q  Tell me about that.

18

1  A  Well, I made -- I remember one time I made a traffic
2     stop in which a male was nude inside his vehicle and
3     simply nothing further wrong with him.
4  Q  Just because somebody's naked doesn't necessarily
5     mean it's excited delirium?
6  A  No.
7  Q  We have to look at other things, such as whether
8     they are paranoid, whether they were talking crazy,
9     whether they are acting bizarre, a number of other
10     things; right?
11  A  It would be the totality of circumstances.
12  Q  So when did you first hear about excited delirium?
13  A  Oh, it's been -- it's hard to say.
14  Q  Well, let me ask you.  Had you heard about it prior
15     to August the 30th of '06?
16  A  Briefly.
17  Q  Briefly as in how?
18  A  Oh, that -- that some departments were having to
19     deal with complaints of in-custody deaths as a
20     result of excited delirium.
    Q  How did you know about that?
22  A  It was presented in the Taser training.
23  Q  Which version?
24  A  That I'm not sure.
25  Q  Years prior to this?

19

1  A  I can't say years.  I might say a year; a year.  It
2     was a -- it was a relatively new situation that
3     departments were having to -- to deal with.
4  Q  Okay.  Let me go to page three of your report.
5     What -- you say here that you went back and reviewed
6     the tape.  When was that?  Was it that evening or
7     the next day?
8  A  Yes.
9  Q  Both of them or Car 5, Car 11?  You remember?
10  A  I don't remember.  It was the only one that was
11     being shown when I was there at the evidence room or
12     at the police department.
13  Q  Have you looked at both of them since then?
14  A  I saw a bit of one yesterday and I don't know which
15     camera it was.  It -- the one I was watching
16     yesterday I was not familiar with.
17  Q  What part did you watch yesterday?
18  A  The very end where Mr. Soto was being picked up
19     and -- and taken to the car, I believe.
20  Q  All right.  What's the policy on Taser usage here in
21     Liberal?
22          MR. GLENDENNING: Object to form.
23  Q  (BY MR. RATHBUN) With the Liberal P.D.
24          MR. GLENDENNING: Object to form.  Go
25     ahead.

20

1  A  Clarification, please.  In regard to what?
2  Q  (BY MR. RATHBUN)  In regard to use of a Taser.  When
3     can an officer use a Taser?
4  A  When reasonable to do so.
5  Q  Do you give them anymore guidance than that?
6  A  We give them -- we emphasize -- I emphasize in the
7     training -- in the use of force training Graham vs.
8     Connor in which the totality of the circumstances
9     needs to be considered.  That all forces -- or all
10     uses of force have to be reasonable.  All uses of
11     force have to be justifiable upon review.
12  Q  What about this:  If I'm -- if you're training me
13     and I'm a new recruit and I want to know when to use
14     a Taser, can you help me more by saying when it's
15     reasonable?
16          MR. GLENDENNING: Object to form.  You can
17     ask him if he gives examples.
18  Q  (BY MR. RATHBUN)  How do you tell me -- as a -- as a
19     recruit, how can you tell me when I can use the
20     Taser?
21  A  Again, I emphasize the totality of the circumstances
22     in regards to the severity of the situation.
23  Q  So we look to see how severe the situation is;
24     correct?
25  A  Yes.

---

33

1  **Q** They come to you?

2  **A** Yes.

3  **Q** I have -- let me show you Exhibit 2. I've got a
   copy for you somewhere.

5         MR. GLENDENNING: Is that one we produced?

6         MR. RATHBUN: Yeah, you gave it to me.

7         MR. GLENDENNING: There's no Bates Number

8  on it.

9         MR. RATHBUN: Oh, no. You produced the

10 disk. That's off the disk. There's your copy.

11        MR. GLENDENNING: Oh.

12 **Q** (BY MR. RATHBUN) This is the explanation to changes

13    made, training DVD version 13.0 in May of '06. You

14    see that up at the top?

15 **A** Yes.

16 **Q** As I understand it, when you get these new disks

17    that means all the prior ones are not valid or

18    they're obsolete after that. Right?

19 **A** Yes.

20 **Q** All right. When you get them in, like for instance,

21    this is effective this is effective May of 2006. Do

22    they send these right out when they make those

23    changes?

24        MR. GLENDENNING: Object to form and
   foundation.

---

34

1  **A** I don't know exactly when they send it out. When I
   get it is when I get it.

3  **Q** (BY MR. RATHBUN) All right.

4  **A** So however long it takes Taser to do that and for me
   to get is however long it takes.

6  **Q** Do you record in your office anywhere where you
   receive these disks?

8  **A** No.

9  **Q** Are they sent certified mail?

10 **A** No.

11 **Q** What do you do when you get the disk?

12 **A** Whenever I get a disk, I start using that disk to
   train from. As I go through the -- the training --
   and, again, I teach straight from the disk. I
   present the Power Point to the students or student,
   however many officers I've got, and we go slide by
   slide verbatim through all those -- through the
   presentation.

19 **Q** And when you get these disks, you look at all of it;
   right? You don't just pick and choose?

21 **A** Yes, I look at the whole thing.

22 **Q** All right.

23 **A** The training portion of it, that's --

24 **Q** Right. Right. Have you seen Exhibit 5? He's got a
   copy of it.

---

35

1         MR. GLENDENNING: That's what I'm trying

2  to make clear here because we're using multiple

3  numbers. Is that Exhibit 5 from --

4  **Q** (BY MR. RATHBUN) Good point. Yeah. Have you seen

5    the Head Exhibit 5?

6  **A** I believe I have, yes.

7  **Q** All right. This is the warning that became

8    effective on April the 12th of 2006; correct?

9  **A** Yes.

10 **Q** And it superceded all previous versions for Taser

11    devices; right?

12 **A** That -- clarification, please.

13 **Q** Yeah. I wasn't trying to be tricky. I'm just

14    reading from the document.

15 **A** Yeah. It -- it supercedes all prior versions.

16    Whenever I got a new disk, the old disk is put on

17    the shelf and I teach from the current disk, yes.

18 **Q** So it does supercede all prior versions?

19 **A** Yes.

20 **Q** They have a warning in the language about force and

21    physical incapacitation involves a degree of risk

22    that someone will get hurt or may even be killed due

23    to physical exertion, unforeseen circumstances and

24    individual susceptibilities. Nothing that's -- I

25    started to say shocking there, but nothing that's

---

36

1  new with that; correct?

2  **A** Correct. Nothing new.

3  **Q** We know that anytime a Taser is used, that

4    circumstances arising out of that Taser usage could

5    result in the death of someone?

6         MR. GLENDENNING: Object to form.

7  **Q** (BY MR. RATHBUN) Yes?

8  **A** Yes.

9  **Q** What are the risks involved in deploying a Taser,

10    using a Taser?

11        MR. GLENDENNING: Object to the form.

12 **A** There's -- there's the overall inherent risks that

13    an officer is faced with on a multitude of occasions

14    with unusual or resistive subjects. Are you asking

15    the inherent risk that the person receiving --

16 **Q** Yeah. Talking about deployment, health risks.

17        MR. GLENDENNING: Object to form.

18 **A** There is secondary injuries.

19 **Q** (BY MR. RATHBUN) Such as?

20 **A** From the person falling to the ground.

21 **Q** Anything other than that?

22 **A** From the Taser, secondary risks, falling. It might

23    cause -- you might have a slight burning to the skin

24    from the probes or -- other than that, no, from the

25    Taser.

---

CINDY L. FENTON, CSR  620-277-2346

37

1      And I don't necessarily call them -- well,
2   I don't know if "risk" is an appropriate word.  I
3   mean, when you taze somebody, more than likely
4   they're going to fall to the ground.
5 Q  All right.  What about, is there a deployment health
6   risk involving sudden in-custody death syndrome?
7   Are you familiar with that?
8      MR. GLENDENNING:  Object to form.
9 A  Uh-huh.
10 Q  (BY MR. RATHBUN)  What is that?
11 A  That's what I believe you're referring to excited
12   delirium cases in which in-custody deaths have
13   arisen or been noted.
14 Q  Does Taser list that as a deployment health risk?
15   If you know.
16 A  I don't know if they specifically list it as a
17   health risk.  I am familiar with Taser making it
18   aware that the Taser is an option that can be used
19   in dealing with people that are demonstrating signs
20   of excited delirium.
21 Q  Okay.  Why don't we look at page two under
22   deployment health risks.
23 A  Okay.
24 Q  What do they tell us there under the first one?  Do
25   they list sudden in-custody death syndrome?

38

1      Let me ask you, have you seen this before?
2 A  I'm familiar with it.  I don't -- I mostly teach
3   from the Power Point so I'm more familiar with those
4   because I'm more involved with them.
5      As far as the rest of the stuff, I'm
6   somewhat familiar with it, but I can't recite
7   specifics and so forth.  But, yes, on the bottom of
8   this page it deals with deployment risks.
9 Q  Had you seen this prior to preparing for this
10   deposition?
11 A  Yes.
12 Q  When?  When it first came out?
13 A  In my instructor classes we talked about excited
14   delirium.  So --
15 Q  What about their warnings that came -- when did you
16   see this warning first?  Did you see this warning in
17   preparing for this deposition for the first time?
18 A  No.  I've seen it previous to this.
19 Q  When would that have been?
20 A  Before the Juan Soto case, yes.
21 Q  Before Mr. Soto?
22 A  Yes.
23 Q  All right.  When you get these disks, they tell you
24   to read the warnings, don't they, and be aware of
25   the warnings?

