**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

TONYA BOWEN-SOTO, as administrator )
of the estate of Juan Soto, Jr.,   )
                                    )
                Plaintiff, )   **CIVIL ACTION**
                                    )
v.                                  )   No. 08-1171-MLB
                                    )
CITY OF LIBERAL, KANSAS,            )
                                    )
                Defendant. )
_____)

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion for summary judgment. (Doc. 84). The motion has been fully briefed and is ripe for decision. (Docs. 85, 88, 93, 102, 105). Defendant's motion is granted in part and denied in part for the reasons herein.

Pursuant to 42 U.S.C. § 1983, plaintiff alleges that defendant failed to train law enforcement officers on: 1) the use of a hog-tie restraint and 2) the need for summoning immediate medical treatment when encountering a person suffering from excited delirium.

**I. FACTS AND PROCEDURAL HISTORY**

The following facts are either uncontroverted or, if controverted, taken in the light most favorable, along with all favorable inferences, to plaintiff. See Hall v. United Parcel Serv., No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). To the extent relevant, the factual disagreements between the parties will be noted.

On August 30, 2006, at approximately 6:00 p.m., Liberal Police

Sgt. Antrim responded to a 911 dispatch stating that decedent Juan Soto, Jr. was naked and yelling obscenities at people outside of a McDonald's. Around 6:05 or 6:06, Sgt. Antrim arrived at the scene. Soto was holding his hands over his face and talking. Sgt. Antrim, who had already drawn his taser, told Soto to drop down to his knees. Sgt. Antrim intended to take Soto to the hospital for a mental evaluation after taking him into custody.

Another citizen approached and Soto began to run towards the McDonald's and a busy intersection. Sgt. Antrim chased after Soto and discharged his taser. Ultimately, Soto was "tased" approximately five times.

Corporal Ratzlaff, who is 6 ft. 5 in. tall and weighed approximately 270-280 pounds at the time, got on Soto's back to handcuff him. Soto "did an 'amazing push up to a standing position with [Corporal] Ratzlaff on his back.'" (Doc. 85 at 2). At this time, four other officers had arrived and were attempting to handcuff Soto. Soto would not cooperate. The officers struggled to get Soto's hands behind his back and had to use two sets of handcuffs instead of one.

Soto was handcuffed and restrained by 6:08:10. Some of the officers had blood on them and went to clean it off. Soto calmed down and recognized Officer Keating and began talking to him. Officer Keating, who had dealt with Soto in the past, knew Soto was a drug addict. Soto then began to resist again and started kicking at the officers. Corporal Ratzlaff went to his police car and pulled out a dog leash and restrained Soto's legs. Officer Dixon crossed and pinned Soto's legs to his buttocks. One of the officers attached the leash restraining Soto's legs to his hands in a so-called "hog-tie"

restraint. Although the timing is somewhat disputed, the evidence favoring plaintiff is that Soto was on the ground in some form of restraint for approximately six minutes, from 6:08 to 6:14.

Shortly after 6:14, officers picked Soto off the ground and carried him to a patrol car. The officers were going to take Soto to the hospital. Officers set Soto down and rolled him onto his side. Soto was having difficulty breathing and officers removed his restraints. There is some dispute about Soto's condition at this point. Plaintiff contends that Soto was unconscious and either dead or near dead when officers carried him to the patrol car. Defendant contends that Soto was still moaning and making noises as officers were carrying him and then he went limp. At 6:17 p.m., officers called an ambulance. Soto was still breathing through pursed lips. When Soto stopped breathing, Sgt. Antrim began CPR. The elapsed time between Sgt. Antrim's arrival and the call for an ambulance was approximately 12 minutes.

At 6:18, a fire rescue arrived and applied a defibulator but it was not used because Soto had no shockable cardiac rhythm. (Doc. 85 at 4). At approximately 6:22, the ambulance arrived, but Soto was already dead.[1] At some point Soto had vomited and aspirated which blocked his airway. The paramedics did not suction Soto's airway because they were not aware that he had vomited and aspirated until after his death.