39

1 A  Yes.  They usually put those in the instructor or
2   student/instructor versions.
3 Q  All right.  They say if a subject is exhibiting
4   signs or behaviors, and then they -- and then they
5   list a number of signs of -- of sudden in-custody
6   death.  They talk about extreme agitation.  Was
7   Mr. Soto, was he acting with extreme agitation?
8 A  Yes.
9 Q  What about the next one, bizarre behavior?
10 A  Yes.
11 Q  Inappropriate nudity?
12 A  Yes.
13 Q  Now, I think we can say yes to this, can't we?
14   Impervious to pain.  Did you have anybody tell you
15   that he acted like he just wasn't feeling drive
16   stuns?
17 A  Nobody told me that, no.
18 Q  Do you know if they used the drive stun on him?
19 A  Yes.
20 Q  How many times?
21 A  I believe three.
22 Q  Did you ever have Officer Head tell you that he
23   acted like he couldn't even feel 'em?
24 A  He didn't tell me specifically, no.
25 Q  Have you read his report?

40

1 A  No.
2 Q  And no one has told you, then --
3 A  I have overheard bits and pieces of conversation
4   from the officers.
5 Q  That would lead you to believe that?
6 A  Yes.
7 Q  Have you ever been drove stunned before?
8 A  Yes.
9 Q  Did you feel it?
10 A  Yes.
11 Q  Can you imagine not feeling it?
12 A  Can I imagine that?  Yes.
13 Q  From -- from you being -- from it being used on you?
14 A  Yes, I can imagine it.
15 Q  Paranoid?  Did it sound like he was paranoid?
16      MR. GLENDENNING:  Object to form and
17   foundation.
18 A  Yes.
19 Q  (BY MR. RATHBUN)  Do you know whether there was
20   exhaustive exertion?
21 A  From what I've heard and reviewed, yes.
22 Q  Super human, quote, end quotes, super human
23   strength, did you hear anything like that?
24 A  No.
25 Q  Hallucinations?

41

1  A  Yes.

2  Q  Sweating profusely?

3  A  That I'm not sure of.

4  Q  What do they tell you to do if you see a subject who

5     is exhibiting these?

6        MR. GLENDENNING:  Who is they?  You mean

7     Exhibit 5?

8        MR. RATHBUN:  Taser.

9  A  As now we are operating and training our officers

10    that whenever these -- these signs of excited

11    delirium are suspected to have dispatch notify EMS

12    and have them heading towards the scene.  Taser

13    pretty much recommends that this person needs to be

14    contained, controlled and then medicated as soon as

15    possible to get lactic acid and chemicals out of the

16    body and cool this person down.  He's actually

17    burning inside, nonetheless.

18 Q  That explains why they take their clothes off?

19 A  To me, that would explain it, yes.

20 Q  Do you train your officers to wait until after

21    they've subdued the subject before they call EMS?

22 A  No.  I just taught this this morning.  As soon as

23    the officer or officers get reason to believe that

24    that is a bizarre situation in which excited

25    delirium could possibly, even remotely be a factor

42

1     in this, they are to tell dispatch have EMS heading

2     this way.

3  Q  Would it surprise you to learn that this morning

4     Officer Head told us that you don't call EMS until

5     you get them subdued?

6        MR. GLENDENNING:  Object to form.

7  A  Yes, it would surprise me.

8  Q  (BY MR. RATHBUN)  He seems like a bright guy.  I'm

9     not calling for a comment there.  Is this -- is this

10    some of the new officers that you're training this

11    way?

12 A  Yes.

13 Q  All right.

14 A  All of the officers.

15 Q  I'm sorry?

16 A  All of the officers.  Officer Head may have been

17    confused or on -- I don't know.  I can't testify to

18    Officer Head's, but I know from my point of view

19    exactly, I have trained and I am training all of the

20    officers in regard to excited delirium.

21 Q  What he said is if you call EMS the subject may go

22    to the EMS vehicle and hurt the EMS personnel if you

23    call them before they're subdued --

24       MR. GLENDENNING:  Just --

25 Q  (BY MR. RATHBUN)  -- is my recollection.

43

1        MR. GLENDENNING:  Okay.  There's no

2     question yet.

3  Q  (BY MR. RATHBUN)  Does that make any sense to you at

4     all?

5        MR. GLENDENNING:  Object to form.  Go

6     ahead.

7  A  The only sense I can make of that is Officer Head

8     was thinking that he did not want to have EMS enter

9     the actual scene for wanting to protect them.  As

10    far as getting them there, yes, have them on their

11    way so that they're that much more quicker to

12    providing medical treatment to the suspect once they

13    are contained and controlled.

14 Q  That's what I asked him.  Why couldn't you have them

15    just park on the street and wait until you had them

16    subdued.  And I think his concern was they could go

17    over and somehow get in the EMS vehicle and hurt the

18    personnel.  Does that make any sense to you?

19       MR. GLENDENNING:  Objection.  It's been

20    asked and answered.

21 Q  (BY MR. RATHBUN)  Go ahead.

22 A  No, it does not make any sense.

23 Q  Now, this excited delirium warning on April the 12th

24    of 2006, that wasn't the first time that Taser had

25    given you training materials on that, was it?

44

1  A  I don't believe so, but I'm not --

2  Q  All right.

3        MR. RATHBUN:  Allen, this is kind of a

4     weird deal, but I'm going to ask you, this is Taser

5     version 12 from November '04.  I'm going to ask you

6     to put this in your computer simply because I don't

7     want him coming around here.

8        (An off-the-record discussion was

9     had.)

10       MR. RATHBUN:  I didn't make a copy of this

11    and I need to ask him about something, so if you

12    wouldn't mind pulling up the training material on

13    that.

14       MR. GLENDENNING:  What are you looking

15    for?  Documents?

16       MR. RATHBUN:  Yeah.  There's a deal that's

17    mine that says open first on mine.  Can you back up

18    one?  It was a word doc.  There we go.  And the only

19    reason that's important is I just want to kind of

20    establish for the record -- can you get in that?

21    All right.

22 Q  (BY MR. RATHBUN)  In terms of timing, Lieutenant, I

23    was just trying to get established, it looks like

24    this Disk Number 12 is dated November of '04.

25 A  Uh-huh.

45

1      MR. GLENDENNING:  This one?

2  Q  (BY MR. RATHBUN)  This is a different one.  This is

3      the one prior to this one here.  Okay.

4  A  Yes.

5  Q  And you review these disks carefully when you get

6      them; right?

7  A  I try to, yes.

8      MR. RATHBUN:  All right.  Could you go

9      back out and go to support materials.  Medical info.

10     Excited delirium, Power Point.  Would you just open

11     that up first?  Would you just run the show?

12 Q  (BY MR. RATHBUN)  Would you have gone through

13     this -- do you have Power Point capability?  Would

14     you have gone through this Power Point?

15 A  Yes.

16 Q  So we know as of November of '04 you had this?

17 A  Yes.

18 Q  Can we move on with this?  Let's go onto a couple --

19     you talk about cocaine.  It kind of -- hit it some

20     more.  Go ahead.  Keep going.  All right.  I'm

21     sorry.  Okay.  Here we go.

22         This talks about symptoms and behavioral

23     patterns, again, bizarre and aggressive behavior;

24     correct?

25 A  Yes.

46

1  Q  Dilated pupils, fear, high temperature, hiding

2      behind things, irrational, incoherent speech,

3      jumping into water.  There's more of them.  Panic,

4      paranoia, profuse sweating, public disrobing,

5      self-inflicted injuries, shivering, shouting,

6      seizures, unexpected physical strength, violent

7      behavior.

8          This is something that, again, a number of

9      these are the things that we were seeing with

10     Mr. Soto; right?

11         MR. GLENDENNING:  Object to form.

12 Q  (BY MR. RATHBUN)  Go ahead.

13 A  Not all of those, from what I saw, or from the brief

14     video that I watched, but, yes.

15 Q  Certainly a number of them?

16 A  Yes.

17 Q  All right.  Do you remember reading about Cruz vs.

18     The City of Laramie, Wyoming, on hogtying?

19 A  Briefly, yes.

20 Q  Have you taught your officers about hogtying?

21 A  No.

22 Q  What's hogtying?

23         MR. GLENDENNING:  Object to form and

24     foundation.

25 A  Hogtying is an unpolitical term -- or unpolitically

47

1      correct term that departments use for which I refer

2      to as a total restraint in which the subject's arms

3      are more or less -- where the subject's arms are

4      restrained with a connection device to the legs.

5  Q  (BY MR. RATHBUN)  On their stomach, arms behind

6      their back, then legs tied to their hands?

7  A  Could be referred to that, or it could be referred

8      to the hands to the feet up front.

9  Q  All right.

10 A  I've heard a few general descriptions of what you

11     were referring to as hogtying.  Again, I don't refer

12     to it as hogtying.

13 Q  Would you allow one of your subjects to be placed on

14     their stomach with their hands behind their back and

15     then their legs pulled up and have their hands tied

16     to their legs?

17         MR. GLENDENNING:  Object to form.

18 Q  (BY MR. RATHBUN)  Do you teach that that's

19     appropriate?

20         MR. GLENDENNING:  They don't teach that.

21 Q  (BY MR. RATHBUN)  If that happens, that would be

22     contrary to your training?

23         MR. GLENDENNING:  Object to form.

24 A  The training then or the training now?

25 Q  (BY MR. RATHBUN)  In '06?

48

1  A  Again, I didn't -- we don't teach what you refer to

2      as hogtying.  We just now teach that we're not going

3      to do it.

4  Q  When did you start doing that?

5  A  The last time I did it was this morning and --

6  Q  When did you start?

7  A  This morning, as far as officially teaching it.  As

8      far as putting the word out?