Plaintiff's police expert has averred that:

> All of the actions by the members of the Liberal

---

[1] According to Liberal EMS Jessica Navarette, Soto was dead when they arrived.

> Police Department members were contrary to nationally recommended law enforcement guidelines dealing with individuals exhibiting Excited Delirium behavior; guidelines and warnings that were readily available to the police department from various sources prior to the Soto incident. The improper actions by the officers on the scene were further exacerbated by the fact that two supervisors were on the scene and took no action to remediate the situation by immediately calling emergency medical personnel to the scene.

(Doc. 88-11 at 8). Plaintiff's medical expert stated in a report that:

> It is my opinion, to a reasonable degree of medical certainty, that the officers of the Liberal Police Department were negligent in their failure to have emergency medical personnel in immediate attendance at the time that the decision to restrain Mr. Soto was made, so that his care could be immediately turned over to such personnel; this opinion is irrespective of the underlying reason for Mr. Soto's psychotic manifestations. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Soto vomited while in the full-restrained prone position and massively aspirated his vomit, which is the immediate and proximate cause of his death. Had his care been immediately assumed by emergency medical personnel after he was subdued by the law enforcement officers, and had he not been allowed to remain in the full-restrained prone position after he was subdued, this occurrence would most probably not have happened.

(Doc. 88-12 at 7).[2]

## II. SUMMARY JUDGMENT STANDARDS

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no

---

[2] These are only portions of the experts' opinions. They have not been subjected to a Daubert analysis and some of the police expert's opinions may or may not be admissible for evidentiary reasons. See, e.g., Specht v. Jensen, 853 F.2d 805 (10th Cir. 1988), A.E. by and through Evans v. Independent School District, 936 F.2d 472, 476 (10th Cir. 1991) and Zuchel v. City and County of Denver, 997 F.2d 730, 740 (10th Cir. 1993).

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Adamson v. Multi Community Diversified Svcs., Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

**III. ANALYSIS**

**A.   1983 Claims**

When law enforcement officers abuse their power, suits against them allow those wronged an effective method of redress. See <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987) (citing <u>Harlowe v. Fitzgerald</u>, 457 U.S. 800, 814 (1982)). Pursuant to 42 U.S.C. section 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 was enacted to provide protections to those persons wronged by the misuse of power. While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed.

See Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995). To state a claim for relief in a section 1983 action, plaintiff must establish that he was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law. See Am. Mfr's. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). There is no dispute that defendants were acting under color of state law.

A municipality cannot be vicariously liable under § 1983. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). To establish liability, plaintiff must point to a policy or custom of defendant's that inflicted injury on Soto. Additionally, defendant may be liable under § 1983 where failure to train amounts to deliberate indifference to Soto's constitutional rights. Id. at 388. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389.

City of Canton specifically states that ". . . there are limited circumstances which an allegation of a 'failure to train' can be the basis for liability under § 1983." Id. at 387. To be successful on a failure to train claim, "[p]laintiff must first prove the training was in fact inadequate, and then satisfy the following requirements: (1) the officers exceeded constitutional limitations ...; (2) the [violation] arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come

into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003).

In Olsen v. Layton Hills Mall, 312 F.3d 1304 (10th Cir. 2002), the court explained:

> Indeed, we have confirmed that this deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1999). Although a single incident generally will not give rise to liability, Okla. City v. Tuttle, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985), "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." Barney, 143 F.3d at 1307 (internal citations omitted). The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 399, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). That is, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" City of Canton, 489 U.S. at 391, 109 S. Ct. 1197. With regard to any attempted showing of "deliberate indifference" by a municipality, the existence of "material issues of material fact preclude[s] summary judgment." Cruz v. City of Laramie, 239 F.3d 1183, 1191 (10th Cir. 2001).

Id. at 1318.