9  Q  Yeah.

10 A  Since this situation.

11 Q  Since this lawsuit was filed?

12 A  No.  It's been -- it hasn't been told to the

13     officers that they can't do it.  It's been told

14     unofficially, not in a training atmosphere or a

15     policy or a written directive atmosphere, that we

16     won't be doing it.

17 Q  When did you start doing it?

18 A  This morning.

19 Q  I'm sorry.  One other thing.  Do you agree with what

20     Taser was telling you that excited delirium is

21     regarded as a medical emergency with a psychological

22     presentation?

23         MR. GLENDENNING:  Object to form and

24     foundation.

25 A  I would -- I would agree with that generally, yes.

CINDY L. FENTON, CSR  620-277-2346

53

1    getting medical treatment for somebody that's been
2    injured. I mean, do you see a distinction between
3    those two?
4  A  If the officer doesn't see a need for medical
5     attention or a reason for medical attention, I don't
6     see how the officer can be held until that came out.
7  Q  And that's what you were trying to do here --
8  A  Yes.
9  Q  -- was tell these guys, hey, you can't wait until
10    the guy's dead. You've got to call a medical
11    emergency right off the bat; right?
12  A  As soon as possible.
13  Q  And it surprises you that they didn't know that
14    prior to this training?
15        MR. GLENDENNING: Object to form.
16  A  Well, I'm confused because your previous question
17     was was there anything in writing before this --
18  Q  Before this?
19  A  Prior to that -- that in terms of excited delirium.
20     Specifically to excited delirium, there was not
21     anything in writing as to needing medical attention
22     there as soon as possible. And in the training I
23     gave examples. If the dispatcher were to give you a
24     description of the incident being reported at this
25     time, if the officer is gaining information from the

54

1    dispatcher that, for example, this person is nude,
2    he's out in the street, he's breaking glass, he's
3    acting very unusual -- and we have discussed these
4    basic symptoms of excited delirium -- to tell
5    dispatch to go ahead and have EMS heading this way.
6  Q  That's the way to do it; right?
7  A  That's the best way I know how. If there's anything
8     that can be better done, I'm all for it.
9  Q  And it surprises you that prior to March of '07 your
10    officers weren't aware of that; right?
11        MR. GLENDENNING: Object to form.
12  A  I think the way that the question may have been
13     asked or presented to them may have been confusing.
14     I believe that my officers as soon as they know that
15     somebody needs medical attention, I have no doubt
16     that my officers would give it to them.
17  Q  (BY MR. RATHBUN) Well, why didn't they call for
18    medical attention in the case of Mr. Soto?
19  A  I can't -- I was not there. From the -- the partial
20     video that I saw of the officers dealing with him,
21     they were busy attempting to restrain Mr. Soto, calm
22     him down. And as soon as they noticed that he
23     needed medical attention, from what I saw in the
24     video, they -- they asked for EMS to get there.
25  Q  How many minutes had passed?

55

1  A  I'm not sure. I -- I didn't count the --
2  Q  Fifteen, does that sound about right?
3  A  No.
4  Q  So what you're saying is there was nothing that
5    Antrim saw when he got there, a naked man running
6    around swatting at flies, saying you have an
7    explosive device, you're not an American, nothing in
8    that that should have alerted him that we might
9    ought to get EMS involved here?
10        MR. GLENDENNING: Object to form.
11  A  I can't say what Officer Antrim was thinking about
12     in his own mind. I can only speculate.
13  Q  And I'm not asking for that, of course, because
14    we'll never know that.
15        My question to you is there's not enough
16    there that he should have notified EMS?
17        MR. GLENDENNING: Object to form and it's
18    been asked and answered.
19  A  From the partial video that I saw, Antrim had to act
20     very quickly and he had a -- a rapidly dynamic event
21     in which Mr. Soto was quickly running back towards
22     McDonald's and I believe from my perception is that
23     we didn't -- this call started out with a naked man
24     in McDonald's and we didn't want this guy to
25     possibly get back to proximity of other innocent

56

1    persons and endanger them based on the unusualness
2    of the information already given to the officers.
3        I'm sure that if Officer Antrim had time
4    and Officer Antrim is -- I don't know exactly his
5    depth of medical training at that time. I know that
6    he is or was, maybe he still is, an EMT. He, as
7    well as any officer, I believe, would call for EMS
8    as soon as they got the opportunity to do so.
9  Q  All right. You understand that it's a simple matter
10    of him saying "request 49" or whatever on his mike?
11    You understand that; right?
12  A  I understand that it could be simple if pertain --
13     to whoever's asking the question, but through the
14     officer's mind, dealing with the totality of
15     circumstances, it may not be so very simple at that
16     split second.
17  Q  Have you seen the dispatch log in this case?
18  A  I don't believe so.
19  Q  How many words does it take out of his mouth to call
20    fire rescue?
21  A  Just a few.
22  Q  He certainly at the time he was -- shot the first
23    Taser, he certainly had time to call in and say that
24    he had deployed the Taser; didn't he?
25  A  I believe that he did, yes.

57

1  Q  Is there any reason he couldn't have said "deployed
2     Taser, call 49"?  10-49, that's what, emergency?
3  A  Request for an ambulance.
4  Q  Yeah. I mean, no reason he couldn't have said
5     "Taser deployed, call 49"; right?
6  A  Yes, there is a reason.
7  Q  What was the reason?
8  A  He was dealing with the actions and perceptions
9     given to him by Mr. Soto.
10 Q  I understand that, but I mean physically there's no
11    reason when he said "Taser deployed" he couldn't
12    have also said "49"?
13 A  He could have, yes.
14 Q  When he calls in and says, I forget his number,
15    22 -- 522 at scene. No reason at that point he
16    couldn't have said "522 at scene, call 49."
17    Correct?
18             MR. GLENDENNING:  Object to foundation.
19 A  Yes, there is a reason.
20 Q  (BY MR. RATHBUN)  And what was the reason?
21 A  He would probably at that time want to know or get a
22    better idea of what was happening.
23 Q  Okay. So it's your position that someone -- when
24    he's standing there talking to Mr. Soto -- have you
25    seen the video?

58

1  A  Not in its entirety, no.
2  Q  Have you seen the part where he's talking to him?
3  A  I saw a brief part of that, yes.
4  Q  He's talking to him saying "I'm just here to help
5     you."
6  A  Yes.
7  Q  The guy is saying "You got an explosive device.
8     You're not an American." The guy's naked as a
9     jaybird and there's nothing there that would make
10    you think excited delirium?
11 A  Yes, there would be.
12 Q  Why, if you -- if you believe the training you give
13    your guys here, why wouldn't you call for EMS at
14    that point?
15 A  From what I saw on the video, and again I want to
16    say I did not watch the video in its entirety. From
17    what I saw, it was a -- a very short period of time
18    in which Officer Antrim made contact or had visual
19    and communication contact with Mr. Soto. From what
20    I saw, Mr. Antrim or Officer Antrim was -- was doing
21    a good job of trying to calm Mr. Soto down, and
22    Mr. Soto from what I was -- from what I can remember
23    from the video was looking or giving the officer the
24    perception that he was paranoid and getting ready to
25    run. It was just a -- a combination of events

59

1     that -- like I said earlier, totality of
2     circumstances that Officer Antrim was having to deal
3     with.
4              And could he have? Yes, he could have.
5     But did he? Obviously, he didn't. But I think he
6     did the best that he could with -- with what he had
7     right then and there.
8  Q  I'm -- I'm not arguing -- I'm not arguing you that.
9     I mean, because if we listen to Antrim he said
10    nobody ever trained me how to handle a situation
11    like this. Nobody had told me about excited
12    delirium. I mean, how could you expect him to be
13    any different; right?
14             MR. GLENDENNING:  Object to form.
15 A  If -- if he can say that he wasn't trained in that
16    area, then I could see him saying that. But he --
17    there was training there. This was -- there was
18    basic fundamentals that were -- were followed.
19 Q  Let me ask you this:  Under your policy of excited
20    delirium, the guy is standing there naked. He is
21    swatting at flies all around him. Slapping himself
22    in the face. Saying you've got an explosive device.
23    Saying you're not an American. Does that sound like
24    excited delirium to you?
25 A  Yes.

60

1  Q  If you're there on the scene and you're talking to
2     this guy, do you -- do you have any idea how long he
3     talked to the guy before he took out running?
4  A  From what I remember, it was a matter of seconds.
5     Very -- very quick time.
6  Q  And if it was -- and if it was more than that, like
7     a minute, any reason he couldn't have popped the
8     mike and said "call 49"?
9  A  I believe I answered this before. Yes, there could
10    be a reason.
11 Q  All right. The things that you show that you taught
12    from your reference materials, did you come up with
13    those reference materials?
14 A  Some of them.
15 Q  Who else came up with the reference materials other
16    than you?
17 A  Pat McClurg and our county attorney, Don Scott, went
18    to Las Vegas for an excited delirium training event.
19    They brought back with them material. So that was
20    included. I -- we had some Taser material that we
21    presented as well. We also at the same -- within a
22    very close proximity of that time, we had at the
23    department a telenet training in which the specific
24    subject was excited delirium.
25 Q  Do you -- did you copy that or was it a -- explain