### B. Hog-tie Restraint

#### Inadequate Training

First, plaintiff must show that defendant inadequately trained its officers on hog-tying. Supervisor Mulanax, who oversees the field training and is involved in policy development for defendant, testified that he was aware of Tenth Circuit case Cruz v. City of Laramie, Wyo., 239 F.3d 1183 (10th Cir. 2001). However, he had not

-7-

taught his officers about hog-tying prior to the incident with Soto. The first day that Supervisor Mulanax told his officers to not use a hog-tie restraint was December 9, 2008, the day of his deposition. (Doc. 88-13 at 30).

Sgt. Antrim testified that he was cautioned on using the hog-tie restraint, but it was okay in certain circumstances, for example, when the person is kicking or combative. (Doc. 88-13 at 3). Defendant's officers had discretion as to when it is appropriate to use the hog-tie restraint. The court finds that there is sufficient evidence to show that a material question of fact exists as to whether defendant's training on the use of a hog-tie restraint was inadequate. Even though Supervisor Mulanax was aware of Cruz, he did not instruct his officers as to when, if ever, the use of a hog-tie restraint is appropriate in accordance with Cruz.

### Constitutional Violation

Plaintiff cites Cruz in support of her position that defendant's officers exceeded constitutional limitations when they restrained Soto. The hog-tie restraint at issue in Cruz involved "the tying of the decedent's arms behind his back, binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground." 239 F.3d at 1188. The Tenth Circuit distinguished between a hog-tie restraint and a hobble restraint, noting that a distance of one foot or less between a person's hands and legs is considered a hog-tie restraint whereas a distance of two or more feet is considered a hobble restraint. The Tenth Circuit held that police officers shall not use a hog-tie restraint "when an individual's diminished capacity is apparent."

> This diminished capacity might result from severe
> intoxication, the influence of controlled substances, a
> discernible mental condition, or any other condition,
> apparent to the officers at the time, which would make the
> application of a hog-tie restraint likely to result in any
> significant risk to the individual's health or well-being.
> In such situations, an individual's condition mandates the
> use of less restrictive means for physical restraint.

In Cruz, the Tenth Circuit found that the defendant officers were aware of the decedent's diminished capacity the moment they arrived on the scene and throughout the encounter. Likewise, the officers in this case either were aware of Soto's diminished capacity the moment they saw him and while they tried to restrain him or an issue of material fact exists on this point. Soto was naked and was talking to himself. Soto repeatedly stated that "the sheriff's office had sprayed something in his eyes that were [sic] burning his eyes." (Doc. Exh. E at 46). Sgt. Antrim stated that he initially wanted to help Soto and planned to take Soto for a mental evaluation.

The parties do not dispute that Soto's hands and legs were bound together behind his back using a dog leash or rope as he lay face down. However, the distance between Soto's hands and legs is in dispute. Defendant states that the restraint used on Soto was approximately two feet apart. Plaintiff controverts this fact stating that Soto was hog-tied in the manner described in Cruz.

The court finds that there is a material question of fact regarding the distance between Soto's hands and feet when he was restrained. While Officer Head testified that he believed the distance was around two feet, he was unsure and said that he did not have a way to measure it. (Doc. Exh. G at 37). No officer testified as to an exact distance between Soto's hands and legs. Making all

-9-

reasonable inferences in favor of plaintiff, the court finds that a material question of fact exists as to whether Soto was hog-tied and/or restrained using an unconstitutional technique

### Usual and Recurring

Plaintiff must also show that defendant's use of the hog-tie restraint was usual and a recurring situation with which officers must deal. See Brown v. Gray, 227 F.3d 1278, 1288 (10th Cir. 2000).

> [Plaintiff] must show that the situation [defendant's officers were] faced with on the day of the [incident] was "common" (or at least not "uncommon"), ... "likel[y]," ... "foreseeable," ... or "predictable[.]" The situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront. Other circumstances that constitute usual and recurring situations for police include individuals requiring medical care while in custody, ... arrests of fleeing felons, ... and encounters with armed mentally ill people[.]

Id. (internal citations omitted).