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF KANSAS


TONYA A. BOWEN-SOTO, on her)
behalf and as Next Friend )
of JS, HS and AS,         )
                          )
               Plaintiff, )
                          )
     vs.                  )Case No. 08-1171-MLB-DWB
                          )
CITY OF LIBERAL, KANSAS,  )
                          )
               Defendant. )
_____)
```

D E P O S I T I O N

The deposition of **JESSICA NAVARRETTE**, a witness, taken pursuant to Federal Code of Civil Procedure, before Susan Maier, a Certified Shorthand Reporter of Kansas, at Seward County Courthouse, 415 North Washingotn, Liberal, Kansas, on the 3rd day of March, 2009, at 11:00 a.m.

**Page 2**

A P P E A R A N C E S

2 The plaintiff appeared by and through her
3 attorney, Randall K. Rathbun of Depew, Gillen
4 Rathbun & McInteer, 8301 East 21st Street North,
5 Suite 450, Wichita, Kansas  67206-2936.
6
7 The defendant appeared by and through its
8 attorney, Allen G. Glendenning of Watkins, Calcara,
9 1321 Main Street, Suite 300, Great Bend, Kansas
10 67530.

**Page 3**

I N D E X

JESSICA NAVARRETTE

        Direct Examination by Mr. Glendenning      4

        Cross-Examination by Mr. Rathbun          24

        Redirect Examination by Mr. Glendenning   34

        Recross-Examination by Mr. Rathbun        37

        Further Redirect by Mr. Glendenning       39


SIGNATURE OF WITNESS                              41

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER       42

CONDENSED

**Page 4**

JESSICA NAVARRETTE

called as a witness, having been first duly sworn by the reporter, testified as follows:

DIRECT EXAMINATION

BY MR. GLENDENNING:

Q    Would you state your name and address, please?

A    Jessica Navarrette, 1691 North Calhoun, Liberal, Kansas.

Q    Have you ever had your deposition taken before?

A    No.

Q    Have you talked to anybody about what a deposition is or what you might expect?

A    They said just lots of questions.

Q    Okay.  Well, a deposition is an opportunity for the attorneys for parties in a lawsuit to ask you questions similar to what you might be asked if the case goes to trial and you're called to testify at trial.  It helps us find out what your testimony may be, it may help us get the case resolved before having to go to trial.  On the other hand, it kind of nails it down so that if you do come to trial and you say something different

25

1 plus some medical, or would it be all medical
2 training?
3     A     It is now.  It is the Associate's degree.
4 You have to have the English.  And when I took it,
5 it was just all medical training.
6     Q     How many hours of medical training was
7 that?  In other words, was it like an Associate's
8 degree is?  Sixty hours of college?  Was that five
9 days a week classes all day long, or --
10     A     We did two days a week, five hours a day.
11     Q     Evening courses, day courses?
12     A     Evening courses.
13     Q     Okay.  All right.  Now, whether there's no
14 written or defined policy that you are aware of, if
15 you get a call from the police saying, "We've got
16 someone that's in distress," you get right over
17 there, right?
18     A     Yes, that's correct.
19     Q     I'd like to figure out, if we could, by
20 looking at your -- I think I know the answer, but I
21 want to make sure I'm right.  Let's look at your Cad
22 report that's attached.
23     A     (Witness complied.)
24     Q     If you look at the Cad sheets, it looks to
25 me like -- you would know this from looking -- but

26

1 it looks like Antrim, if you look at 522, was on the
2 scene at 6:05?
3     A     Okay.
4     Q     Does that look right?
5     A     Yes, that's correct.
6     Q     Okay.  I'm trying to figure out how long
7 transpired between the time he arrived at the scene
8 and the time you arrived at the scene.  Can you do
9 that calculation for me?
10     A     Sure.  He arrived on scene at 18:05 and we
11 arrived on the scene at 18:22.
12     Q     So, you got there 17 minutes after he did?
13     A     Yes.
14     Q     Certainly if he had called you at 6:05,
15 you would have been there -- is it fair to
16 extrapolate that you would have been there at 6:10?
17     A     Approximately 6:10.  It took us
18 approximately four minutes to get on scene.
19     Q     It looked to me like you were en route at
20 6:17 and arrived at 6:22.  And that's where I came
21 up with the five minutes.
22     A     We were en route at 6:18.
23     Q     Oh, 6:18?
24     A     Yes.
25     Q     So you got there in four minutes.  So

27

1 roughly you could have been there at 6:09 or 6:10,
2 correct?
3     A     Correct.
4     Q     Now, I'm a little confused by something
5 that you said.  You said you had never been involved
6 with someone with excited delirium.  You don't know
7 that to be the case, because when you got there he
8 wasn't excited delirium, was he?
9     A     No.
10     Q     He was dead when you got there?
11     A     Yes.
12     Q     And I say -- When I say "dead," he hadn't
13 been officially pronounced dead, but if we look at
14 your charts from the very first time we get on
15 pulse, no motor response.  There was nothing to
16 indicate when you did your first assessment at 6:22
17 that he was alive at that point, right?
18     A     Correct.
19     Q     And, in fact, that never changed
20 throughout?
21     A     Never changed.
22     Q     So, by the time -- For all intents and
23 purposes even though he had -- even though he hadn't
24 been declared dead, he was dead when you got there?
25         MR. GLENDENNING:   Object to form and

28

1 foundation.
2     Q     You can answer.
3     A     Okay.  Yes.
4     Q     All right.  You may have noticed we'll
5 object from time to time.
6     A     Okay.
7     Q     But you still need to answer.
8         So the excited delirium is nothing that
9 you really observed or know anything about.  That's
10 just something you heard later on?
11     A     Yes.
12     Q     And as far as you know -- Have you seen
13 Dr. Peterson's, his pathology report?
14     A     I think I saw it shortly after we did the
15 run, but --
16     Q     Okay.  Probably one of most dangerous
17 things around is a lawyer getting on the internet
18 trying to do some research.  But I noticed this
19 morning just reading EMS articles that if someone is
20 in a position where they could aspirate, vomit,
21 according to stuff I read it said they should be
22 head down on a right lateral position with suction.
23 I noticed you said left.  Does it matter, or is that
24 --
25     A     It doesn't matter.

29

1   Q   Any idea why they would say on a right
2   lateral position with the head down? Would that
3   have any therapeutic reasons for that?
4       A   I think it has to do with the bronchus and
5   the lungs and the way they are formed.
6       Q   All right. Now, I take it your advice --
7   Had you been there, your advice to the police would
8   be to get him on his side or someplace else like
9   that where he wouldn't aspirate his vomit?
10          MR. GLENDENNING:   Object to form.
11      Q   Go ahead.
12      A   Yes, if I would have known he was
13  vomiting.
14      Q   Has anyone ever given you instruction in
15  the dangers of being in a hog-tied -- Do you know
16  what a hog-tied position, if I tell you, what that
17  is?
18      A   Yes.
19      Q   Has anyone ever given you instruction or
20  do you have any background of the dangers of being
21  in a hog-tied position after you've been in a
22  struggle?
23      A   No.
24      Q   Would it surprise you that after you've
25  been in a struggle in a hog-tied position you should

31

1   foundation.
2       A   I don't know.
3       Q   I guess that's the problem. No one will
4   know that?
5       A   No.
6       Q   But certainly had you been there as
7   someone with some medical training, you certainly
8   could have helped these guys out, right?
9           MR. GLENDENNING:   Object to form.
10      A   Quite possibly.
11      Q   You know that Taser, prior to this
12  happened, told police officers -- the Taser company
13  told police officers before this ever happened that
14  if they come upon a scene with someone who has
15  excited delirium they should immediately summon EMS?
16          MR. GLENDENNING:   Object to form.
17      A   No.
18      Q   You think that's a good idea?
19          MR. GLENDENNING:   Object to form and
20  foundation.
21      A   Yes, I do.
22      Q   And had you been immediately summoned, we
23  don't know what the results would have been,
24  correct?
25          MR. GLENDENNING:   Object to form.

30

1   be moved so that you're not laying face down?
2           MR. GLENDENNING:   Object to form and
3   foundation.
4       Q   Go ahead.
5       A   Yes.
6       Q   Yes, it would surprise you or that's
7   common knowledge?
8           MR. GLENDENNING:   Same objections.
9       Q   That would be common knowledge for you,
10  anyway?
11          MR. GLENDENNING:   Same objections.
12      Q   Go ahead.
13      A   You would think that you would need to
14  have them in a safe position.
15      Q   Yes. All right. Now, let me ask you
16  this. Let me change circumstances as they happen.
17  Let me change them a little bit. Would it be a
18  pretty fair statement that had you arrived at 6:09
19  and 6:10 and were standing at a, say, five-foot
20  distance while the officers were subduing Mr. Soto,
21  once they had him subdued and you instructed them to
22  put him on his side, or whatever you thought was
23  appropriate at the time, chances are he would still
24  be alive today, wouldn't he?
25          MR. GLENDENNING:   Object to form and

32

1       A   Correct.
2       Q   We certainly know it would improve this
3   man's chance to still be alive today, don't we?
4           MR. GLENDENNING:   Object to form and
5   foundation.
6       A   It's possible.
7       Q   All right. Now, you said something that
8   I'm not sure I understood. You said, "From what I
9   now understand about excited delirium, I don't know
10  that my presence would have helped." Are you
11  familiar with excited delirium or is this just
12  something somebody has told you?
13      A   I sat in on a class and listened and
14  learned about it. I'm not an expert by no means.
15      Q   You have learned from the classes that
16  you've sat in that if there's someone experiencing
17  excited delirium you need to be there. As someone
18  with paramedical training or EMS, you need to be
19  there right away, right?
20          MR. GLENDENNING:   Object to form.
21      A   Right.
22      Q   And have you looked at any of the
23  mortality rates from excited delirium when EMS
24  individuals are not there?
25      A   No, I haven't.

CINDY L. FENTON, CSR  620-277-2346

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA BOWEN-SOTO, on         )
her behalf and as Next       )
Friend of minor JS,          )
minor MS and minor AS,       )
                             )  Case No. 08-1171-MLB
          Plaintiffs,        )
                             )
vs.                          )
                             )
CITY OF LIBERAL,             )
KANSAS.                      )
                             )
          Defendant.         )