Officer Andrew Scott testified that he was aware of a hog-tie restraint being used on two occasions including the one used on Soto. (Doc. 85, exh. I at 74). Corporal Ratzlaff testified that the officers used dog leashes to restrain a suspect's legs when he or she was kicking. (Doc. 88-13 at 40). Sgt. Antrim testified that he had been cautioned against using the hog-tie, but it was appropriate to use to restrain combative and uncooperative individuals. (Doc. 88-13 at 3).

It was also foreseeable that defendant's officers would encounter a person suffering from intoxication and/or who was combative and uncooperative (but not necessarily by definition, excited delirium). Supervisor Mulanax testified that he had heard of excited delirium a year prior to the incident with Soto and further that he knew some

other police departments were experiencing in-custody deaths as a result of excited delirium.

Based on the above testimony, there is sufficient evidence to support a finding that defendant's use of a hog-tie restraint in arresting a person suffering from intoxication and/or was uncooperative and combative was a usual and recurring situation.

### Deliberate Indifference

A successful showing of deliberate indifference requires plaintiff to show that "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of [defendant] can reasonably be said to have been deliberately indifferent to the need[.]'" Brown, 227 F.3d at 1288 (citing City of Canton, 489 U.S. at 390). The court must look to the risk created by the inadequate training and defendant's awareness of that risk. Id. at 1288-89.

The court finds that a reasonable jury could find that defendant was aware of the risk it created by inadequately training its officers on hog-tying. As noted above, Supervisor Mulunax was aware of both the Cruz case and that other departments were experiencing in-custody deaths as a result of excited delirium. Yet, Supervisor Mulunax did not instruct his officers to not use the hog-tie restraint on individuals suffering from excited delirium. In fact, Supervisor Mulunax failed to inform his officers that the hog-tie restraint was inappropriate when restraining an individual with any type of diminished capacity. Defendant's officers were given the discretion to use the hog-tie restraint when dealing with a combative person. Thus, a reasonable jury could find that defendant was deliberately

-11-

indifferent to people like Soto.

### Direct Causal Link

Plaintiff must also show the existence of a direct causal link between the illegal hog-tie and defendant's inadequate training.

> [M]unicipalities are subject to liability only for their official policies or customs: "[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." (Citations omitted). Therefore, in order for liability to attach in a failure to train case, "the identified deficiency in a city's training program must be closely related to the ultimate injury," City of Canton, 489 U.S. at 391, 109 S.Ct. 1197, so that it "actually caused" the constitutional violation, id.

Brown, 227 F.3d at 1290.

Several of defendant's officers testified that defendant did not have a specific policy regarding hog-tying prior to the incident with Soto. However, defendant's officers had dog leashes in their cars, which were sometimes used to restrain a suspect's legs when he or she was kicking. Sgt. Antrim testified that he had been cautioned against using the hog-tie, but it was appropriate to use to restrain combative and uncooperative individuals. (Doc. 88-13 at 3). Corporal Ratzlaff testified at his deposition that he learned how to restrain a person who was kicking by securing the legs and hands in a hog-tie/hobble restraint in defendant's field training, which was shown to him by Sergeants Antrim and Wade. (Doc. 88-13 at 44).

Based upon Sgt. Antrim and Corporal Ratzlaff's testimony, the court finds that a reasonable jury could find that defendant maintained a custom on using the hog-tie and/or hobble restraint to secure a person who is combative and/or kicking. This custom and training was used directly on Soto to restrain him. Therefore,

-12-

plaintiff has presented sufficient evidence that a reasonable jury could find a direct causal link between the hog-tie and Soto's death.

In sum, plaintiff has presented sufficient evidence that a reasonable jury could find that defendant's failure to train on hog-tying resulted in Soto's death. Defendant's motion for summary judgment on plaintiff's hog-tying claim is denied.

**C.     Summoning Medical Assistance**

In the first version of the pretrial order, plaintiff alleged that:

1. The officers of the Liberal Police Department violated Soto's constitutional due process right under the 14th amendment by being deliberately indifferent to his serious need for immediate medical treatment for excited delirium.
2. The City's training program for police officers was not adequate to train its officers to respond properly to excited delirium;
3. The City was deliberately indifferent to an obvious need to train its officers adequately; and
4. The failure to provide proper training was the proximate cause of the deprivation of the plaintiffs' rights protected by the laws of the United States.