D E P O S I T I O N

        The deposition of DAVID ODLE was taken on
behalf of the plaintiff before CINDY L. FENTON, a
Certified Shorthand Reporter of Kansas, at
Conference Room, Liberal Inn, 603 East Pancake,
Liberal, Kansas, on October 22, 2008, commencing at
2:18 P.M.

---

**Page 2**

## APPEARANCES

The **plaintiffs** appeared in person by TONYA
BOWEN-SOTO, and by:

**RANDALL K. RATHBUN**
Depew, Gillen, Rathbun & McInteer
8301 East 21 Street, Suite 450
Wichita, Kansas  67206-2936

The **defendant** appeared by:

**ALLEN G. GLENDENNING**
Watkins Calcara, Chtd.
P. O. Drawer 1110
Great Bend, Kansas  67530

---

**Page 3**

# I N D E X

Page

DAVID ODLE
Direct Examination by Mr. Rathbun          4

## Exhibits

ID'd

Deposition Exhibit 10 (177-178)           6
Deposition Exhibit 11 (361-363)          13
Deposition Exhibit 12 (212-328)          22
Deposition Exhibit 13 (189-192)          22
Deposition Exhibit 14 (308-321)          15

---

**Page 4**

**DAVID ODLE,**
called as a witness on behalf of the plaintiff,
having been first duly sworn, testified as follows:
          (Marked Deposition Exhibits 10, 11,
          12, 13 and 14.)
## DIRECT EXAMINATION
BY MR. RATHBUN:

Q What's your name?

A David Odle.

Q Lieutenant now; right?

A Lieutenant now.

Q All right.  Lieutenant, have you ever given a
    deposition before?

A One other.

Q Tell me about that.  How long ago was it?

A It was in the mid '90s, Virginia, before I became a
    police officer.  It was a civil action on a motor
    vehicle accident.

Q Okay.  Plaintiff or defendant?

A Kind of in the middle.  They were -- I was one guy
    that got hit of several so it was just --

Q Okay.  You were in the chain reaction?

A Yeah.

Q All right.  You probably don't remember too well the
    rules of that.  So I'll kind of go over the rules of

---

21

1  A  Small children or at least use caution with it.  The
2     elderly, pregnant women.
3  Q  What about people suffering with dementia?
   A  I don't recall him addressing any issue like that.
5  Q  What about people that are intoxicated or drug
6     intoxication?
7  A  As far as I remember, there is no reason that we
8     would not be able to -- to utilize a Taser on
9     someone that was intoxicated, drugs or alcohol.
10 Q  Has Taser provided you, your Liberal P.D., a warning
11    on when you shouldn't use your Tasers, on what
12    subjects you shouldn't use them on?
13          MR. GLENDENNING:  Object to form.  Go
14    ahead.
15 Q  (BY MR. RATHBUN)  He's going to object probably a
16    lot.
17 A  Yeah.  I was waiting for him, make sure he was done.
18          I'm not sure what Taser has provided the
19    Liberal police department.  I can only tell you what
20    Lieutenant Mulanex or Sergeant Bogart has conveyed
21    to us during training.  Information they've
22    received, I'm not sure what they have or don't have.
23 Q  If they provided it to you and it hasn't been shared
24    with you, then, it obviously doesn't do you any
      good.

22

1  A  Correct.
2  Q  So the only thing you know of is what Mulanex would
3     provide to you guys by way of training?
4  A  That's correct.
5  Q  Because you don't do any independent study, I take
6     it --
7  A  No.
8  Q  -- on the use of Tasers?
9  A  No.
10 Q  Would you look at Deposition Exhibit 12, and that is
11    Document 323.  What is that?
12 A  This appears to be what we commonly call is a CAD
13    log.
14 Q  And what is Exhibit 13?
15 A  This is also a -- again what is called a CAD log.
16    It's a log from our computer-aided dispatch.  It
17    would indicate the calls as they came in or as are
18    dispatched.
19 Q  What's the difference between the dispatch card and
20    the CADVisor, those two exhibits?  Do you know?
21 A  The -- the incidents this item, Exhibit 13, is going
22    to be essentially everything that occurred during
23    that time, specifically coming in and out of
24    dispatch regardless of whether or not it was
25    involved with any particular incident.

23

1  Q  Okay.  So the dispatch card is related to this
2     specific incident and the CADVisor is all calls
3     coming in and out at that point?  Did I understand
4     that correctly or did I say that backwards?
5  A  That's -- that's my understanding is how they --
6     they break that up.  I've only seen Exhibit 12, that
7     type of a document, one other time, but I believe
8     that's how they break that up.
9  Q  All right.  Let's take a look at Exhibit 12 now.
10    That's the dispatch card; right?
11 A  Yes, it is.
12 Q  Who would have printed that off?
13 A  These come from our -- our dispatchers.
14 Q  Okay.
15 A  They're -- they have control over this, this
16    information.
17 Q  And if you look before we start with the specific
18    times, it has numbers for you, Antrim, Ratzlaff and
19    Dixon.  What are those?
20 A  Which numbers?  There's one on each side.
21 Q  I'm sorry.  The -- looks like the car numbers on the
22    left; right?
23 A  That's our unit number for the day, that is correct.
24 Q  And what's the number on the right?
25 A  Those are our radio numbers or the badge number.

24

1     That's how we differentiate between each other
2     before we are assigned a unit for the day.
3  Q  All right.  Is the operator, is that simply the
4     dispatcher, L. Willis?
5  A  Yes.  That is the dispatcher that is entering that
6     information at the time.
7  Q  All right.  And when we start out at August the 30th
8     of '06 at 6:01:21, 18:01:21 military time, now, do
9     those times come from -- is that like atomic clock
10    time so that we know they're correct?
11          MR. GLENDENNING:  Object to form and
12    foundation.
13 Q  (BY MR. RATHBUN)  Go ahead.
14 A  There is a clock in dispatch on the wall.  I'm told
15    it is an atomic clock.  Those times are entered by
16    the dispatcher or in this case the operator that's
17    named here.  They're the ones that physically look
18    at the clock.
19 Q  Look up at the atomic clock?
20 A  Key in the item.
21 Q  All right.  So in terms of trying to get this thing
22    pinned down on best time, at least we know that
23    operator is looking at an atomic clock when she's
24    doing this; right?
25          MR. GLENDENNING:  Object to form and

25

1   foundation.

2   A   To my knowledge, that's what they do. I'm not aware

3       of it being generated by another system. It's my

        understanding they physically look at the clock.

5   Q   (BY MR. RATHBUN)  Okay. What would the first entry,

6       "successful single range match of 24 East Pancake

7       Boulevard." Any idea what that means?

8   A   I don't know what that means.

9   Q   All right. If we go down to 6:05:01, it tells us

10      that officer 552 is en route; right?

11  A   Yes, it does.

12  Q   We don't know who that is, though. I wonder --

13          MR. GLENDENNING:  Why don't we --

14  Q   --'cause I don't know who 552 is. Do you?

15  A   Not off the -- the -- not off the top of my head.

16      We've -- since this incident, officers that were

17      involved have since changed badge numbers because of

18      promotions and that sort of thing. That would be

19      the 500 numbers. So without checking --

20          MR. GLENDENNING:  Well, I don't know

21      whether you want me to try to be helpful with what I

22      think. I don't want to inter -- and I don't want

23      him to testify to what he doesn't know, but there

24      does seem to be an indication up at the top of who

25      the officers are and what their numbers and --

26

1           MR. RATHBUN:  But I don't see a 552.

2   A   In addition to the four names you see, myself,

3       Antrim, Ratzlaff and Dixon were the ones that were

4       indicated as being on duty at that time. We also

5       had now Sergeant Keating and now Corporal McCord

6       also responding to this that were actually off

7       coming. That may have been one of their badge

8       numbers. I don't know.

9           MR. RATHBUN:  Yeah. I -- Allen, I thought

10      the same thing. I thought it was Antrim but it's

11      not because Antrim --

12          MR. GLENDENNING:  I was assuming it was a

13      typo.

14          MR. RATHBUN:  I don't think it is.

15      Because if you look four seconds later we actually

16      have Antrim in there.

17  Q   (BY MR. RATHBUN)  What's the -- at scene, is that

18      what A-T-S-C-N-E means?

19  A   That's correct.

20  Q   And there's that 552 again. Again at 6:05:56, it

21      tells us that Antrim is out with the subject. It

22      tells us that Ratzlaff arrived at 6:07. And it also

23      tells us that Antrim discharged or deployed his

24      Taser at 6:07:49; correct?

25          MR. GLENDENNING:  Object to form and

27

1   foundation.

2   Q   (BY MR. RATHBUN)  Go ahead.

3   A   And -- correct, it's -- that's what this document

4       says.

5   Q   When does it say that Odle got there?

6   A   The next two lines are P.D. 10. That's me.

7   Q   Oh. Why aren't you 511?

8   A   Because what happens is the -- when you start your

9       day, the watch commanders begin their days, in this

10      case, at 1730 -- 5:30 to 5:30 is our shifts. The

11      officers on the shift starts their days 6:00 to

12      6:00. That gives the watch commander a half hour to

13      get in, get set up and ready to go.

14          I had -- already was in service as my unit

15      designation of 10, P.D. 10 that day. Antrim at that

16      time had yet to go in service as a unit number.

17      That's why they're indicating as a badge number.

18  Q   Oh, I see. P.D. 10 is your vehicle number on the

19      left-hand side?

20  A   That's correct.

21  Q   Sorry about that. Subject in custody at 6:08:57.

22      You were already there. Had been there about a

23      minute. Or, no, had been there -- yeah, been there

24      about a minute, it looks like. Except -- explain

25      that to me. It's got you at the scene at 6:07:51,

28

1       but en route at 6:08:01.

2   A   I can only imagine the dispatchers --

3           MR. GLENDENNING:  Don't speculate.

4   A   Don't know why it's that way.

5   Q   (BY MR. RATHBUN)  You think it's bass akwards?

6           MR. GLENDENNING:  Object to form and

7       foundation.

8   A   Normally, we are en route first at scene.

9   Q   At scene. All right. Explain what overdue means?

10  A   The computer system is set at a time. I am not sure

11      what time specifically is, but it -- it

12      indicates a warning to our dispatchers to check on

13      the officer if there has not been any radio traffic

14      from them. There hasn't been any during that period

15      of time and it is telling the dispatchers to check

16      on 'em.

17  Q   I see. Especially in this case where you've got

18      someone with the subject, they want to keep track of

19      the officers?

20  A   Yes. They want to make sure the officer has not

21      been injured and is unable to respond on his radio.

22  Q   All right. If we turn the page --

23          (An off-the-record discussion was

24      had.)

25  Q   Dixon arrives, according to this, at 6:10:32. Am I

CINDY L. FENTON, CSR   620-277-2346

**Page 1**

```
10:17AM  1
         2
         3
         4                IN THE UNITED STATES DISTRICT COURT
                                DISTRICT OF KANSAS
         5
         6   TONYA BOWEN-SOTO, on       )
             her behalf and as Next     )
         7   Friend of minor JS,        )
             minor HS and minor AS,     )
         8                              )  Case No. 08-1171-MLB
                         Plaintiffs,    )
         9                              )
             vs.                        )
        10                              )
             CITY OF LIBERAL,           )
        11   KANSAS,                    )
                                        )
        12               Defendant.     )
        13              D E P O S I T I O N
        14
        15
        16
        17
        18        The deposition of JARED RATZLAFF was taken
        19   on behalf of the plaintiff before CINDY L. FENTON, a
        20   Certified Shorthand Reporter of Kansas, at
        21   Conference Room, Liberal Inn, 603 East Pancake,
        22   Liberal, Kansas, on October 22, 2008, commencing at
        23   10:29 A.M.
        24
        25
```

**Page 2**

```
 1
 2
 3                    APPEARANCES
 4
 5   The plaintiffs appeared in person by TONYA
 6   BOWEN-SOTO, and by:
 7   RANDALL K. RATHBUN
 8   Depew, Gillen, Rathbun & McInteer
 9   8301 East 21 Street, Suite 450
10   Wichita, Kansas   67206-2936
11
12   The defendant appeared by:
13   ALLEN G. GLENDENNING
14   Watkins Calcara, Chtd.
15   P. O. Drawer 1110
16   Great Bend, Kansas   67530
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2
 3                     I N D E X
 4
 5                                              Page
 6
 7   JARED RATZLAFF
 8      Direct Examination by Mr. Rathbun       4
 9
10
11
12
13                     Exhibits
14
15                                     ID'd
16
17   Deposition Exhibit 6 (128-129)             6
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 JARED RATZLAFF,
 2   called as a witness on behalf of the plaintiff,
 3   having been first duly sworn, testified as follows:
 4               DIRECT EXAMINATION
 5   BY MR. RATHBUN:
 6   Q  What's your name?
 7   A  Jared Ratzlaff.
 8   Q  Officer, what do you do for a living?
 9   A  I work for the City of Liberal police department.
10   Q  How long you done that?
11   A  Since January of 2004, so almost five years.
12   Q  Have you ever given a deposition before?
13   A  No, I haven't.
14   Q  All right.  Let me run through what I call the rules
15      of the road here, just so you know kind of what
16      we're going to be doing today.  Since you took an
17      oath when we started, it's very, very important that
18      you understand my questions before you attempt to
19      answer them.  So if at any point I ask a question
20      which sounds confused or garbled in any way, will
21      you ask me it straighten it out?
22   A  Yes, sir.
23   Q  And can we have an agreement that if you don't
24      understand it, you're just not going to answer it?
25   A  Yes, sir.
```

29

1  of his right arm?
2  A  Yes, sir.
3  Q  Keating was trying to get control of his head?
4  A  Yes.
5  Q  And was Dixon there at the time on the legs or not?
6  A  I'm not real sure when he showed up.
7  Q  Okay.  Were the four of you -- let's say not
8     counting Dixon at this point.  Were the four of you
9     able to get him under control?
10 A  No.
11 Q  What happened?
12 A  He was fairly strong and just, there was -- we
13    couldn't get his arms out from underneath him.  It
14    took everything we had and eventually we were able
15    to, but it took a long time.
16 Q  And you heard the Taser going off at times during
17    this struggle?
18 A  Yes.
19 Q  How many times did he discharge the Taser?  Do you
20    know?
21 A  I'm not sure.
22 Q  How long did the struggle take for you to get him
23    under control?
24 A  I really don't know for sure.
25 Q  All right.  And at some point Dixon arrived, then,

30

1     and got control of the legs?
2  A  Yes, sir.
3  Q  While this was going on, Antrim was drive stunning
4     him, trying to get control?
5  A  Yes, sir.
6  Q  And then you went back to Patrol Car 26 and grabbed
7     a dog leash; right?
8  A  After getting him in handcuffs; yes, sir.
9  Q  And what was the purpose of the dog leash?
10 A  We use the dog leash when people are trying to kick
11    officers or to control the legs.
12 Q  Is that -- do you call that a hog tie or what do you
13    call that?
14 A  A hobble restraint.
15 Q  A hobble restraint?
16 A  Yes, sir.
17 Q  Do you know what a hog tie is?
18 A  Yes.
19 Q  Is that different than a hobble restraint?
20 A  Not really.
   Q  They're the same in thing your viewpoint?
22 A  Yes, sir.
23         MR. RATHBUN:  When you -- I told you I
24    wouldn't need that video tape again, but I may need
25    the second one, the --

31

1         MR. GLENDENNING:  Car 5?
2         MR. RATHBUN:  Car 5 towards the end there.
3  I wanted to get --
4         MR. GLENDENNING:  When he's putting up the
5  tape?
6         MR. RATHBUN:  Yeah.  I also want to get it
7  there where he is -- at 6 -- at 6:12, if you can get
8  it to 6:12.
9         MR. GLENDENNING:  1812?  These are police
10 tapes.  You're going to have to get that language
11 down.
12        MR. RATHBUN:  I've done this more than I
13 care over the years.  I'm back to civilian stuff
14 now, man.
15        MR. GLENDENNING:  What are you looking
16 for?
17        MR. RATHBUN:  When he goes to the car and
18 gets the leash.  It's right about 6:12.  Then see if
19 you can enlarge it.  Okay.  Here we go.
20        (Video running.)
21        MR. RATHBUN:  Can we stop that?
22        MR. GLENDENNING:  Yeah.
23 Q  (BY MR. RATHBUN)  Who was that that just walked over
24    there?
25 A  That is me.

32

1  Q  And you have -- that's when you have the dog leash
2     in your hand?
3  A  I don't know if I had it at that point or not.
4         MR. RATHBUN:  Let's back up.
5         MR. GLENDENNING:  Back up and look at it
6     closer.
7  Q  (BY MR. RATHBUN)  Maybe you can conclude that as you
8     see what you do with it.
9         (Video Running.)
10        MR. RATHBUN:  He may have to just watch
11    what he does there before he can say for sure what
12    he's doing.
13        MR. GLENDENNING:  I'll just go by real
14    slow frame by frame so you can see what you have in
15    your hand, maybe.
16 A  Okay.
17 Q  (BY MR. RATHBUN)  You recognize what -- what you're
18    doing there?
19 A  Yes, I do.
20 Q  Are you -- this is on Car 5 at 18:12:20.  It looks
21    like you're wrapping his legs?
22 A  Yes, sir.
23 Q  All right.  Keep going.  It looks like at some point
24    you turn this over to Dixon to do?
25 A  Yes, sir.

33

1  Q All right.  Let me ask you, in terms of restraining

2    individuals with the hog tie or hobble, whatever you

3    want to call it, do you have training -- have you

4    had training on that with the P.D.?

5  A Just training while I was in field training with a

6    field training officer.

7  Q At KLETC or --

8  A No, on-the-street training here.

9  Q Okay.  And what training would that have been?

10 A On the -- when we're arresting somebody that's

11   kicking us while they're on the ground we'll take

12   the restraint, tie it around their legs and tie it

13   to their handcuffs in the back, and then carry them

14   to the car in that fashion.  Untie it from their

15   hands and shut it in the door at that point.

16 Q Shut what in the door?

17 A Shut the dog leash in the door so they can sit

18   upright.

19 Q So -- but it keeps their legs still tied together --

20 A Yes.

21 Q -- but you untie them from the cuffs?

22 A Right.

23 Q And I take it, the closer you get the legs tied to

24   the cuffs, the less they move?

25 A Yes.

34

1  Q So you try and get it as close to the cuffs as you

2    can?

3         MR. GLENDENNING:  Object to the form.

4  A We just try to get it where they can't kick the knot

5    loose.

6  Q So there's no slack in it, in other words?

7  A Right.

8  Q So you try and push the legs back as far as you can

9    get it so that -- so that they can't kick their legs

10   around?

11        MR. GLENDENNING:  Object to form.

12 Q (BY MR. RATHBUN) Go ahead.

13 A Not necessarily, no.

14 Q Well, if you don't push the legs all the way back,

15   then how do you keep them from kicking?

16 A I'm not real sure what you're asking or how to

17   answer what you're saying.

18 Q You're doing a good job then.  You're supposed to

19   ask me to clarify.

20        Obviously, the closer you get the legs to

21   the cuffed hands, the less the legs can move;

22   correct?

23 A Yes.

24 Q So is it your goal to try and stop the kicking,

25   then, to get the legs as close to the cuffs as you

35

1    can?

2         MR. GLENDENNING:  Object to form.

3  A No.

4  Q (BY MR. RATHBUN)  Okay.  What's your goal?

5  A The goal is just to get the legs and the hands

6    secured to a point where they can't continue to

7    kick.

8  Q Where there's no slack between the two?

9  A There may be some slack, but not enough to where

10   they can kick.

11 Q And you learned how to do that from field training

12   from somebody that you were riding around with --

13 A Yes, sir.

14 Q -- showed you how to do that?

15 A Yes, sir.

16 Q And who was that?

17 A It would have been Sergeant Antrim, Sergeant Wade,

18   and I believe that's it.

19 Q Is there any written procedure you know of about

20   when you use the hog tie?

21 A Not that I can recall right now.

22 Q And you've never had any -- and you've never had any

23   training from Mulanex or any of the other highers up

24   on how to use a hog tie and when to use it?

25 A Not that I can recall, anyway.

36

1  Q All right.  What happened then after the legs were

2    secured?

3  A After the legs were secured, I went back to my

4    patrol car to get hand sanitizer for myself.

5  Q Is that in the videotape where Antrim yells, "Jeff,

6    get my hand sanitizer"?  Is that --

7  A No, that's at a different point.

8  Q Okay.  What happened next?

9  A I came back up to where we were at and started

10   collecting the Taser cartridge and the probes for

11   evidence purposes.

12 Q Okay.  At this point is he still laying in the same

13   place with the arms behind his back and the legs or

14   has he been moved?

15 A I'm not --

16        MR. GLENDENNING:  Object to form.

17 A I'm not sure.

18 Q (BY MR. RATHBUN)  Okay.  What happens next?

19 A I heard somebody ask Soto if he was okay.  Turned

20   back around and saw Officer McCord pulling the

21   handcuffs off of him and checking for a pulse.

22 Q Okay.  What did you do at that point?

23 A I went back up to see if I could assist, but we had

24   officers that were already performing CPR.  So,

25   again, I just started scene security to make sure

CINDY L. FENTON, CSR  620-277-2346

**37**

1    that nobody came up and interfered with the
2    officers.
3  Q  So at this point that they're doing CPR, they didn't
4    have a pulse on him?
5  A  No, sir.
6  Q  What happened next?
7  A  An ambulance was called for.  I'm not sure who
8    actually got on the radio and called for the
9    ambulance, and then I began putting tape around the
10    scene.
11  Q  Why did you put tape around the scene?
12  A  That way we had a secured scene, try to keep
13    everybody else out so all evidence could be
14    preserved on what happened.
15  Q  Were you -- when you were putting the tape around
16    the scene, was fire rescue already there or did you
17    put the tape up before fire rescue got there?
18  A  They got there as I was putting it.
19  Q  And then EMS came how much later?  Do you know?
20  A  I'm not sure.
21  Q  All right.  What happened next after that?
22  A  I -- Soto was placed in the back of the ambulance.
23    Officer McCord drove the ambulance for the
24    paramedics and I followed the ambulance up there in
25    my patrol car to pick up Officer McCord so I could

**38**

1    bring him back.
2  Q  All right.  After the time where they were doing
3    CPR, had he ever get a pulse back that you're aware
4    of?
5  A  Not that I'm aware of.
6  Q  At that point what did you do?
7  A  At that time I came back to the scene and got with
8    at that time Sergeant Odle, now Lieutenant Odle.
9    And then we were all taken back to the police
10    department and then subsequently the hospital for
11    blood tests.
12  Q  Did you do -- and what were the blood tests for?
13  A  I'm not 100 percent sure what they were checking
14    for.  They just told me I needed to go take one.
15  Q  Okay.  At that point -- well, strike that.  Have you
16    tried to play this situation back in your mind to
17    see if you did -- if you handled the situation
18    correctly?
19  A  Yeah.
20  Q  Using hindsight now, anything that you would have
21    changed in the way you did things?
22  A  No.
23  Q  Did the training that you -- did you receive
24    training in '07 on excited delirium?
25  A  I'm not sure what the date was, but that sounds

**39**

1    right.
2  Q  What's excited delirium?
3  A  My understanding is somebody that either is on
4    narcotics of some sort, possible mental disease.  As
5    their body is excited to the point that their heart
6    rate is expanded, their body temperature is raised
7    up and they're just -- they've lost control of most
8    of their body.
9  Q  Okay.  What did you learn in these courses about how
10    to handle cases like that?
11  A  What I was -- the training was the best way to take
12    care of it is to use a Taser if available to subdue
13    the person as fast as possible and have as many
14    officers available and have EMS on standby so we can
15    get medical care immediately.
16  Q  Had you had this training back in '06, would you
17    have had -- would you have contacted medical
18    personnel when you arrived at the scene?
19  A  Probably so, yes.
20  Q  All right.
21          MR. RATHBUN:  Let's take a break.
22          (Recess taken.)
23  Q  (BY MR. RATHBUN)  Officer, I have no further
24    questions.  Thank you for your time today.
25  A  Thank you.

**40**

1          MR. GLENDENNING:  Read and sign.
2          (The deposition concluded at 11:13 a.m.)
3          (END OF DEPOSITION)
4          * * * * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

29

1   of his right arm?
2   A  Yes, sir.
3   Q  Keating was trying to get control of his head?
4   A  Yes.
5   Q  And was Dixon there at the time on the legs or not?
6   A  I'm not real sure when he showed up.
7   Q  Okay.  Were the four of you -- let's say not
8      counting Dixon at this point.  Were the four of you
9      able to get him under control?
10  A  No.
11  Q  What happened?
12  A  He was fairly strong and just, there was -- we
13     couldn't get his arms out from underneath him.  It
14     took everything we had and eventually we were able
15     to, but it took a long time.
16  Q  And you heard the Taser going off at times during
17     this struggle?
18  A  Yes.
19  Q  How many times did he discharge the Taser?  Do you
20     know?
21  A  I'm not sure.
22  Q  How long did the struggle take for you to get him
23     under control?
24  A  I really don't know for sure.
25  Q  All right.  And at some point Dixon arrived, then,

30

1      and got control of the legs?
2   A  Yes, sir.
3   Q  While this was going on, Antrim was drive stunning
4      him, trying to get control?
5   A  Yes, sir.
6   Q  And then you went back to Patrol Car 26 and grabbed
7      a dog leash; right?
8   A  After getting him in handcuffs; yes, sir.
9   Q  And what was the purpose of the dog leash?
10  A  We use the dog leash when people are trying to kick
11     officers or to control the legs.
12  Q  Is that -- do you call that a hog tie or what do you
13     call that?
14  A  A hobble restraint.
15  Q  A hobble restraint?
16  A  Yes, sir.
17  Q  Do you know what a hog tie is?
18  A  Yes.
19  Q  Is that different than a hobble restraint?
20  A  Not really.
    Q  They're the same in thing your viewpoint?
22  A  Yes, sir.
23         MR. RATHBUN:  When you -- I told you I
24     wouldn't need that video tape again, but I may need
25     the second one, the --

31

1         MR. GLENDENNING:  Car 5?
2         MR. RATHBUN:  Car 5 towards the end there.
3   I wanted to get --
4         MR. GLENDENNING:  When he's putting up the
5   tape?
6         MR. RATHBUN:  Yeah.  I also want to get it
7   there where he is -- at 6 -- at 6:12, if you can get
8   it to 6:12.
9         MR. GLENDENNING:  1812?  These are police
10  tapes.  You're going to have to get that language
11  down.
12        MR. RATHBUN:  I've done this more than I
13  care over the years.  I'm back to civilian stuff
14  now, man.
15        MR. GLENDENNING:  What are you looking
16  for?
17        MR. RATHBUN:  When he goes to the car and
18  gets the leash.  It's right about 6:12.  Then see if
19  you can enlarge it.  Okay.  Here we go.
20        (Video running.)
21        MR. RATHBUN:  Can we stop that?
22        MR. GLENDENNING:  Yeah.
23  Q  (BY MR. RATHBUN)  Who was that that just walked over
24     there?
25  A  That is me.

32

1   Q  And you have -- that's when you have the dog leash
2      in your hand?
3   A  I don't know if I had it at that point or not.
4         MR. RATHBUN:  Let's back up.
5         MR. GLENDENNING:  Back up and look at it
6   closer.
7   Q  (BY MR. RATHBUN)  Maybe you can conclude that as you
8      see what you do with it.
9         (Video Running.)
10        MR. RATHBUN:  He may have to just watch
11  what he does there before he can say for sure what
12  he's doing.
13        MR. GLENDENNING:  I'll just go by real
14  slow frame by frame so you can see what you have in
15  your hand, maybe.
16  A  Okay.
17  Q  (BY MR. RATHBUN)  You recognize what -- what you're
18     doing there?
19  A  Yes, I do.
20  Q  Are you -- this is on Car 5 at 18:12:20.  It looks
21     like you're wrapping his legs?
22  A  Yes, sir.
23  Q  All right.  Keep going.  It looks like at some point
24     you turn this over to Dixon to do?
25  A  Yes, sir.

CINDY L. FENTON, CSR  620-277-2346

33

1  Q  All right.  Let me ask you, in terms of restraining
2     individuals with the hog tie or hobble, whatever you
3     want to call it, do you have training -- have you
4     had training on that with the P.D.?
5  A  Just training while I was in field training with a
6     field training officer.
7  Q  At KLETC or --
8  A  No, on-the-street training here.
9  Q  Okay.  And what training would that have been?
10 A  On the -- when we're arresting somebody that's
11    kicking us while they're on the ground we'll take
12    the restraint, tie it around their legs and tie it
13    to their handcuffs in the back, and then carry them
14    to the car in that fashion.  Untie it from their
15    hands and shut it in the door at that point.
16 Q  Shut what in the door?
17 A  Shut the dog leash in the door so they can sit
18    upright.
19 Q  So -- but it keeps their legs still tied together --
20 A  Yes.
21 Q  -- but you untie them from the cuffs?
22 A  Right.
23 Q  And I take it, the closer you get the legs tied to
24    the cuffs, the less they move?
25 A  Yes.

34

1  Q  So you try and get it as close to the cuffs as you
2     can?
3          MR. GLENDENNING:  Object to the form.
4  A  We just try to get it where they can't kick the knot
5     loose.
6  Q  So there's no slack in it, in other words?
7  A  Right.
8  Q  So you try and push the legs back as far as you can
9     get it so that -- so that they can't kick their legs
10    around?
11         MR. GLENDENNING:  Object to form.
12 Q  (BY MR. RATHBUN)  Go ahead.
13 A  Not necessarily, no.
14 Q  Well, if you don't push the legs all the way back,
15    then how do you keep them from kicking?
16 A  I'm not real sure what you're asking or how to
17    answer what you're saying.
18 Q  You're doing a good job then.  You're supposed to
19    ask me to clarify.
20         Obviously, the closer you get the legs to
21    the cuffed hands, the less the legs can move;
22    correct?
23 A  Yes.
24 Q  So is it your goal to try and stop the kicking,
25    then, to get the legs as close to the cuffs as you

35

1     can?
2          MR. GLENDENNING:  Object to form.
3  A  No.
4  Q  (BY MR. RATHBUN)  Okay.  What's your goal?
5  A  The goal is just to get the legs and the hands
6     secured to a point where they can't continue to
7     kick.
8  Q  Where there's no slack between the two?
9  A  There may be some slack, but not enough to where
10    they can kick.
11 Q  And you learned how to do that from field training
12    from somebody that you were riding around with --
13 A  Yes, sir.
14 Q  -- showed you how to do that?
15 A  Yes, sir.
16 Q  And who was that?
17 A  It would have been Sergeant Antrim, Sergeant Wade,
18    and I believe that's it.
19 Q  Is there any written procedure you know of about
20    when you use the hog tie?
21 A  Not that I can recall right now.
22 Q  And you've never had any -- and you've never had any
23    training from Mulanex or any of the other highers up
24    on how to use a hog tie and when to use it?
25 A  Not that I can recall, anyway.

36

1  Q  All right.  What happened then after the legs were
2     secured?
3  A  After the legs were secured, I went back to my
4     patrol car to get hand sanitizer for myself.
5  Q  Is that in the videotape where Antrim yells, "Jeff,
6     get my hand sanitizer"?  Is that --
7  A  No, that's at a different point.
8  Q  Okay.  What happened next?
9  A  I came back up to where we were at and started
10    collecting the Taser cartridge and the probes for
11    evidence purposes.
12 Q  Okay.  At this point is he still laying in the same
13    place with the arms behind his back and the legs or
14    has he been moved?
15 A  I'm not --
16         MR. GLENDENNING:  Object to form.
17 A  I'm not sure.
18 Q  (BY MR. RATHBUN)  Okay.  What happens next?
19 A  I heard somebody ask Soto if he was okay.  Turned
20    back around and saw Officer McCord pulling the
21    handcuffs off of him and checking for a pulse.
22 Q  Okay.  What did you do at that point?
23 A  I went back up to see if I could assist, but we had
24    officers that were already performing CPR.  So,
25    again, I just started scene security to make sure

1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

TONYA A. BOWEN-SOTO, on
her behalf and as Next
Friend of JS, HS and AS,

                              CASE

        Plaintiff,

                              NO. 08-1171-MLB-DWB

        vs.

CITY OF LIBERAL, KANSAS,
        Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~

                DEPOSITION OF
             KRIS SPERRY, M.D.
                 1:50 p.m.
              April 1, 2009
          2700 Centennial Tower
           101 Marietta Street
             Atlanta, Georgia

       Linda E. Cheek, RMR, CCR-A-752



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.0208
Facsimile: 303.832.7640

Suite 565
303 E. 17th Avenue
Denver, CO 80203
www.esquiresolutions.com

Kris Sperry, M.D.                                              April 1, 2009

                                    34

1   so...

2        Q.    Have you ever been involved in providing

3   treatment to someone who is in excited delirium?

4        A.    No, I don't think I have.

5        Q.    How about drug-induced psychosis?

6        A.    Other than alcohol induced psychosis and

7   withdrawal, I don't recall that I personally have

8   treated someone who is in a non alcohol drug induced

9   psychotic state.

10       Q.    Have you reviewed any literature or

11  studies about the treatment of persons with excited

12  delirium or drug-induced psychosis?

13       A.    Yes.

14       Q.    Has that literature given you any feel for

15  how many of those people actually survive even when

16  they make it to the emergency room?

17       A.    Yes.

18       Q.    And what is that?

19       A.    Well, the mortality rate for true excited

20  delirium individuals up until a few years ago was

21  somewhere in the 20 to 30 percent range.  And more

22  prompt medical attention and improved diagnosis

23  really is what it is, and transport to hospitals, has

24  decreased that down, depending on who you read, it's

25  somewhere between maybe about 7 and 12 percent



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.0208
Facsimile: 303.832.7640

Suite 565
303 E. 17th Avenue
Denver, CO 80203
www.esquiresolutions.com

Kris Sperry, M.D.                              April 1, 2009

59

1       A.      Yes, that observation was made.

2       Q.      Is that significant in determining whether

3   or not a person is in excited delirium?

4       A.      Not that I have ever been aware of, no.

5       Q.      Does it tell you anything at all?

6       A.      What it tells me is that at that point in

7   time he was more probably -- he probably was actually

8   in the process of dying.  That's an involuntary

9   aspect of the dying process.

10      Q.      Is semen emission?

11      A.      Oh, yes.

12      Q.      What if he was actually ejaculating, is

13  that part of the dying process?

14      A.      True ejaculation, no.  This is involuntary

15  contracture of the seminal vesicles, again as part of

16  the dying process.  It's -- I mean the appearance of

17  semen around the genital area or the penis of a

18  deceased male has unfortunately for years been

19  mistaken to have some kind of significance, when it's

20  totally involuntary.

21      Q.      When you say it's part of the dying

22  process, would that indicate that he is essentially

23  dead at that point?

24      A.      I think at that point in time he was

25  unconscious and, you know, I think in the process of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.0208
Facsimile: 303.832.7640

Suite 565
303 E. 17th Avenue
Denver, CO 80203
www.esquiresolutions.com

Kris Sperry, M.D.                                    April 1, 2009

                                70

1          because this whole thing is full of opinions.

2          He is going to -- and he is certainly going to

3          opine everything that's in his report.

4          Q.    (By Mr. Glendenning)  Well, are there any

5    other opinions that I have left out of that list?

6          A.    Well, okay.  I guess -- I guess we talked

7    about, to some extent, anyway, the cocaine and the

8    fact that no testing of the blood for cocaine was

9    done, was performed.  And although we haven't talked

10   about it, the -- I mean I have opinions regarding the

11   testing of the brain that was done at the University

12   of Miami to try to ascertain whether or not Mr. Soto

13   had a cocaine variant of dopaminergic overdrive

14   syndrome.  And that that is not reliable in this

15   particular situation.

16         Q.    Anything else?

17         A.    Well, and that if Mr. Soto had been

18   attended by paramedical personnel immediately, that

19   is, if they had been there when he was restrained and

20   then they attended to him and placed him on his side

21   and monitored him, if indeed he vomited then, then

22   the probability of him dying as a consequence of the

23   aspiration of his vomitus would be very, very low and

24   more probably than not he would have survived.

25              And I guess in the broadest sense



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.0208
Facsimile: 303.832.7640

Suite 565
303 E. 17th Avenue
Denver, CO 80203
www.esquiresolutions.com

Kris Sperry, M.D.                                April 1, 2009

                              92

1   I have not -- other than Dr. Pablo who I spoke with

2   this morning because, actually, after reading

3   Dr. Peterson's deposition it was apparent to me that

4   he really didn't know what the testing was being done

5   for.  He just did it because he was requested to by

6   the, as far as I know, the KBI agents that attended

7   the autopsy.  And I thought it would be interesting

8   to see if the people at the brain research bank knew.

9        Q.    All I asked was a simple question.  Is

10  there anybody else --

11       A.    Oh.

12       Q.    -- that you have talked to other than

13  Dr. Pablo and Mr. Rathbun?

14       A.    No.

15       Q.    About any aspect of this case?

16       A.    No.

17       Q.    If a person is sedated, how long does it

18  take the sedation to take effect?

19       A.    If it's administered intravenously, it's

20  in seconds.

21       Q.    If it's administered intramuscularly?

22       A.    It will take longer depending on the drug

23  that's used and the dosage that's used.  It can take

24  a number of minutes, certainly.

25       Q.    Can it even take up to a half an hour?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.0208
Facsimile: 303.832.7640

Suite 565
303 E. 17th Avenue
Denver, CO 80203
www.esquiresolutions.com