(Doc. 83, filed 12/15/2009).

Thereafter, the parties filed their summary judgment submissions (Docs. 83-85, 88 and 93). When the court reviewed the submissions, it noted that the parties had not cited Wilson v. Meeks, 52 F.3d 1547 (10th Cir. 1995) (remanded to 1995 WL 643834 (D. Kan. Oct. 12, 1995) and aff'd, 93 F.3d 1247 (10th Cir. 1996)   The court requested

additional briefing on the question: "if there is no duty to summon, how can there be a duty to train?" (Doc. 94). The parties' additional briefing raised an additional concern which the court raised in a subsequent letter (Doc. 98). Plaintiff's counsel responded, in part, that he "does not contend that the officers should have done anything at the scene to save Mr. Soto other than to <u>timely</u> summon medical care." (Doc. 96 at 5; emphasis in original.)

An amended pretrial order was filed on July 28, 2010 which modified the claim regarding medical assistance:

1. The officers of the Liberal Police Department violated Soto's constitutional rights under the 4th amendment by failing to recognize excited delirium, which lead to a delay in summoning medical help.
2. The City's training program for police officers was not adequate to train its officers to recognize excited delirium and immediately summon medical assistance upon encountering a person showing signs of excited delirium.
3. The City was deliberately indifferent to an obvious need to train its officers adequately on this issue; and
4. The failure to provide proper training was the proximate cause of the deprivation of the plaintiffs' 4th amendment rights.

(Doc. 99, filed 7/28/2010).

There is no Tenth Circuit case similar to Cruz which explicitly holds that a police officer violates a person's constitutional rights by failing to recognize excited delirium, nor is there any Tenth Circuit case which holds that a police officer commits a

constitutional violation by failing to immediately summon medical assistance for someone suffering from excited delirium. Finally, there is no Tenth Circuit case which holds that a municipality can be "deliberately indifferent" for failing to train its officers to immediately summon medical help for someone who is experiencing excited delirium.

The undisputed facts are that medical assistance <u>was</u> summoned within 9 minutes of Soto being subdued. This may not have been soon enough in the opinion of plaintiff's police expert, but the "delay" does not amount to deliberate indifference by the officers under <u>City of Canton</u> and Tenth Circuit case law. Additional undisputed facts are that even if EMTs are summoned immediately when officers arrive on a scene, the EMTs can do nothing about excited delirium until the person is subdued and under control. So if the paramedics had arrived on the scene while the officers were struggling with Soto, they would have done nothing during the struggle. This was not a normal police situation that Liberal police officers encounter every day. This is the only case of excited delirium the Seward County paramedic/shift supervisor had ever seen (Doc. 85, undisputed facts 40, 41, 46, 47 and Doc. 88 at 3).

Taking plaintiff's facts at face value that defendant's training officer had "heard of" excited delirium a year before the Soto arrest and was aware that "some police departments" had experienced deaths in excited delirium situations, the facts, including all reasonable inferences, do not create a dispute regarding whether the absence of a training program regarding excited delirium was "substantially certain" to result in an unconstitutional violation and that the city

-15-

"consciously and deliberately [chose] to disregard the risk of harm." There is no evidence that city policymakers made a ". . . deliberate choice to follow a course of action . . . from among various alternatives . . ." not to train officers regarding excited delirium. City of Canton v. Harris, id. at 389. The most which can be taken from plaintiff's police expert's opinion is that "members" of the police department failed to follow guidelines. Such an opinion would incorrectly allow the city's liability to be based on respondeat superior and, in any event, does not create a jury question regarding whether the lack of training constitutes deliberate indifference.

**IV. CONCLUSION**

Defendant's motion for summary judgment (Doc. 84) is denied, in part, and granted, in part, for the reasons stated herein. The clerk will set this case for a status conference and for trial.

IT IS SO ORDERED.

Dated this ___9th___ day of November 2010, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE